IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 1:18-CV-637-RP |
| Plaintiffs, | § § | |
| v. | § § | **Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction** |
| GURBIR GREWAL, in his official capacity as New Jersey Attorney General; MICHAEL FEUER, in his official capacity as Los Angeles City Attorney; ANDREW CUOMO, in his official capacity as New York Governor; MATTHEW DENN, in his official capacity as Attorney General of the State of Delaware; JOSH SHAPIRO, in his official capacity as Attorney General of Pennsylvania; and THOMAS WOLF, in his official capacity as Pennsylvania Governor, | § § § § § § § § § § § § | |
| Defendants. | § § | |

Plaintiffs Defense Distributed and Second Amendment Foundation, Inc. file this emergency motion for a temporary restraining order and preliminary injunction against Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General.

## SUMMARY OF THE ARGUMENT

Yesterday, the State of New Jersey enacted Senate Bill 2465. Section 3(*l*)(2) of that law creates an unconstitutional speech crime. The new speech crime is content-based and sweeping.

Section 3(*l*)(2) criminalizes the expression of "instructions" about how to "produce a firearm" with a "three-dimensional printer." Specifically, New Jersey made it a crime to "distribute" those "instructions" "by any means, including the Internet, to a person in New Jersey" (except for manufacturers and wholesalers). But "distribute" does not just carry its ordinary meaning. "Distribute" is defined as "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute." Backed by a penalty of imprisonment, New Jersey has banned this information from the field of public discourse altogether. Section 3(*l*)(2) blatantly violates the First Amendment, Commerce Clause, and Supremacy Clause.

Plaintiffs are this new speech crime's targets. Several months ago, they brought this action against New Jersey (and other states) to stop an existing censorship effort that was already extraordinary. At that point, New Jersey had demanded that the Plaintiffs cease engaging in the speech at issue. But their demands could *not* allege that the speech at issue violated any statute because, at that point, no state had dared to enact such a law. Now New Jersey has done just that, declaring that their new law is intended "to stop the next Cody Wilson" and Defense Distributed "supporters" who are "still trying to release these codes online." Ex. B at 11-15.

To preserve the status quo and prevent irreparable harm, the Court should (1) issue a temporary restraining order against the enforcement of Section 3(*l*)(2); (2) set an expedited preliminary injunction briefing schedule; and (3) hold a hearing as soon as possible. Otherwise, the Plaintiffs' current and ongoing activities may give rise to a criminal prosecution under a facially-unconstitutional law, causing precisely the kind of chilling effect that Section 1983 injunctions are designed to stop.

## STATEMENT OF THE CASE

### I.   Procedural Posture

Plaintiffs' First Amended Complaint sets forth this case's basic facts.  Dkt. 23.  Essentially, this case picks up where things left off in *Defense Distributed, et al. v. United States Department of State, et al.*, No 1:15-CV-372-RP (W.D. Tex.) ("*Defense Distributed I*").

This action's plaintiffs are Defense Distributed and the Second Amendment Foundation. Defense Distributed promotes the Second Amendment's individual right to keep and bear Arms by publishing information about firearms to the general public, including the Second Amendment Foundation's members.   In particular, Defense Distributed is committed to legally publishing information about firearms to the public domain on the internet by hosting computer files on its website and making them available for visitors to download.  *See* Dkt. 23 at 4, ¶¶ 9-13.

### A.   *Defense Distributed I* resolved the federal censorship controversy.

*Defense Distributed I* was about *federal* censorship of the Plaintiffs—whether an export control regime run by the State Department could stop Defense Distributed from publishing an array of computer files about firearms now known as the "*Defense Distributed I* Files."  *See* Dkt. 23 at 6-9, ¶¶ 27-39.  Plaintiffs and the State Department settled that controversy by entering into a Settlement Agreement that, among other things, gave the Plaintiffs a license—a vested federal right—to publish the "*Defense Distributed I* Files" freely.  *See* Dkt. 23 at 9-12, ¶¶ 40-52.

In accordance with the Settlement Agreement and federal license, from the evening of July 27, 2018, until the afternoon of July 31, 2018, Defense Distributed published many of the *Defense Distributed I* Files to the internet's public domain via a Defense Distributed website.  The files were downloaded thousands of times and independently republished across the internet.  To this day, other publishers continue to publish the *Defense Distributed I* Files and files like them to websites that can be located by a simple Google search.  *See* Dkt. 23 at 12, ¶¶ 53-55.

