# Constitutionality of Proposed Revisions of the Export Administration Regulations

Proposed revisions of the Export Administration Regulations dealing with the export of technical data to foreign nationals apply a prior restraint, in the form of a licensing requirement, to a wide variety of speech protected by the First Amendment. There is thus a considerable likelihood that in their current form the regulations would be invalidated as unconstitutionally overbroad. The regulations would also be vulnerable to constitutional attack on grounds of vagueness. If the regulations were cast not as a licensing scheme but as a form of subsequent punishment, they could cover a far broader range of conduct.

A licensing system is likely to be held constitutional only if it applies narrowly to exports which are likely to produce grave harm under the test set forth in *New York Times Co. v. United States*, 403, U.S. 713 (1971).

July 28, 1981

## MEMORANDUM OPINION FOR THE DIRECTOR, CAPITAL GOODS PRODUCTION MATERIALS DIVISION, DEPARTMENT OF COMMERCE

This will respond to your request for the views of this Office on the constitutional issues raised by your draft revision of Part 379 of the Export Administration Regulations. Those regulations clarify the circumstances in which a license is required for the export of technical data to foreign nationals. We believe that the regulations, as currently drafted, have a number of unconstitutional applications, and that they should therefore be substantially revised in order to meet the constitutional objections. In the discussion below, we offer a general statement of our reasoning, together with some suggestions for possible revision.

### I. Background

The general purpose of the regulations is to require a license before the "export" of "technical data," subject to two exceptions discussed below. Under the regulations, technical data is defined as "information and know-how of any kind that can be used, or adapted for use, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance, or reconstruction of commodities." The term "commodity" encompasses a wide range of articles compiled on the Commodities Control List. Many of the articles fall generally in the broad category of "high technology" items, including,

230

but not limited to, items subject to direct use for military purposes. However, the definition of commodities also embraces items with only indirect military application. An "export" is defined as an actual shipment or transmission of technical data out of the United States; any release of technical data in the United States with knowledge or intent that the data will be shipped or transmitted from the United States to a foreign country; and any release of technical data of United States origin in a foreign country.

Under the regulations, a critical distinction is made between "basic research"—research "directed toward an increase in knowledge"—and "applied research"—research "directed toward the practical application of knowledge." In addition, "development" is defined as the systematic use of knowledge directed toward the design and production of useful prototypes, materials, devices, systems, methods, or processes.

The regulations grant a general license for two broad categories of technical data. The first category provides a general license applicable to all destinations and includes three subcategories, of which the first consists of data "made generally available to the public" through release at conferences that are open to the public in the sense that the general public or a range of qualified participants is eligible to attend. This license appears designed to cover conferences in which the information will not be closely held because of the generally open nature of the proceedings. The second subcategory consists of exports resulting from "basic [scientific] research," but "applied research" is specifically excluded from this license. The third consists of data "released through formalized classroom instruction . . . at commercial, academic, government or private institutions," provided that the instruction does not give access to applied research or development activities.

The second broad category provides a general license to a limited number of countries for two subcategories of technical data. The first consists of data in such forms as manuals or instruction books, provided that they are sent as part of a transaction directly related to commodities licensed for export and that they are not directly related to the production of commodities wholly or in part. The second subcategory includes technical data supporting a bid, lease, or offer to sell.

For all other exports of technical data, a license is required.

## II. Discussion

The Export Administration Regulations represent an effort to serve the legitimate interests of the United States in controlling the dissemination of information to foreign countries, especially when the result of such dissemination may be the development of military equipment. The courts, however, have been almost invariably unwilling to uphold licensing schemes that require government approval before particular information may be disclosed. Such schemes amount to "prior re-

straints," which are presumed invalid and subject to an exceptional burden of justification. *See New York Times Co. v. United States,* 403 U.S. 713 (1971). The courts have never held that the technical and scientific materials involved here—which, to be sure, do not contain political speech—are entitled to less than full protection under the First Amendment. In order to ensure that the regulations at issue here will survive judicial scrutiny under the First Amendment, we believe that it will be necessary to revise them and thus to guarantee that the legitimate interests that they attempt to promote will in fact be served if the regulations are challenged in court.

In a recent memorandum, this Office commented on the constitutional issues raised by a revision of the "technical data" provisions of the International Traffic in Arms Regulations (ITAR). *See* Memorandum Opinion of July 1, 1981, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, for the Office of Munitions Control, Department of State.* In that memorandum, we divided the technical data provisions of the ITAR into three general categories, applying a separate First Amendment analysis to each. The first category included transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology. Following the decision in *United States v. Edler Industries, Inc.,* 579 F.2d 516 (9th Cir. 1978), we concluded that technical data exported during the course of such transactions fell into the same general category as communications made during the course of a criminal conspiracy. The courts treat such communications not as speech protected from prior restraint, but as an integral part of conduct that the government has a right to prevent. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978), and cases cited. We concluded, therefore, that technical data transmitted during the course of such transactions could constitutionally be subjected to a licensing requirement.

