IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, | § § § § | Case No. 1:18-CV-637 |
| *Plaintiffs,* | § § | |
| v. | § § | |
| GURBIR S. GREWAL, in his official capacity as the State of New Jersey's Attorney General; MICHAEL FEUER, in his official capacity as the City of Los Angeles, California's City Attorney; et al., | § § § § § § | |
| *Defendants.* | § | |

## DEFENDANT MICHAEL FEUER'S REQUEST FOR JUDICIAL NOTICE

Defendant Michael Feuer filed a Request for Judicial Notice (Dkt. 28) in support of his initial Motion to Dismiss. That Request is referred to in his subsequent and currently pending Motion to Dismiss First Amended Complaint (Dkt. 50). Later, when the Court found the initial motion moot in light of the amended complaint, it also held that the previous Request for Judicial Notice was moot. (Text order, 11/27/18). This Request for Judicial Notice is identical to the previous request, so all such citations in the Motion to Dismiss First Amended Complaint can be directly substituted for citations to this Request.

Pursuant to Federal Rule of Evidence 201, Defendant Michael Feuer in his official capacity as Los Angeles City Attorney, by and through his attorney, hereby requests that the

Court take judicial notice of the following facts in support of his Motion to Dismiss First Amended Complaint:

1. In the matter of *State of Washington, et al., v. U.S. Dept. of State, et al*., Case No. C18-1115RSL, the U.S. District Court for the Western District of Washington issued a Preliminary Injunction on August 27, 2018, which extended the restrictions of a July 31, 2018 temporary restraining order enjoining the United State Department of State and other related defendants from "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued until further order of the Court." As true and current copy of this Preliminary Injunction is attached as Exhibit 1.

2. In the matter of *Defense Distributed, et al., v. U.S. Dept. of State, et al*., Case No, 1:15-CV-372-RP, the U.S. District Court for the Western District of Texas entered an Order on July 27, 2018 which denied the Movant's Joint Emergency Motion to Intervene. A true and current copy of that Order is attached hereto as Exhibit 2.

3. In the matter of *Defense Distributed, et al., v. U.S. Dept. of State, et al*., Case No, 1:15-CV-372-RP, the U.S. District Court for the Western District of Texas ordered the dismissal with prejudice of that matter on July 30, 2018, pursuant to the stipulation of the parties. A true and correct copy of that Order is attached hereto as Exhibit 3.

Each of these facts is based on a formal action taken by a U.S. District Court as a matter of record, and is therefore subject to judicial notice under Federal Rule of Evidence 201(b).

Defendant Michael Feuer respectfully requests that the Court take judicial notice of these facts and their supporting documents.

Dated this 14th day of December, 2018          Respectfully Submitted,


_James P. Clark_
California Bar No. 64780
Los Angeles City Attorney's Office
200 North Main Street, 8th Floor
Los Angeles, CA 90012
Tel: (213) 978-8100
james.p.clark@lacity.org

_Connie K. Chan_
California Bar No. 284230
Los Angeles City Attorney's Office
200 North Spring Street, 14th Floor
Los Angeles, CA 90012
Tel: (213) 978-1864
connie.chan@lacity.org

_Michael M. Walsh_
California Bar No. 150865
Los Angeles City Attorney's Office
200 North Main Street, 8th Floor
Los Angeles, CA 90012
Tel: (213) 978-2209 / Fax: (213) 978-0763
michael.walsh@lacity.org

_Jason P. Steed_
Texas State Bar No. 24070671
KILPATRICK TOWNSEND &
    STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Tel: (214) 922-7112; Fax: (214) 853-5731
jsteed@kilpatricktownsend.com

_COUNSEL OF RECORD_

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

                Defendants.

NO. C18-1115RSL

PRELIMINARY INJUNCTION

This matter comes before the Court on the "Plaintiff States' Motion for Preliminary Injunction." Dkt. # 43. A temporary restraining order was entered on July 31, 2018, enjoining the federal defendants[1] from implementing or enforcing a "Temporary Modification of Category I of the United States Munitions List" and a July 27, 2018, letter issued by the U.S. Department of State to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation. The order also required the federal defendants to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. Pursuant to the limitations set forth in Fed. R. Civ. P. 65, the matter was set for hearing on August 10, 2018, but the restraining order was extended by agreement of the parties to August 28, 2018, to accommodate an August

---

[1] The federal defendants are the United States Department of State, Michael R. Pompeo, the Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema.

PRELIMINARY INJUNCTION - 1

21, 2018, hearing date.