**B.      New Jersey is censoring Defense Distributed directly under color of state law.**

New Jersey is engaged in a deliberate campaign to stop Defense Distributed's publication of the *Defense Distributed I* Files.  In addition to its efforts to unsettle the *Defense Distributed I* resolution indirectly, New Jersey has decided to attack Defense Distributed directly.  Led by Attorney General Gurbir Grewal, New Jersey's top priority now is to censor the Plaintiffs directly under the color of state law.  *See* Dkt. 23 at 16-18, ¶¶ 75-87.

To begin the direct censorship effort, New Jersey Attorney General Gurbir Grewal issued Defense Distributed a formal cease-and-desist letter on July 26, 2018.  Dkt. 23-5.  The letter commanded Defense Distributed to cease publishing the *Defense Distributed I* Files by alleging that publication violated New Jersey tort law.  The letter threatened to punish Defense Distributed for publishing the files online.  *See* Dkt. 23 at 16-18, ¶¶ 75-87.

After the Plaintiffs began the instant action in this Court, New Jersey sued Defense Distributed.  That case is pending before a New Jersey federal court and attempts to use tort law as a means of enjoining Defense Distributed's publication efforts.  *See* Dkt. 23 at 17, ¶ 81.

On July 30, 2018, Attorney General Grewal sent letters to Defense Distributed's website service providers, encouraging them to terminate their service contracts with Defense Distributed. *See* Dkt. 23 at 17-18, ¶¶ 81-87.

On August 27, 2018, New Jersey and its political allies obtained from the United States District Court for the Western District of Washington a favorable preliminary injunction against the State Department on their APA claims.  *See* Dkt. 23 at 13-14, ¶¶ 59-63.  But that did *not* slow New Jersey's plan of direct action against Defense Distributed.

New Jersey issued Defense Distributed another cease-and-desist letter on August 30, 2018. This one pertained not to the *Defense Distributed I* Files themselves, but to a YouTube video that had merely spoken *about* the *Defense Distributed I* Files.  *See* Exs. C-D.

## II.    New Jersey Enacted Senate Bill 2465 to censor the Plaintiffs.

Yesterday, New Jersey completed the process of enacting a sweeping new criminal statute: Senate Bill 2465.  The new law creates a new speech crime for purpose of stopping Defense Distributed's publication of the *Defense Distributed I* Files.  To say this—that a state enacted a criminal law for the purpose of silencing one specific entity's speech—is, indeed, a shocking proposition.  And it is true.  Proof lies in the words of the New Jersey Governor that signed the bill and the Attorney General charged with enforcing it.  They are not hiding from the fact that New Jersey created a speech crime for Defense Distributed in particular.  They are embracing it.

New Jersey's Governor signed Senate Bill 2465 at a public ceremony with Attorney General Gurbir Grewal and the bill's leading legislative sponsor, Senator Joseph Cryan.  A video recording is available,[1] and has been transcribed, Ex. B.  The official statements delivered in conjunction with Senate Bill 2465's enactment prove that this law is an integral part of the censorship effort against the Plaintiffs that began in June.  This is not a matter of inference.  The Governor and Attorney General both said so expressly and repeatedly, in no uncertain terms.

---

[1] The Governor's version of the video is at https://www.youtube.com/watch?v=lJiQ6iFH5x4 and another copy of the same video is available at https://files.beckredden.com/dl/YgZq87eZgG.

**A.    Senate Bill 2465 "backs up" the cease-and-desist letter New Jersey sent to Defense Distributed.**

First, the Governor expressly linked Senate Bill 2465 to the censorship efforts at issue in

this lawsuit.  He called Senate Bill 2465 part of the very same "fight" as the cease-and-desist letters

that the Attorney General sent to Plaintiffs earlier this year:

> The Attorney General has been a national leader in this fight.  Last June he issued ***a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them***.  He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm.  ***This law that we're going to sign today further backs up his efforts***, and I thank him for all that he has done.  Thank you, Gurbir.