The second category consisted of technical data divulged for the purpose of promoting or proposing the sale of technical data or items on the munitions list. We concluded that this form of "commercial speech" would probably not be held subject to the prior restraint doctrine in light of the lower level of protection sometimes accorded to that speech and the substantial government interests at stake. *See Central Hudson Gas & Elec. v. Public Service Comm'n,* 447 U.S. 557 (1980).

The third category consisted of technical data disseminated by an exporter who is unconnected with any foreign enterprise, but who knows or has reason to know that the data may be taken abroad and used there in the manufacture or use of arms. Speech in this category, we concluded, would generally be protected from prior restraint. The

---

* Note: The July 1, 1981, Memorandum Opinion is reprinted in this volume, at p. 206, *supra.* Ed.

Court has made clear that the First Amendment protects the right of Americans to communicate with foreigners, even if the foreigners are citizens of adversaries of the United States. *See Lamont* v. *Postmaster General,* 381 U.S. 301 (1965); *see also Kleindienst* v. *Mandel,* 408 U.S. 753 (1972).[1] The Court has also made clear that a prior restraint can be imposed only in the most compelling circumstances. *See New York Times Co.* v. *United States,* 403 U.S. 713 (1971). In the absence of such circumstances—such as a grave and immediate threat to national security, as where important military information is being communicated to an adversary for current use against the United States—speech falling in this category is protected from prior restraint. *See id.*

We believe that this general framework is the proper one from which to analyze the restrictions at issue here. Applying that framework, it is apparent that the revised regulations apply a prior restraint, in the form of a licensing requirement, to a wide variety of protected speech falling in the third category described in our memorandum on the ITAR. For example, scientists and researchers must obtain a license for exports of technical data resulting from applied research. The results of such research are, however, entitled to full protection under the First Amendment. Similarly, the regulations subject university instruction to a licensing requirement if the instruction includes applied research or development activities. This requirement applies a prior restraint to protected speech and is thus impermissible except in the most compelling circumstances. For example, we do not believe that the courts would uphold a requirement that a professor obtain a license before "releasing" information to foreign students simply because the information may be used in the overhaul of certain kinds of computer chips. The same considerations suggest that an American scientist could not be barred in advance from informing his colleagues, some of whom are foreign nationals, of the results of an experiment that could help produce some other high technology item. Other examples could readily be imagined. In more general terms, the regulations cover a wide variety of speech that is constitutionally protected. We believe that they should therefore be substantially narrowed. Indeed, the range of impermissible applications is sufficiently great, and the number of permissible applications so comparatively small, that there is a considerable likelihood that in their currrent form the regulations would be invalidated as substantially overbroad under *Broaderick* v. *Oklahoma,* 413 U.S. 601 (1973).

We note in addition that the regulations are vulnerable to claims of vagueness in two critical respects. First, the distinction between "applied research" and "basic research" seems to be too thin to support the

---

[1] The Court has apparently not authoritatively determined whether and to what extent Americans have First Amendment rights while travelling abroad. *See Haig* v *Agee,* 453 U.S. 280 (1981) (assuming such rights *arguendo*).

conclusion that "applied research" can in all contexts be subjected to the licensing requirement. Second, the definition of an export as a "release of technical data . . . with knowledge or intent that the data will be . . . transmitted from the United States to a foreign country" is highly ambiguous. In order to be subject to the licensing requirement, must the speaker know with a high degree of certainty that the data will be so transmitted? Or, as we have been told informally, is it sufficient if he knows that foreign nationals are among his audience? If the first interpretation is adopted, the regulations will of course be substantially more narrow.

While we are not at this stage prepared to describe in detail what materials may, consistent with the First Amendment, be covered by the regulations, we would like to conclude with some general observations. First, the legal difficulties in this context arise largely because of the profound constitutional hostility to prior restraints. If the regulations were cast, not as a licensing scheme, but as a form of subsequent punishment, they could cover a far broader range of conduct. Under *Brandenburg* v. *Ohio,* 395 U.S. 444, 447 (1969), the government may punish speech that is both "directed to inciting or producing imminent lawless action" and "likely to . . . produce such action" (footnote omitted). Similar considerations may justify subsequent punishment for the export of technical data in circumstances in which the exporter knows or intends that the result will likely be harmful to the national security interests of the United States. In order to implement such a scheme of subsequent punishment, persons planning to "export" might be given an opportunity, but not required, to seek advice from the Secretary of Commerce as to whether the particular disclosure is prohibited by law.

Second, if a licensing system is to be retained, the constitutional prohibition against prior restraint suggests that it may be applied only to exports that are very likely to produce grave harm. *See New York Times Co.* v. *United States, supra.* Under this rationale it may be permissible to require a license before a person may disclose (with the requisite *scienter*) technical data having direct military applications to an adversary of the United States. Apart from this limited category, we believe that the prior restraint doctrine bars a licensing requirement.

As noted above, these comments are directed to the current version of your regulations. We will be pleased to provide further comments or assistance with respect to any future revisions.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*