Having considered the memoranda, declarations, and exhibits submitted by the parties, as well as the amicus curiae submissions of the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Electronic Frontier Foundation,[2] and having heard the arguments of counsel, the Court finds as follows:

## PRELIMINARY INJUNCTION STANDARD

The standard for issuing a preliminary injunction is identical to the standard the Court used when granting the temporary restraining order in this case. Thus, for purposes of the current motion, the Court considers the more developed record to determine whether plaintiffs (1) are likely to succeed on the merits of their APA claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). In the alternative, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).[3]

---

[2] The requests for leave to file amicus curiae briefs (Dkt. # 46, # 47, and # 58) are GRANTED.

[3] The Court finds that the injunction plaintiffs seek is prohibitory in nature, rather than mandatory. A prohibitory injunction maintains the status quo, which is generally described as the last, uncontested status which preceded the present controversy. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). In this case, the status quo existed before the federal defendants issued

## BACKGROUND AND PROCEDURAL HISTORY

Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of computer aided design ("CAD") data files that would allow the creation of guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

---

the temporary modification and letter on July 27, 2018.

PRELIMINARY INJUNCTION - 3

system of prior restraints that was applied in an arbitrary manner in violation of Defense Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed wanted to publish on the internet were technical data subject to the ITAR.

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-

PRELIMINARY INJUNCTION - 4

Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The Honorable Robert L. Pitman denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or

terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex). Later that month, the parties reached a tentative settlement agreement. Pursuant to the settlement, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On May 24, 2018, the federal defendants published the promised rulemaking notice, with the public comment period ending on July 9, 2018. 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed.

Reg. 24,166 (May 24, 2018). The settlement agreement was signed on June 29, 2018, in the midst of the public comment period, but not made public until July 10, 2018. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the United States Constitution.[4] After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the temporary modification resulted in the removal of one or more items from the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018, and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor.

## DISCUSSION

Plaintiffs' request for a preliminary injunction is centered on its claim that the federal defendants violated the APA. The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a

---

[4] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

PRELIMINARY INJUNCTION - 7

temporary modification were procedurally defective in that the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1) and failed to obtain the concurrence of the Secretary of Defense as required by the President when he delegated his removal authority to the Secretary of State in Executive Order 13637, § 1(n)(i).[5] Plaintiffs also argue that, to the extent the temporary modification permits "any United States person" to use the CAD files at issue, the federal government's action impermissibly conflicts with state and federal laws limiting access to guns. Finally, plaintiffs challenge the decision to allow the CAD files to be published on the internet as arbitrary and capricious because the State Department failed to articulate any explanation for its decision to allow the publication of the CAD files on the internet or to alter its earlier factual findings and representations regarding the harms such publication will likely cause.

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States lack standing, while the private defendants argue that this lawsuit is an impermissible collateral attack on the outcome of the litigation in the Western District of Texas.[6]

---

[5] Plaintiffs, citing a presidential tweet and a White House press briefing, also suggest that the State Department exceeded its authority over the USML because the President disagrees with the way in which that authority was exercised. Plaintiffs acknowledge, however, that the President has delegated USML designations to the State Department. That delegation was not conditioned on obtaining the President's prior approval of or subsequent acquiescence to a listing decision. To the extent the President believes that allowing printable gun files to be published on the internet is not sensible, he has the power to influence, if not outright direct, the State Department's decision-making in this matter. He has not yet done so.

[6] The private defendants' § 701 argument is discussed below.

PRELIMINARY INJUNCTION - 8

**1. Standing**

In order to present a justiciable case or controversy under Article III of the U.S. Constitution, plaintiffs must have standing to challenge defendants' conduct and pursue the relief requested.

> [The] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted). In an APA action, a State alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision that is allegedly causing harm. Mass. v. Envt'l Protection Agency, 549 U.S. 497, 517 (2007). In addition, a State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation. Dep't of Fair Emp't & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

Plaintiffs allege that the federal defendants failed to provide notice of their intent to remove technical data related to the manufacture of 3D guns from the USML and have made a wholly unsupported - and therefore arbitrary and capricious - decision which, in the State Department's own words, will make anyone in possession of a commercially-available 3D printer capable of automatically generating a lethal firearm that would be virtually undetectable

PRELIMINARY INJUNCTION - 9

in metal detectors and other security equipment. The federal defendants assert that the alleged failures are harmless or are causally unrelated to any harm the States might suffer because the federal government's regulatory authority under the AECA is limited to exports and the plaintiffs' concerns are purely domestic. Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well.