Ex. B at 7-8 (video time 6:13-6:48) (emphasis added).[2]

Then the Governor framed Senate Bill 2465 as an effort to change not just what people *do*,

but what they *say* and *think*.  New Jersey passed this law in an effort to "change the *conversation*"

so that a "small fringe of extremists" cannot "instill their guns-in-every-corner *beliefs* here in New

Jersey."  Ex. B at 10-11 (video time 10:23-10:35) (emphasis added).

**B.    Senate Bill 2465 fixes "loopholes" "a Texan named Cody Wilson" and "his supporters" are taking advantage of.**

Next came Attorney General Grewal, who admitted that preexisting New Jersey law

contained "loopholes" that could be utilized by Defense Distributed and its founder, Cody Wilson.

Ex. B at 11-13 (video time 12:00-13:24).  Defense Distributed and its supporters "are not

relenting," he lamented.  *Id.*  And so, because Defense Distributed is "still trying to release these

---

[2] The Governor also deemed it worthwhile to tout the Attorney General's campaign of "naming and shaming" Plaintiff and companies like them that engage in constitutionally protected activity: "The Attorney General has taken the unprecedented step of *naming and shaming the sources* of crime guns that flow into New Jersey from states with lax laws."  Ex. B at 9 (video time 8:18-8:33) (emphasis added).  The complaint has a different label for that: illegal tortious interference.  *See* Dkt. 23 at 17, ¶ 84.

codes online," the Attorney General said he needs "stronger tools to stop them." *Id.* The "stronger

tool" that New Jersey needed — and has now received — is Senate Bill 2465:

> "[T]oday, we're . . . closing dangerous loopholes in our existing laws – loopholes
> that some companies and individuals have tried to exploit. This summer, for
> example, ***a Texan named Cody Wilson*** promised to publicly release computer files
> that would let anyone, even terrorists, felons, and domestic abusers, create firearms
> using a 3D printer. . . . And so back in July, ***we successfully challenged Cody***
> ***Wilson in court***. We obtained legal orders that temporarily halted the release of
> these codes. But ***his supporters are not relenting, they're still trying to release***
> ***these codes online.*** And so it's clear that we need stronger tools to stop them . . .
> tools like the legislation crafted by Senator Cryan and that Governor Murphy is
> signing today.

Ex. B at 11-13 (video time 12:00-13:24) (emphasis added). Attorney General Grewal's specific

invocation of Defense Distributed founder Cody Wilson was no mistake. It was intentional.

Later in the statement about why Senate Bill 2465 exists, New Jersey's Attorney General

said that the law was enacted "to stop the next Cody Wilson  - to fight the ghost gun industry":

> [E]arlier this year, we went after some of the biggest players in this industry. We
> told them that they were wrong on the law. We told them that they were, in fact,
> breaking the law here in New Jersey by selling those weapons here. And we told
> them to stop. And some of them complied. But others did not, and so those
> investigations are ongoing at this time.
>
> But in both of those cases, ***bad actors were trying to take advantage of loopholes***
> ***because no law squarely addressed printable guns or ghost guns***. So we had to
> rely on other laws, like our public nuisance law or our assault weapons law, to fight
> back. Now don't get me wrong: Those laws are important and they're great tools,
> and they helped us stop the spread of these dangerous, untraceable weapons. But a
> law right on point strengthens law enforcement's hand even more.
>
> And so today, there is no question that printable guns and ghost guns are deadly,
> and selling them in New Jersey is illegal. And that's why I'm so proud to support
> Governor Murphy's efforts and the legislature's efforts to close those loopholes, ***to***
> ***stop the next Cody Wilson, to fight the ghost gun industry,*** and to regulate the next
> dangerous gun models before they spread into our communities.

Ex. B at 13-15 (video time 14:20-15:45) (emphasis added).[3]

To end his statement, Attorney General Grewal supplied unequivocal threats.   He announced that New Jersey intends to "come after" "anyone who is contemplating making a printable gun" and to "come after" "the next ghost gun company.   Ex. B at 15 (video time 15:44-16:12).   Even if someone finds another "loophole," New Jersey is "committed to stopping" Defense Distributed and anyone else that wants to publish files like the *Defense Distributed I* Files:

> And here's my message today ***to anyone who is contemplating making a printable gun or to the next ghost gun company*** trying to sell their dangerous weapons into New Jersey: Your products are unlawful and if your break our laws ***we will come after you***. And to anyone else who thinks of trying to find other loopholes in our laws, especially to sell dangerous firearms, we're just as committed to ***stopping each of you***.