The Court finds that plaintiffs have not only alleged harm to their legally protectable sovereign interests under the traditional standing analysis, but have also alleged a procedural APA claim where there is a possibility that compelling compliance with the specified procedures will prompt the agency to reconsider its decision. Forcing the federal defendants to give Congress thirty days' notice of the removal of the CAD files from the USML and to seek the concurrence of the Department of Defense would afford other executive branch entities (including the President) an opportunity to impact the decisionmaking process and would give both Congress and the States a chance to generate any statutes or regulations deemed necessary to address the regulatory void the delisting would create. Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the

PRELIMINARY INJUNCTION - 10

USML. There is, at the very least, a possibility that the States would benefit from the relief requested in this litigation.

Plaintiffs have standing to pursue the relief requested in the amended complaint. Plaintiffs have alleged an injury in fact that is directly threatened by the federal defendants' proposed delisting of the technical data contained in Defense Distributed's CAD files and that could be ameliorated, if not avoided entirely, as a result of this litigation.

### 2. Collateral Attack

The private defendants argue that this lawsuit is an impermissible collateral attack on the dismissal with prejudice of the Western District of Texas litigation. They reason that, had the States moved to intervene in the prior litigation in order to object to the proposed settlement or to seek a preliminary injunction precluding its execution, the motion would have been denied and the States cannot, therefore, obtain such relief here. The conclusion does not follow from the premise. The reasons the States would likely not have been permitted to intervene in the prior litigation is that they were not necessary parties, they had no right to appear simply because they were interested in its outcome, their claim had nothing to do with the facts or law at issue between the existing parties, and their APA-based objections could be heard and their interests protected in a separate litigation with the federal defendants. See Fed. R. Civ. P. 19 and 24. The district court's likely refusal to allow plaintiffs to appear and/or intervene in the Western District of Texas litigation is not relevant to, much less dispositive of, plaintiffs' right to seek relief in this litigation.

If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. If the remedy afforded in this litigation impinges on the federal

defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are challenging the adequacy of agency action. Defendants offer no case law suggesting that violations of the APA can be shielded from judicial review by simply incorporating them into a private settlement agreement.

**B. Likelihood of Success on the Merits**

**1. Congressional Notice**

The AECA authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The President has the power to designate "defense articles and defense services:" the items so designated constitute the USML. Id. The USML identifies categories of defense articles and services that are subject to export controls. The list is "organized by paragraphs and subparagraphs" that "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments; and technical data and defense services directly related to the defense articles of that USML category." 22 C.F.R. § 121.1(a). The USML, Category I, includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the CAD files Defense Distributed seeks to publish are subject to the export controls of ITAR. The Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has

PRELIMINARY INJUNCTION - 12

provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." 22 U.S.C. § 2778(f)(1).

Plaintiffs have shown a likelihood of success on the merits of their APA claim because the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.[7] Assuming that is the case, the federal defendants acknowledge that the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of the review be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

The Department of State argues that its decision to allow the publication of previously-regulated CAD files does not trigger the Congressional notice requirement because it has not removed an "item" from the USML. Defendants argue that the notice requirement applies only

---

[7] The federal defendants refused to produce the administrative record of the agency's decision (Dkt. # 49) and instead rely on the declaration of the Director of the Office of Defense Trade Control Policy within the DDTC (Dkt. # 64-1) to explain how and why the decision was made to reverse the CJ determination regarding the CAD files at issue. This tactic has placed plaintiffs and the Court at a decided disadvantage in evaluating what the government relied upon when concluding that the State Department's prior findings regarding the national security risks posed by plastic, untraceable, undetectable guns should be overruled. For purposes of the procedural APA claim, however, the declaration confirms that notice to Congress will be given as required by 22 U.S.C. § 2778(f) if and only if a final rule is issued. Dkt. # 64-1 at ¶ 24.

PRELIMINARY INJUNCTION - 13

when a whole group or category of defense articles described in the USML, such as

"nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R.

§ 121.1(I)(a), is removed and that that has not yet happened. This argument conflates "category"

with "item." As described in the statute, the USML is a list of items designated by the President

as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an

exhaustive list of every individual article or service that is subject to export control under the

AECA, the Department of State opted to populate the USML with generally descriptive

categories. Those categories describe end-items, however, and it is those items that are the

"defense articles and defense services" that are subject to export control under the AECA. 22

C.F.R. § 121.1. See also Fact Sheet on President's Export Control Reform Initiative (April 20,

2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-

control-reform-initiative (visited August 21, 2018) (noting that the United States' system of

export control involved an "extensive list of controlled items which resulted in almost 130,000

licenses" in 2009). The congressional review and notice requirements specifically apply to items,

not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms

that it is the removal of a particular article or service - i.e., an item rather than a category - that

triggers the review and notice requirements. The Department describes the CJ procedure as a

means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions

List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions

List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations

reiterate that the "Department must provide notice to Congress at least 30 days before any item

is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the

statute and implementing regulations, the Court finds that plaintiffs are likely to prevail on their

PRELIMINARY INJUNCTION - 14

argument that the terms "item" and "category" are distinct and that Congressional notice is required whenever a previously-designated defense article or service is to be removed from the AECA's reach.