Ex. B at 15 (video time 15:44-16:12) (emphasis added).

### C.   Section 3(*l*)(2) creates a sweeping speech crime.

At the end of that press conference, New Jersey's Governor signed Senate Bill 2465 into law.  S. 2465, 218th Leg., Reg. Sess. (N.J. 2018) (as signed by Gov. Philip Murphy, Nov. 8, 2018) (hereinafter "SB 2465").  The most recent official printing is attached as Exhibit A.    Section 4 gives the law immediate effect: "This act shall take effect immediately."  SB 2465 § 4.

Section 3(*l*)(2) is the provision criminalizing speech.  Neighboring provisions criminalize acts, such as Section 2(m) (criminalizing the possession of certain firearms), Section 3(k) (criminalizing the purchase of certain firearm parts), and Section 3(*l*)(1) (criminalizing certain 3D printer uses).  But the Section 3(*l*)(2) provision criminalizing speech is freestanding.  Its operation

---

[3] Similarly, the Senator that sponsored the bill did so because "what Cody Wilson wants for New Jersey and this country is just stunning to me."  Ex. B at 20 (video time 21:38-21:44).

does not depend on the provisions criminalizing acts.  Speech and speech alone is the Section 3(*l*)(2) crime's sole ingredient:

> *l.* Manufacturing or facilitating the manufacture of a firearm using a three-dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

SB 2465 § 3(*l*)(2).  A conviction entails imprisonment for three to ten years, *see* N.J. Stat. 2C:43-6(a)(3); N.J. Stat. 2C:43-7(a)(4), and a fine of up to $15,000, *see* N.J. Stat. 2C:43-3(b)(1).

## ARGUMENT

### I.    Plaintiffs move to enjoin enforcement of Senate Bill 2465 Section 3(*l*)(2).

Plaintiffs move for a temporary restraining order and preliminary injunction.  Specifically, the Court should enjoin Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General (hereinafter "New Jersey"), from enforcing Section 3(*l*)(2) of Senate Bill 2465.

Expedited preliminary injunction proceedings can and should occur here because the case is already on solid procedural footing.  New Jersey has waived service of process, Dkt. 22, is represented by counsel of record with offices in Austin, Dkt. 43, and has taken part in typical

pretrial litigation, *e.g.*, Dkt. 46 (extending response deadlines).  New Jersey's attorneys have also received notice of this filing via both the Court's electronic CM/ECF filing system and via e-mail.[4]

To ensure that a TRO lasts no longer than is necessary, Plaintiffs are ready to comply with whatever preliminary injunction briefing and hearing schedule the Court deems most efficient. Meanwhile, Section 3(*l*)(2)'s enforcement should be temporarily restrained because it is a blatantly unconstitutional law that chills the exercise of First Amendment rights.

Temporary restraining orders and preliminary injunctions both require the movant to show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury absent immediate relief, (3) a favorable balancing of equities, and (4) that the TRO or injunction will not disserve the public interest.  *E.g.*, *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).  All of those requirements are met here.

### A.   Plaintiffs' First Amendment Claim is meritorious.

Plaintiffs' complaint pleads that New Jersey has and is threatening to violate 42 U.S.C. § 1983 by acting, under color of state law, to subject the Plaintiffs to an unconstitutional abridgement of First Amendment freedoms.  Dkt. 26 at 23-24, ¶¶ 120-130.  With respect to yesterday's enactment of Section 3(*l*)(2), Plaintiffs are likely to succeed on the merits of this claim for at least three independent reasons.

---

[4] Hence, the rules regarding the issuance of TROs without notice do not apply.  *See* Fed. R. Civ. P. 65(b); *see also* 11A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2949 & nn. 10 (3d ed. West 2018) ("[W]hen the urgency that is characteristic of the preliminary-injunction context warrants, the court has discretion under Rule 6(c)(1)(C) to modify the period for giving advance notice").