As noted above, the DDTC made an express determination that certain CAD files that can be used with a 3D printer to manufacture guns and/or their components are "defense articles" or "defense services" under the USML. Defendants attempted to revoke that designation through the issuance of the "temporary modification" described in the settlement agreement in the Western District of Texas litigation, thereby removing the CAD files from the USML and lifting all export controls.[8] Congress was not notified prior to the removal. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of any final rule removing firearms up to .50 caliber from the USML. The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[9]

## 2. Concurrence of the Secretary of Defense

When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense

---

[8] The Court rejects the private defendants' attempt to distinguish the terms "remove" and "exclude" in this context.

[9] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification, its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

PRELIMINARY INJUNCTION - 15

services subject to export control have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures. Plaintiffs are not likely to succeed on the merits of this aspect of its claim, however, because the relevant executive order expressly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Executive Order 13637, § 6(c).

### 3. Abrogation of State and Federal Law

In response to the States' objections regarding the scope of the purported authorization for "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from the CAD files at issue, both the federal and private defendants disavow any intent to alter or in any way impact existing federal prohibitions or limitations on the possession of firearms. The federal defendants also recognize the continuing viability of state law gun control measures. Plaintiffs do not address this argument in their reply memorandum.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the files. The federal defendants state that the change was the result of a multi-year review process which led to the determination that firearms up to .50 caliber "do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML." Dkt. # 64-1 at ¶ 24. Even if the Court accepts that the

PRELIMINARY INJUNCTION - 16

undisclosed administrative record will support this argument,[10] there is no indication that the Department considered the unique properties of 3D plastic guns or evaluated the factors Congress deemed relevant when the Department decided to authorize the posting of the CAD files on the internet as of July 27, 2018.

Until April 2018, the federal government took the position that technical data related to the design and production of weapons using a commercially-available 3D printer posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic. Because they were virtually undetectable in metal detectors and other security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.

Against these findings related to the specific defense articles at issue in this litigation, the federal defendants state only that restricting the international availability of firearms up to .50 caliber will not provide the United States with a critical military or intelligence advantage. There

---

[10] Plaintiffs' motion to strike arguments based on the administrative record is DENIED.

PRELIMINARY INJUNCTION - 17

is no indication that the Department evaluated the unique characteristics and qualities of plastic guns when it was considering the deletion of the small firearms category from the USML. Statements made at oral argument affirmatively suggest that it did not do so prior to July 27, 2018. Nor is there any reasoned explanation for its change in position regarding the harms that publication of the regulated technical data will engender. The State Department also appears to have evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Congress, however, directed the Department to consider how the proliferation of technical data and related weaponry would impact world peace, national security, and foreign policy. When President Obama initiated the multi-year review of the export control system on which defendants rely, the stated goals of the review included "enhanc[ing] U.S. national security" and updating the Cold War era system "to address the threats we face today and the changing economic and technological landscape." <u>Fact Sheet on the President's Export Control Reform Initiative (April 20, 2010)</u>, https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export -control-reform-initiative (visited August 21, 2018). Based on the existing record, plaintiffs have raised serious questions regarding the merits of their claim that the federal defendants failed to consider aspects of the problem which Congress deemed important, failed to articulate a reasonable explanation for this particular decision in light of its prior findings and representations, and engaged in arbitrary and capricious agency action.

### 5. Agency Discretion

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to

agency discretion as a matter of law: the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML, which Congress chose not to make unreviewable.

"Over the years, [the Supreme Court has] read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 191 (1993). Thus, an express legislative bar such as that found in § 2778(h) is not a prerequisite to a finding that an action is committed to agency discretion by law. The Supreme Court has found that an agency's decision not to initiate enforcement proceedings, not to grant reconsideration of agency action, or how to allocate funds from a lump-sum budget allocation are presumptively unreviewable because those decisions often involve complicated balancing of factors within the agency's expertise, Congress imposed no relevant requirements or restrictions, and there is no adequate standard by which the judiciary could evaluate the agency action. Id. at 191-93. Those factors do not apply here. Plaintiffs are challenging the federal defendants' failure to comply with certain procedures that Congress and the courts have imposed when making removal decisions under AECA. "The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable." Batalla Vidal v. Duke, 295 F. Supp.3d 127, 148 (E.D.N.Y. 2017).