**1.      Content-based discrimination makes Section 3(*l*)(2) unconstitutional.**

First and most obviously,  Plaintiffs are likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) is a content-based speech[5] restriction that does not satisfy strict scrutiny.  Content-based speech restrictions are "a repressive force in the lives and thoughts of a free people."  *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  "To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid and that the Government bear the burden of showing their constitutionality."  *Id.*

New Jersey's law obviously imposes content-based speech restrictions, in that its penalties apply only to speech with this content: "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  SB 2465 § 3(*l*)(2).  Hence, Section 3(*l*)(2)  is presumptively invalid and acceptable only if the New Jersey can satisfy strict scrutiny.  *See, e.g.*, *Ashcroft* , 542 U.S. at 660; *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015).

---

[5] Importantly, the Supreme Court has held that "the creation and dissemination of information" qualifies as speech meriting protection.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (holding that regulating the dissemination of a physician's prescription practices was subject to heightened scrutiny on this basis).  Indeed, as the Supreme Court has explained, "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."  *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); *see also Sorrell*, 564 U.S. at 570 ("Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs.").  Thus, the First Amendment protects instructions on how to engage in dangerous activities like "autoerotic asphyxiation."  *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1019–20 (5th Cir. 1987).  And both the Second and Sixth Circuits have rightly extended First Amendment protection to computer source code because it "is an expressive means for the exchange of information and ideas about computer programming."  *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) (holding that computer code was speech because they "will often convey information capable of comprehension and assessment by a human being").

An obvious less-restrictive alternative to Section 3(*l*)(2) exists: criminalization of the actual acts at issue without the unneeded speech crime.  Indeed, "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person *who engages in it*." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) (emphasis added).  But New Jersey cannot satisfy that requirement here, particularly in light of the rule that "the Government must present more than anecdote and supposition."  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 822 (2000).  The Plaintiffs are likely to prevail on this claim.

### 2.      Overbreadth makes Section 3(*l*)(2) unconstitutional.

Second, Plaintiffs are likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) is unconstitutionally overbroad.  The "overbreadth doctrine permits a litigant to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011).  To establish overbreadth, a plaintiff must show that the statute "encompasses a substantial number of unconstitutional applications judged in relation to the statute's plainly legitimate sweep."  *Seals v. McBee*, 898 F.3d 587, 593 (5th Cir. 2018); *accord Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002).  Here, Section 3(*l*)(2)'s unconstitutional applications far outrun any others.

One key source of Section 3(*l*)(2)'s overbreadth is the "distribute" definition: "'distribute' means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, *advertise, offer*, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."  SB 2465 § 3(*l*)(2) (emphasis added).  In this way, the statute covers not just *actual*

distribution of the "instructions" at issue, but also an "advertise[ment]" of instructions or an "offer" of instructions.  But of course, if no actual delivery of the instructions occurs, none of the state interests that could possibly justify the statute come into play.

Similarly, Section 3(*l*)(2) is overbroad because it covers any "agreement or attempt to distribute."  States like New Jersey have no compelling interest in criminalizing an "agreement or attempt to distribute" instructions if the distribution never comes to fruition.

Another source of Section 3(*l*)(2)'s overbreadth is the phrase "*may be* used to . . . manufacture or produce a firearm."  SB 2465 § 3(*l*)(2) (emphasis added).  This sweeps in far too much conduct by criminalizing not just instructions that actually play a role in firearm production, but also those that never do anything at all—remaining latent for whatever reason.

Yet another source of Section 3(*l*)(2)'s overbreadth is its lack of limitations regarding recipient identity.  Whereas Attorney General Grewal articulated a fear that instructions might fall into the hands of "terrorists, felons, and domestic abusers," Ex. B at 11-13 (video time 12:00-13:24), the statute makes no effort whatsoever to limit its application accordingly.  It applies with equal force to both persons who use instructions for illegal purposes and those who use instructions to perform perfectly legal activities.  *Cf. Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969).

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), is one of the many precedents supporting the conclusion that Section 3(*l*)(2) is overbroad.  For the same reason that states cannot suppress speech that "appears to"—but does not in fact—entail activities harming minors, *id.*, states also cannot suppress speech that appears to—but does not in fact—entail activities that violate state firearms laws.  If virtual pornography is not bannable, neither is virtual weaponry.  In other words, this is another case in which the First Amendment draws "vital distinctions between words and deeds, between ideas and conduct." *Id.* at 253.