### 6. First Amendment

The private defendants argue that the CAD files are protected speech under the First Amendment, that restrictions on their ability to publish the files constitute a prior restraint that is presumed to be unconstitutional, and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the

PRELIMINARY INJUNCTION - 19

publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to or otherwise invalidate plaintiffs' claims against the federal defendants. To the extent the private defendants' speech is impacted, their First Amendment interests are considered in the balancing of hardships and public interest section below.

**C. Irreparable Harm**

Plaintiffs have submitted evidence, including declarations and the federal defendants' prior findings, showing that the States will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3D printer are published on the internet. Many of the same concerns that prompted the DDTC to conclude that the CAD files are "defense articles" within the scope of the USML apply with equal force to the States. A gun made from plastic is virtually undetectable in metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings. The portability and ease of a manufacturing process that can be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing, possessing, and/or using guns to more easily evade those limitations. The publication of the technical data would subvert the domestic laws of states with more restrictive firearm controls and threaten the peace and security of the communities where these guns proliferate.

In addition, the States have certain public safety, law enforcement, and proprietary interests that were not of particular concern to the United States when considering the effects the technical data would have if exported to other countries. The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if, as the private defendants advocate, every person owns a plastic gun.

The plaintiff States and the District of Columbia, as sovereigns, represent more than160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding

PRELIMINARY INJUNCTION - 21

undetectable and untraceable guns to the arsenal of weaponry already available will likely increase the threat of gun violence they and their people experience.

Defendants do not argue that any of these injuries are reparable. Rather, defendants argue that the injuries are not causally connected to the State Department's decision to overturn its prior CJ determination and remove the CAD files from the USML. The federal defendants assert that, because the AECA regulates the export of defense articles, a change in their regulatory stance cannot be the cause of the domestic effects of which plaintiffs complain. As discussed in the standing analysis, this argument ignores reality and is wholly unpersuasive. The inclusion of the CAD files on the USML prevented the technical data from being posted on the internet. Because there is no "domestic" internet, the ban had the collateral effect of making it more difficult to locate and download instructions for the manufacture of plastic firearms both domestically and internationally. It takes virtually no imagination to perceive the direct connection between removing the CAD files from the USML, the internet publication of the technical data, and the likelihood of the irreparable injuries plaintiffs have identified.

The private defendants, for their part, argue that the causal connection is broken because nine[11] of the CAD files at issue are already on the internet (Defense Distributed posted them again for good measure on July 27, 2018, as soon as the temporary modification and authorizing letter were issued, but took them down when the temporary restraining order was entered). Nevertheless, plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction. First, it is not clear how available the nine files are: the possibility that a

---

[11] In their memorandum and at oral argument, the private defendants state that they published ten CAD files pursuant to the authorizations they received as part of the settlement. The file pertaining to the Ghost Gunner 2 assembly files were not covered by the USML and not subject to ITAR control. Dkt. # 29-1 at 82 and # 63-1 at 8.

PRELIMINARY INJUNCTION - 22

cybernaut with a BitTorrent protocol will be able to find a file in the dark or remote recesses of the internet does not make the posting to Defense Distributed's site harmless. Second, there is no information regarding when these files were posted and whether they were posted with the approval of the relevant government agency. Absent such approval, the files remain "technical data" subject to ITAR control because they are not in the "public domain" for purposes of the AECA. 22 C.F.R. § 120.10(b) and § 120.11(a)(7). Third, many of the files have not yet been released, including files created by third parties and any files Defense Distributed will develop in the future. Fourth, the private defendants' dogged pursuit of the right to publish these files - and the evident alarm with which the proposed publication has been met in the Congress, in the White House, amongst advocacy groups, and in state houses all over the country - suggest that further publication is not harmless.

Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are

PRELIMINARY INJUNCTION - 23

likely to befall the States if an injunction is not issued.

**D. Balance of Hardships and Public Interest**

Against the likelihood that the States will suffer the various harms discussed above, the federal defendants identify no hardship of their own, but argue that the public interest in allowing the Executive to exercise its discretion in determining how best to promote national security weighs against preliminary injunctive relief. That discretion must, however, be exercised through the procedures established by Congress and not in an arbitrary and capricious manner.