Section 3(*l*)(2)'s overbreadth problem also stems from its failure to distinguish information that has *not* yet been committed to the public domain from information that has.  Where, as here, information like the *Defense Distributed* Files is already freely circulating online for public consumption, the applicable rule is that "the Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a "state interest of the highest order."  *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  But since this statute makes no distinction between truly novel "instructions" and those that everyone can already obtain with simple Google searches, its coverage of the latter makes it overbroad.

Together, the litany of ways in which the statute is overbroad establishes that it "encompasses a substantial number of unconstitutional applications judged in relation to the statute's plainly legitimate sweep."  *Seals*, 898 F.3d at 593.  As such, the overbreadth doctrine invalidates the statute in its entirety.

### 3.     A missing scienter element makes Section 3(*l*)(2) unconstitutional.

Third, Plaintiffs are likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) lacks a proper scienter element.  States cannot impose criminal liability on distributors of expressive materials without requiring proof of scienter—that is, knowledge of the fact that truly distinguishes the innocent version of an act from the guilty one.  *See, e.g.*, *New York v. Ferber*, 458 U.S. 747 (1982); *Smith v. California*, 361 U.S. 147, 153-54 (1960).

Section 3(*l*)(2) fails this test because it lacks the necessary scienter requirement.  It does not require the speaker to know that the instructions will, indeed, "be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone what a truly sufficient statute would need to require: knowledge that the information's recipient would use the information to engage in *illegal* production of a

firearm.  Without this requirement, the statute cannot pass constitutional muster. This limitation is necessary because of the "quite legitimate, if not compelling, concern of those who"—like Defense Distributed—"publish, broadcast, or distribute to large, undifferentiated audiences, that the exposure to suit under lesser standards would be intolerable."  *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997).[6]

       **B.**      **Plaintiffs' Commerce Clause Claim is meritorious.**

       Apart from the First Amendment claims, Plaintiffs' complaint pleads that New Jersey has and is threatening to violate 42 U.S.C. § 1983 by subjecting the Plaintiffs to an unconstitutional deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.  Dkt. 26 at 28-29, ¶¶ 157-166.  With respect to yesterday's enactment of Section 3(*l*)(2), Plaintiffs are likely to succeed on the merits of the dormant Commerce Clause claim.

       The United States Constitution's Commerce Clause does more than just give Congress the positive power to "regulate Commerce . . . among the several States."  U.S. Const., Art. I, § 8, cl. 3.  It also imposes "a further, negative command, known as the dormant Commerce Clause." *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015) (quoting *Ok. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).  The negative command works as "a self executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."  *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

---

[6] Even if New Jersey law were to demand that the speaker know certain traits of the expression's recipient, the speaker's need to acquire that information as a means of avoiding criminal liability would constitute an unconstitutional screening requirement.  *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1277 (W.D. Wash. 2012)

Two modes of judicial review occur in dormant Commerce Clause cases.  Apart from the default balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), strict scrutiny applies to any law that discriminates against out-of-state economic interests on its face, in its purpose, or in its practical effect.  *E.g.*, *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013). In such cases, the law is unconstitutional unless the State establishes that it is the least restrictive means of achieving a compelling interest.  *E.g.*, *id.*

Strict scrutiny applies here because the dormant Commerce Clause does not allow a state to "regulate conduct that takes place exclusively outside the state," *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *11 (D.N.J. Aug. 20, 2013), but that is precisely what Section 3(*l*)(2) does in vast majority of its applications.  Despite the fact that speakers like Defense Distributed operate their websites in a passive fashion from outside of New Jersey, Section 3(*l*)(2) projects New Jersey's law about what can and cannot be said on the internet into all other states.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997). Passively hosting a file on an internet server in Texas, that may be accessible by a New Jersey resident, could now give rise to criminal liability.  Because this consequence is not just the statute's incidental effect—it is direct and substantial—Section 3(*l*)(2) triggers strict scrutiny and is unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer, Inst.*, 491 U.S. 324, 336 (1989); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).