The private defendants raise the more substantive argument that a preliminary injunction will impair their First Amendment rights, a loss which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). The First Amendment argument raises a number of challenging issues. Is computer code speech? If yes, is it protected under the First Amendment? To answer those questions, one would have to determine what the nature of the files at issue here is: are they written and designed to interact solely with a computer in the absence of the intercession of the mind or will of the recipient or is it an expressive means for the exchange of information regarding computer programming and/or weapons manufacturing? Are the export controls of the ITAR a prior restraint giving rise to a presumption that they are unconstitutional? Is the AECA a general regulatory statute not intended to control the content of speech but only incidentally limiting its unfettered exercise? Or is the government attempting to regulate distribution of the CAD files because of the message they convey? Depending on which level of scrutiny applies, does the regulation advance important governmental interests unrelated to the suppression of free speech and avoid burdening more speech than necessary or is the regulation narrowly tailored to promote a

PRELIMINARY INJUNCTION - 24

compelling Government interest?

The Court declines to wade through these issues based on the limited record before it and instead presumes that the private defendants have a First Amendment right to disseminate the CAD files. That right is currently abridged, but it has not been abrogated. Regulation under the AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within the United States. The Court finds that the irreparable burdens on the private defendants' First Amendment rights are dwarfed by the irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that, overall, the public interest strongly supports maintaining the status quo through the pendency of this litigation.

For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED. The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court.

Dated this 27th day of August, 2018.

*MW S Lasnik*

Robert S. Lasnik
United States District Judge

PRELIMINARY INJUNCTION - 25

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:15-CV-372-RP |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are a Joint Emergency Motion for Leave to Intervene filed by the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and the Giffords Law Center to Prevent Gun Violence ("the Brady Center") (together, "Movants"), (Dkt. 96), as well as a Joint Emergency Motion for Temporary Restraining Order and for Preliminary Injunction filed by the same parties, (Dkt. 97). Today, the Court held a hearing to consider the two motions. Having considered the parties' arguments, the evidence, and the relevant law, the Court will deny both motions.

## I. BACKGROUND

On June 28, 2018, Plaintiffs Defense Distributed and the Second Amendment Foundation (together, "Plaintiffs") and Defendants the United States Department of State, former Secretary of State John Kerry, and the Directorate of Defense Trade Controls (together, "Defendants") informed the Court that they had reached a settlement in this action. (Status report, Dkt. 95). The status report did not disclose the terms of the settlement agreement (the "Agreement"). (*Id.*). Movants aver that they learned of the Agreement's terms on July 17, 2018, and that they obtained a copy of the Agreement two days later. (Supp. Brief Mot. Intervene, Dkt. 103, at 2). Movants filed a copy of the Agreement with their motions. (Agreement, Dkt. 97-1).

1

The Agreement provides that Defendants will publish a notice of proposed rulemaking to revise the United States Munitions List ("USML") to exclude the technical data at issue in this action. (Agreement, Dkt. 97-1, at 1). While the final rule is in development, Defendants agree to temporarily modify the USML to exclude that same data as of today's date. (*Id.* at 1–2). Defendants also agree to issue a letter to Plaintiffs today advising them that the technical data at issue is exempt from the International Traffic in Arms Regulation's ("ITAR") licensing requirements. (*Id.* at 2). The parties have represented to the Court that they will enter a stipulation of dismissal on or before August 4, 2018. (Status report, Dkt. 95).

Movants are organizations dedicated to supporting the passage and enforcement of gun safety laws across the United States. (*See, e.g.*, Everytown Decl., Dkt. 103-1, ¶ 3). They move to intervene in the case and request a preliminary injunction that would prohibit Defendants from performing under the Agreement. (Mot. Prelim. Inj., Dkt. 97, at 2). Movants argue that if Defendants perform their obligations under the Agreement, Plaintiffs will promptly thereafter publish technical information online that can be used to manufacture firearms components. (*See* Supp. Brief Mot. Intervene, Dkt. 103, at 1 ("Defense Distributed intends to post on the Internet numerous and significant files that are not yet available to the public.")). Plaintiffs and Movants filed briefing related to Movants' two motions, and all parties participated in a hearing today.

## II. MOTION TO INTERVENE

Movants seek to intervene both by right and permissively. (Mot. Intervene, Dkt. 96, at 4–8). For the following reasons, the Court finds that Movants are not entitled to intervene by right and declines to exercise its discretion to permit them to intervene.

### A. *Intervention by Right*

Intervention by right is governed by Federal Rule of Civil Procedure 24(a). To intervene by right, the prospective intervenor either must be "given an unconditional right to intervene by a

federal statute," Fed. R. Civ. P. 24(a)(1), or must meet each of the four requirements of Rule

24(a)(2):

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). "Although the movant bears the burden of

establishing its right to intervene, Rule 24 is to be liberally construed." *Id.* (citations omitted).