**C.     Plaintiffs' Preemption Claim is Meritorious.**

The complaint pleads that New Jersey is violating 42 U.S.C. § 1983 by acting, under color of state law, to censor speech with state laws that Congressional enactments preempt.  Dkt. 23 at 30-31.  Plaintiffs seek a declaration to this effect and an injunction stopping such enforcement efforts against Plaintiffs. *Id.* at 32-34.  Plaintiffs are likely to succeed on the merits of this claim.

**1.     CDA Section 230 preempts Section 3(*l*)(2).**

New Jersey should be enjoined from enforcing Section 3(*l*)(2) because it is preempted by Section 230 of the Communications Decency Act of 1996.  "The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006)).  Several specific CDA subsections are at issue.

CDA Section 230(c)(1) is the first provision at issue.  For interactive computer services such as a website, it governs who the law can treat as information's "publisher or speaker": "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  § 230(f)(3).

CDA Section 230(e)(3) is the other key provision at issue.  It expressly preempts state laws that are inconsistent with subsection (c)(1): "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may

be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(c)(2).

New Jersey's law contradicts CDA Section 230 by making it a crime to "distribute" the "information" at issue regardless of whether or not it was "provided by another information content provider."  The key term is "distribute."  Section 3(*l*)(2) makes it a crime to "distribute" the information at issue *without regard for the information's source*.  No matter who truly provided the information, New Jersey made it a crime to "distribute" "instructions" on the internet.

Because of this conflict, Section 3(*l*)(2) is plainly "inconsistent with" CDA Section 230(c)(1) and preempted.  This infirmity makes Section 3(*l*)(2) invalid facially, for "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause."  *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011).

This conclusion is not novel.  Courts encounter similar laws regularly and have produced a consistent line of precedent holding that CDA Section 230 preempts criminal laws like Section 3(*l*)(2).  *See Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *1 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1271 (W.D. Wash. 2012). Temporary restraining orders and/or preliminary injunctions against the statutes' enforcement were issued in several of these precedents, *e.g.*, *McKenna*, 881 F. Supp. 2d 1262 (issuing preliminary injunction), confirming the remedy's appropriateness here.

## 2.     New Jersey's attempt to override the State Department is preempted.

Additionally, New Jersey's use of Section 3(*l*)(2) to stop Defense Distributed's publication of the *Defense Distributed I* files, in particular, is preempted by the federal government's exclusive authority to administer and enforce pertinent provisions of the Arms Export Control Act of 1976, 22 U.S.C. ch. 39,[7] and the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130; by the federal government's exclusive authority to enter into and fulfill the Settlement Agreement; and by the federal government's exclusive authority to conduct litigation in which the United States, an agency, or officer thereof is a party, or is interested, *see* 28 U.S.C. §§ 516, 519.

On July 27, 2018, the State Department acted in accordance with both the AECA and the President's delegated authority to issue Defense Distributed a license under ITAR Section 125.4(b)(13). Dkt. 23-3.  This license was derived from the Acting Deputy Assistant Secretary of State for Defense Trade Controls.  That same day, the State Department acted in accordance with the AECA and the President's delegated authority to issue a temporary modification under ITAR Section 126.2, authorizing publications and other exports of certain files. Dkt. 23-2.  These actions permit Defense Distributed to publish, export, and otherwise distribute the files at issue here.

---

[7] The Arms Export Control Act ("AECA"), 22 U.S.C. ch. 39, provides that "the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2278(a)(1).  Furthermore, Congress authorized the "President . . . to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." *Id.*  As relevant to this case, through the AECA, Congress authorized the President to grant or deny licenses to export defense articles, which includes technical data. 22 U.S.C. § 2778(g)(6). The AECA also provides that a license to export defense articles "may be revoked, suspended, or amended by the Secretary of State, without prior notice, whenever the Secretary deems such action to be advisable." 22 U.S.C. § 2791(e)(2)(A); *see also* 22 C.F.R. § 126.7(a). On March 8, 2013, President Obama delegated his Constitutional and statutory authority to control the export of defense articles to the Secretary of State.  Pursuant to this delegation, the State Department administers the AECA through the regulatory regime known as the "ITAR"— the International Traffic in Arms Regulations, 22 C.F.R. parts 120-130.

By seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey is effectively seeking to have its legislature take over the President's job of "control[ling] the import and the export of defense articles." § 2778(a)(1). Indeed, General Grewal declared, "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."[8] The Supremacy Clause forbids this usurpation of federal power.

## II.   Plaintiffs will suffer irreparable harm in the absence of immediate relief.

The second issue to address is whether Plaintiffs will likely suffer irreparable harm in the absence of temporary relief. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008). This requirement is easily met because it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In addition, Plaintiffs will suffer irreparable harm by virtue of the extent to which they must halt a broad array of constitutionally protected current and ongoing activities under threat of the new law. These activities include public accessibility of files on the DEFCAD website; participating in trade shows where Plaintiffs are unable to determine the state of residence of attendees that may view their displays and other advertisements; sending advertisements via email lists where Plaintiffs are unable to determine the states of residence of the recipients and have no way of knowing in which states recipients will be when they receive emails; and participation in any national advertising network, radio communication, televised media, and other media that may advertise and promote Plaintiffs' respective missions. These current and ongoing activities may give rise to criminal liability under the New Jersey law.

---

[8] https://nj.gov/oag/newsreleases18/pr20180726c.html

## III.     The balance of equities favors the Plaintiffs.

The next issue to address is whether the balance of equities favors the Plaintiffs.  *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The Plaintiffs  have approached this litigation in a fundamentally fair manner, having both exhausted all possible avenues for relief in *Defense Distributed I* and filed this motion as soon as possible after the passage of New Jersey's statue.  For them, the risk of erroneously denying the injunction entails the "potential for extraordinary harm and a serious chill upon protected speech."  *Ashcroft*, 542 U.S. at 671.

"The harm done from letting [an] injunction stand pending a trial on the merits, in contrast, will not be extensive," especially where, as here, "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands."  *Id.*   Indeed, a TRO would not cause New Jersey any significant hardship because the state's interest in prosecuting the new speech crime will be just as achievable a few short weeks from now as it is at present.  If the state wishes to punitively jail its citizens for speaking about topics New Jersey dislikes, starting that process just a few weeks later than otherwise will not lessen the punishment's punitive brunt.

## IV.     A preliminary injunction will serve the public interest.

The final issue to address is whether injunctive relief would serve the public interest.  *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  This requirement is met because "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)).

## Conclusion

The Court should (1) issue a temporary restraining order against New Jersey's enforcement of Section 3(*l*)(2); (2) set an expedited preliminary injunction briefing schedule; and (3) hold a hearing as soon as possible.

Date: November 9, 2018                    Respectfully submitted,

BECK REDDEN LLP
By /s/ Chad Flores
Chad Flores*
cflores@beckredden.com
State Bar No. 24059759
1221 McKinney St., Suite 4500
Houston, TX 77010
(713) 951-3700 | (713) 952-3720 (fax)

FARHANG & MEDCOFF
Matthew Goldstein*
mgoldstein@fmlaw.law
D.C. Bar No. 975000
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711
(202) 550-0040 | (520) 790-5433 (fax)

Josh Blackman
joshblackman@gmail.com
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, TX 77002
(202) 294-9003 | (713) 646-1766 (fax)

*Admitted *pro hac vice*

Attorneys for Plaintiffs Defense Distributed
and Second Amendment Foundation, Inc.

## CERTIFICATE OF SERVICE

On November 9, 2018, I served this filing on the following persons via CM/ECF:

> Counsel for Defendant Gurbir S. Grewal
> Kenneth W. Taber
> Ronald Casey Low
>
> Counsel for Defendant Michael Feuer
> Connie K. Chan
> James P. Clark
> Michael M. Walsh
> Jason P. Steed
>
> Counsel for Defendants Josh Shapiro and Thomas Wolf
> J. David Cabello
> John D. Kimball
>
> Counsel for Plaintiffs
> Chad Flores
> Matthew A. Goldstein
> Joshua Michael Blackman

On November 9, 2018, I served this filing on the following persons via email:

> Counsel for Defendant Andrew Cuomo
> Michael McCartin
>
> Counsel for Defendant Matthew Denn
> Joseph Handlon

/s/ *Chad Flores*
Chad Flores