"Federal courts should allow intervention where no one would be hurt and the greater justice could

be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir.1994) (internal quotation marks

omitted). However, the Fifth Circuit has also cautioned courts to be "circumspect about allowing

intervention of right by public-spirited citizens in suits by or against a public entity for simple

reasons of expediency and judicial efficiency." *City of Houston v. Am. Traffic Sols., Inc.*, 668 F.3d 291,

294 (5th Cir. 2012).

Plaintiffs argue that Movants fail to meet all four prongs of Rule 24(a)(2). (Mem. Opp. Mot.

Intervene, Dkt. 107, at 15–24). Because the Court finds that Movants do not meet the second

prong—the requirement of a sufficient interest in the main action—the Court need not analyze the

remaining prongs.

Rule 24(a)(2) requires that an applicant to intervene has a "direct, substantial, legally

protectable interest in the proceedings." *Texas*, 805 F. 3d at 657 (citation and quotation marks

omitted). Whether an applicant has a legally protectable interest in the main action "turns on

whether the intervenor has a stake in the matter that goes beyond a generalized preference that the

case come out a certain way. So, an intervenor fails to show a sufficient interest when he seeks to

intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely

prefers one outcome to the other." *Id.* Although defining a "legally protectable interest" can be a "a

tautological exercise—a party may intervene if its interest is legally protectable and its interest is legally protectable if it can intervene"—the Fifth Circuit's cases provide guidance about what constitutes a sufficient interest for purposes of Rule 24(a)(2). *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 568 (5th Cir. 2016).

For example, an applicant has a legally protectable interest if it is subject to the regulations at issue in an action or if it is the beneficiary of the regulations at issue. *Wal-Mart*, 834 F.3d at 568–69; *Texas*, 805 F.3d at 660–61. A nonprofit organization has a legally protectable interest in the "unique" circumstance that the organization "engineered the drive that led to" the regulation at issue being enacted. *City of Houston*, 668 F.3d at 294. On the other hand, a "purely economic interest" is insufficient. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co. (NOPSI)*, 732 F.2d 452, 466 (5th Cir. 1984) (denying intervention to city officials in an action between a utility and a natural gas company based on the city official's interest in price it paid for gas); *see also Texas*, 805 F.3d at 658 (explaining that the *NOPSI* applicant's "generalized" interest was insufficient and observing that "every electricity consumer . . . yearns for lower electric rates.") (citation and quotation marks omitted).

According to Movants, the Agreement would make their work "immeasurably more difficult, if not impossible." (Mem. Supp. Mot. Intervene, Dkt. 26, at 6). Movants aver that they have a legally protectable interest in this action because "the intent of the Plaintiffs, through the Settlement Agreement, is to make Proposed Intervenors' work untenable." (*Id.* at 7). Movants aver that they "will be forced to expend additional resources to protect their respective missions." (*Id.*).

The Court finds that Movants' interest in this action is too generalized to establish their entitlement to intervention by right. The Fifth Circuit has counseled this Court to be "circumspect about allowing intervention of right by public-spirited citizens in suits by or against a public entity." *City of Houston*, 668 F.3d at 294. Like the applicants in *NOPSI*, there is little to distinguish Movants

4

from the many individuals who share Movants' policy preferences. The Court finds no authority to support the notion that simply expending organizational resources in support of a set of policy goals is sufficient to establish a legally protectable interest for purposes of Rule 24(a)(2), and Movants have cited none.[1] Movants are not entitled to intervention by right under Rule 24(a)(2).

### B. *Permissive Intervention*

On a timely motion, a court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact. Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention "is wholly discretionary . . . even though there is a common question of law or fact." *NOPSI*, 732 F.2d at 470–71.

There are no questions of law or fact common to both the main action and Movants' claims. Movants argue that the Agreement violates the Administrative Procedure Act ("APA") because the Agreement is a final agency action and its terms are arbitrary and capricious. (Mot. Prelim. Inj., Dkt. 97, at 3, 8). The instant action is a declaratory judgment action concerning the application of State Department regulations and the First and Second Amendments to the United States Constitution. (*See* Compl., Dkt. 1). Movants aver that they "satisfy the[ ] factors" relevant to Rule 24(b) but identify no common questions of law or fact between their claims and the main action. The Court declines to exercise its discretion to permit Movants to intervene under Rule 24(b)(2). Movants' motion to intervene is denied.

### C. *Standing*

Contrary to the Movants' belief, (see Mem. Supp. Mot. Intervene, Dkt. 96-1, at 8–9), "an intervenor of right must have Article III standing in order to pursue relief that is different from that

---

[1] Movants describe the resources they have diverted from their typical activities in support of their argument that they have Article III standing. (Supp. Brief Mot. Intervene, Dkt. 103, at 3–7). While resource diversion may be relevant to Article III standing, *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017), there is no authority—and Movants cite none—that resource diversion is sufficient to establish a legally protectable interest for purposes of Rule 24(a)(2).

which is sought by a party with standing." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651, 198 L. Ed. 2d 64 (2017). No party to the main action is seeking Movants' desired relief—an injunction of the Agreement based on a finding that it violates the APA—and therefore Movants must demonstrate independent standing. Plaintiffs argue that Movants lack independent standing, (Mem. Opp. Mot. Intervene, Dkt. 107, at 2–13), and the Court agrees.

To establish Article III standing, a plaintiff must establish, among other things, an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted). Movants argue that their standing arises from the injuries to them as organizations (rather than asserting the standing of their members). (Mem. Supp. Mot. Intervene, Dkt. 96-1, at 9 n.2). An "organization can establish standing in its own name if it "meets the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Movants must therefore establish that the Agreement causes them a concrete, particularized, and imminent injury.

Movants argue that they have standing because they have "have diverted significant resources to counteract the Settlement Agreement and the proliferation of 3-D printed guns." (Supp. Brief Mot. Intervene, Dkt. 103, at 3). The Fifth Circuit has made clear that resource diversion can support an organization's standing if a defendant's conduct requires the organization to divert resources to activities outside of its typical business activities. *See OCA-Greater Houston*, 867 F.3d at 611–12 (finding standing where an organization that is "not a lobbying group" "went out of its way" to educate its members on how to comply with the Texas' application of its election laws). On the other hand, an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its "routine lobbying activities." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). The burden rests with the plaintiff to identify "specific projects

that [it] had to put on hold or otherwise curtail in order to respond to" the defendant's conduct. *Id.*; *see also Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (finding that an organization lacked standing because it "neither mentioned any specific projects [it] had to put on hold . . . nor did [it] describe in any detail how [it] had to re-double efforts in the community").

Movants fail to satisfy that burden. Each of the Movants submitted a declaration identifying activities they have undertaken since learning about the Agreement, such as "researching 3-D gun printing technology"; communicating with members, supporters, and lawmakers; submitting Freedom of Information Act requests related to the Agreement, and "work related to bringing the instant legal action." (Everytown Decl., Dkt. 103-1; Giffords Decl., Dkt. 103-2; Brady Decl., Dkt. 103-3).[2] It is unclear how much of this work differs from the Movants' "routine lobbying activities." *City of Kyle*, 626 F.3d at 238. More significantly, only one movant, the Brady Center, identifies any projects that it might have to put on hold as a result of responding to the Agreement, (*see* Brady Decl., Dkt. 103-3, at 2–3), and those projects are not described with sufficient specificity to constitute an injury in fact. For example, the Brady Center avers that if not for responding to the Agreement, it would have been able to use more resources to work on "strengthening gun laws," "fighting in the courts to defend gun laws," and "providing direct legal advocacy on behalf of victims and communities affected by gun violence." (*Id.* at 3). This evidence is not sufficiently specific to establish an injury in fact. *See ACORN*, 211 F.3d at 305–06 (finding, where a witness for the plaintiff organization testified that responding to defendant's conduct "really takes away from our activities in other areas, being able to do outreach and education, research and monitoring, intakes and investigations of complaints," that such testimony was too "conjectural, hypothetical, and speculative" to establish an injury in fact). Because the Movants cannot establish an injury in fact, they lack Article III standing to intervene in this action.

---

[2] It is well settled in the Fifth Circuit that an organization's "litigation efforts cannot establish injury in fact." *City of Kyle*, 626 F.3d at 238.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Movants' Joint Emergency Motion to Intervene,

(Dkt. 96), is **DENIED**. Because Movants are not permitted to intervene, their Motion for

Temporary Restraining Order and for Preliminary Injunction, (Dkt. 97), is **DENIED**.

**SIGNED** on July 27, 2018.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:15-CV-372-RP |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is the parties' Stipulation of Dismissal with Prejudice. (Dkt. 112). The parties stipulate that they have resolved all causes of action and that this action should be dismissed with prejudice. (*Id.*). Federal Rule of Civil Procedure 41(a)(1)(A)(ii) allows a plaintiff to dismiss an action upon filing a stipulation of dismissal signed by all parties who have appeared. Plaintiff has done so. The Court therefore **ORDERS** that the case is **DISMISSED WITH PREJUDICE**. All costs shall be taxed to the party incurring them. This action is **CLOSED**.

**SIGNED** on July 30, 2018.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Connie K. Chan*
Connie K. Chan
