

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————

No. 19-50723

————————

Certified as a true copy and issued
as the mandate on **Sep 11, 2020**

Attest: *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2020

Lyle W. Cayce
Clerk

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

Plaintiffs - Appellants

v.

GURBIR S. GREWAL, Attorney General of New Jersey,
in his official capacity,

Defendant - Appellee

———————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-637

———————————————

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District
Court is REVERSED, and the cause is REMANDED to the District Court for
further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that defendant-appellee pay to plaintiffs-
appellants the costs on appeal to be taxed by the Clerk of this Court.

STEPHEN A. HIGGINSON, Circuit Judge, concurring.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-50723

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2020

Lyle W. Cayce
Clerk

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,

      Plaintiffs - Appellants

v.

GURBIR S. GREWAL, Attorney General of New Jersey,
in his official capacity,

      Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from the ongoing efforts of New Jersey's Attorney General Gurbir Grewal and several of his peers to hamstring the plaintiffs' distribution of materials related to the 3D printing of firearms. To defend against their efforts, the plaintiffs filed this lawsuit, alleging, *inter alia*, infringement of their First Amendment rights and state law claims. Grewal countered with a motion to dismiss for lack of personal jurisdiction. The district court, relying principally on this court's decision in *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), granted Grewal's motion. *Stroman*, however, is distinguishable from this case and does not compel

No. 19-50723

dismissal. Based on well-established principles of personal jurisdiction, we conclude that Grewal is subject to the jurisdiction of Texas courts. We REVERSE and REMAND for further proceedings.

## I

Plaintiff Defense Distributed is a Texas company operated for the purpose of promoting popular access to firearms. To carry out this purpose, it produces and makes accessible information related to the 3D printing of firearms and publishes and distributes such information to the public. Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide, non-profit membership organization that "promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." Across the nation, SAF members seek the digital firearms information created by Defense Distributed, circulate their own digital firearms information by utilizing Defense Distributed's facilities, and republish digital firearms information independently.

Defense Distributed began distributing files related to the 3D printing of firearms in December 2012. It did so by publishing files to its defcad.org and defcad.com websites and letting visitors freely download them. It also distributed digital firearms information via mail and at a brick-and-mortar public library in Austin, Texas. Defense Distributed's efforts were initially met with opposition from the United States Department of State.[1] But, after a period of litigation, the parties reached a settlement agreement that granted Defense Distributed a license to publish its files.

---

[1] *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016); *id.* at 462–76 (Jones, J., dissenting).

No. 19-50723

Shortly thereafter, nine Attorneys General, including New Jersey Attorney General Grewal, filed suit on behalf of their respective states in the Western District of Washington to enjoin the State Department from authorizing the release of Defense Distributed's files. They argued that the State Department's license to Defense Distributed constituted an *ultra vires* about-face that violated the Administrative Procedure Act and jeopardized the states' statutory and regulatory schemes for firearms. The Western District of Washington quickly issued a temporary restraining order, followed closely by a nationwide preliminary injunction.[2]

Just before the Attorneys General sued in Washington, Defense Distributed and SAF brought the instant action in the Western District of Texas challenging select enforcement actions taken by the state Attorneys General. Of relevance to this appeal, plaintiffs alleged these actions by Grewal: (1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey;[3] and (4) threatening Defense Distributed with criminal sanctions at a live press conference. Further, these actions, coupled with the injunctive orders issued in the Washington litigation, have

---

[2] The Attorneys General later filed a motion for summary judgment, which the district court granted in part. *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019). On appeal, the Ninth Circuit found that the case was moot and thus dismissed for lack of jurisdiction. *Washington v. Defense Distributed*, Nos. 20-35030 & 20-35064, 2020 WL 4332902 (9th Cir. July 21, 2020).

[3] That lawsuit was removed to federal court before being administratively terminated in light of the nationwide injunction issued in Washington. The plaintiffs have likewise sued in New Jersey, raising the same claims asserted in the case at bar. *See Defense Distributed v. Grewal*, D.N.J. No. 3:19-CV-4753. That case is currently stayed pending resolution of this one.

No. 19-50723

caused Defense Distributed to cease publication of its materials. The plaintiffs asserted, *inter alia*, that these actions infringed the exercise of their First Amendment freedoms and constituted tortious interference with the State Department's settlement agreement.

Grewal moved to dismiss for lack of personal jurisdiction.[4] The plaintiffs, meanwhile, sought a preliminary injunction. After holding a hearing and considering the parties' arguments, the court granted Grewal's motion and dismissed the action without prejudice.

The district court's order addressed two primary issues: judicial estoppel and minimum contacts. The plaintiffs had argued that Grewal should be judicially estopped from challenging the court's jurisdiction because, in the Washington litigation, Grewal asserted that Defense Distributed had minimum contacts with Washington, and that argument was inconsistent with the position taken in Grewal's motion to dismiss. The court disagreed, concluding that Grewal's position in the Washington case "is in no way inconsistent with [his] argument here that [he] ha[s] no minimum contacts with Texas."

Next, the court determined that the plaintiffs failed to establish that Grewal had "minimum contacts with the State of Texas." The court found most instructive this court's decision in *Stroman*, in which it was held that sending a cease-and-desist letter into Texas was, by itself, insufficient to exercise personal jurisdiction over an out-of-state defendant. Just as in *Stroman*, the court explained, Grewal did not "purposefully avail [himself] of the benefits of Texas law like someone actually 'doing business' in Texas" when he demanded that Defense Distributed cease publication of its materials. *See Stroman*,

---

[4] The other state Attorneys General also moved to dismiss, and the district court granted their motions. On appeal, the plaintiffs challenge only the judgment related to Grewal.

4

No. 19-50723

513 F.3d at 484. "It follows that [Grewal] could not have reasonably anticipated being haled into federal court in Texas to defend [the enforcement of his state's laws]." The court rejected the plaintiffs' attempt to distinguish *Stroman* based on Grewal's additional alleged contacts, finding that they were either the plaintiffs' own contacts with Texas or were contacts not "expressly aimed at Texas." The district court also rejected the plaintiffs' invocation of the "effects test" pronounced in *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984), because it believed only the plaintiffs—and not Texas more generally—were affected by Grewal's enforcement activities. Grewal's relationship to Texas, in other words, was a "mere fortuity."

The plaintiffs' motion to alter or amend the judgment was denied, and they timely appealed.

## II

In this court, the plaintiffs continue to press the arguments that the doctrine of judicial estoppel bars Grewal from arguing against personal jurisdiction, and Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas's courts. We agree with the second argument and thus need not address the judicial estoppel claim.

"We review the district court's dismissal for lack of personal jurisdiction *de novo*." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). At the motion to dismiss stage, the plaintiffs bear the burden of presenting sufficient evidence to support a prima facie case of jurisdiction. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000). We "accept the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

Personal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports

with due process. *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Id.* Though personal jurisdiction can be general or specific, this case implicates only the latter. Texas's long-arm statute permits the exercise of specific jurisdiction over any defendant "doing business" in the state, including defendants who "commit[] a tort in whole or in part in th[e] state." TEX. CIV. PRAC. & REM. CODE § 17.042.

"The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Stroman*, 513 F.3d at 484 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). This court has framed the inquiry as a three-step analysis: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

The issue on appeal is whether Grewal has established sufficient minimum contacts with Texas. The parties' arguments rely on the interpretation and application of three cases—*Stroman*; *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999); and *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984). Grewal argues that *Stroman* controls here and compels the conclusion that he lacks the minimum contacts necessary to justify the

exercise of jurisdiction. The plaintiffs aver that *Stroman* is distinguishable and posit that the district court's judgment runs counter to principles announced in *Wien Air Alaska* and *Calder*. We consider each of these cases in turn.

Stroman Realty, Inc. was a Texas-based real estate firm that sought relief in Texas federal court from attempts by the Commissioner of the Arizona Department of Real Estate to exercise regulatory authority over the company's timeshare sales business. *Stroman,* 513 F.3d at 479. "[T]he totality of the Commissioner's contacts with Texas involve[d] a cease and desist order and correspondence with Stroman's attorneys." *Id.* at 485. This court concluded that "[b]ased on such minimal known contacts, . . . [the] nonresident state official . . . could not have reasonably anticipated being haled into federal court in Texas to defend her enforcement of an Arizona statute." *Id.* at 484.

This court disagreed with Stroman's invocation of the *Calder* "effects test," as we observed that this circuit has "declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident." *Id.* at 486. "By seeking to regulate Stroman's activities involving Arizona residents or property," the court explained, "the Commissioner is not 'expressly aim[ing]' her actions at Texas." *Id.* (alteration in original) (quoting *Calder*, 465 U.S. at 789, 104 S. Ct. at 1487). Rather, "it was Stroman who chose to market Arizona properties and transact business with Arizona residents. Arizona is simply attempting to uniformly apply its laws." *Id.* Put another way, the nexus to Texas was "based entirely on the unilateral actions and decisions of Stroman, not the Commissioner." *Id.* And "[i]n general, '[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* (second alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40 (1958)). To embrace

Stroman's approach, the court warned, would subject state officials seeking to enforce their state's laws "to suit in any state where the validity of her state's laws were in question." *Id.*

The facts of this case bear a resemblance to those in *Stroman*. "[T]he totality of [Grewal's] contacts with Texas involves a cease and desist order" sent to Defense Distributed. *Id.* at 484. And Grewal's purpose in issuing the cease-and-desist letter ostensibly was to enforce New Jersey public nuisance and negligence laws (more on this below). Further, Grewal, like the Commissioner in *Stroman*, was sued in his official capacity and did not derive commercial benefits from performing his governmental function.

While acknowledging some of these factual similarities, the plaintiffs contend that *Stroman* is distinguishable principally because the cease-and-desist letter at issue in *Stroman* focused on activities occurring *outside* Texas whereas Grewal's cease-and-desist letter focused on activities occurring *inside* Texas. But *Stroman* expressly forecloses this distinction. "Although it may be true that the Commissioner's action against Stroman is based upon *conduct which occurred entirely in Texas*, we cannot find, as Stroman urges, that the Commissioner has purposefully directed her conduct at Texas. . . . [T]he Commissioner, by proceeding with the cease and desist order, is essentially asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 485–86 (emphasis added).

The plaintiffs also maintain that *Stroman* is distinguishable because Grewal did more than just send a cease-and-desist letter. He "(1) obtained a nationwide injunction that governs the State of Texas itself and everyone in it, (2) threatened companies that contracted to provide internet security services for Defense Distributed, and last but not least, (3) stood at a live broadcast's podium to call out Defense Distributed's founder by name and promise that he would 'come after' 'anyone who is contemplating making a printable gun' and

'the next ghost gun company.'" None of these actions, however, represent direct contacts with Texas.[5] The nationwide injunction is just that—a nationwide order not targeting Texas but rather the plaintiffs' nationwide operations. *Cf. J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880–87, 131 S. Ct. 2780, 2787–91 (2011) (rejecting jurisdiction based on the defendant's nationwide product distribution system where the defendant did not otherwise manifest an intent to benefit from or submit to the laws of the forum state). The companies Grewal threatened are based in California, not Texas, and the broadcast event the plaintiffs reference took place in New Jersey.

*Stroman*, however, is distinguishable in at least two key respects. First, many of the plaintiffs' claims are based on Grewal's cease-and-desist letter. In contrast, Stroman's claim was that "Arizona's attempted exercise of regulatory jurisdiction to license timeshare resales violated the Commerce Clause by discriminatorily and unduly burdening nonresident participation in the interstate secondary timeshare market." *Stroman*, 513 F.3d at 481. Stroman's claim, in other words, was more a product of Arizona's regulatory scheme than it was the cease-and-desist letter itself. Not so for the plaintiffs' claims here, many of which are based on injuries stemming solely and directly from Grewal's cease-and-desist letter. Grewal's contact with Texas is more relevant to the personal jurisdiction inquiry than was the cease-and-desist letter analyzed in *Stroman*.

Second, and more important, *Stroman* found that the Arizona public official did not purposefully direct her conduct at Texas because she was simply "asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 486. The contrary is alleged here.

---

[5] But, as explained below, these actions affirm Grewal's intention to undermine Defense Distributed's operations and have significant effects on Texas.

Grewal's assertion of legal authority is much broader. He does not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demands that the plaintiffs cease publication of their materials generally. For example, in his cease-and-desist letter, Grewal states that the plaintiffs' "widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey." He accordingly requests that Defense Distributed "halt publication of the printable-gun computer files" without specifying that Defense Distributed cease marketing its materials to New Jersey residents.[6]

Grewal's conduct beyond sending the cease-and-desist letter confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey. Grewal's enforcement actions are selective. He has not targeted the many similarly-situated persons who publish Defense Distributed's files on the internet.[7] *Cf. id.* (stressing that Arizona was "simply attempting to *uniformly* apply its laws") (emphasis added). Instead, he has focused solely on Defense Distributed. Perhaps nowhere is this better illustrated than in Grewal's efforts to enjoin the national distribution of Defense Distributed's files by suing in Washington, far from his

---

[6] Grewal's letter opens with the command "to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*." Perhaps this could be interpreted as a limited instruction. But, as just noted, elsewhere, Grewal orders Defense Distributed to "halt publication of the printable-gun computer files" lock, stock, and barrel. This latter command better captures the general tone of the cease-and-desist letter. And regardless, at this stage of the litigation, we are required to resolve all factual disputes in favor of the plaintiff. *Panda Brandywine Corp.*, 253 F.3d at 868.

[7] As Defense Distributed notes in its complaint, other publishers continue to publish Defense Distributed's files to generally-accessible internet websites. "Such files can be located with a simple Google search." *See also Defense Distributed*, 838 F.3d at 462 (Jones, J., dissenting) (observing that Defense Distributed's files were downloaded "hundreds of thousands of times").

or the plaintiffs' home state. Grewal has also threatened Defense Distributed's founder, Cody Wilson, by name, promising to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company." Together, these actions confirm Grewal's intent to force Defense Distributed to close shop.

Relatedly, the intended effects on the plaintiffs and, by extension, the intended effects on Texas residents who would benefit from the plaintiffs' activities, are much greater than the effects at issue in *Stroman*. Whereas the Arizona Commissioner only requested that Stroman acquire a license before doing business in the state, Grewal seeks to bar Defense Distributed from publishing its materials anywhere, not just in New Jersey. Grewal's actions, moreover, have all been taken in the name of law and order. He has projected himself across state lines and asserted a pseudo-national executive authority that the public official in *Stroman* never asserted. Because *Stroman* is distinguishable, and thus not dispositive, we consider the applicability of *Wien Air Alaska* and *Calder*.[8]

In *Wien Air Alaska*, this court considered whether the defendant, Brandt, had sufficient contacts with Texas to subject him to the jurisdiction of Texas's courts. Relying largely on *Calder*'s "effects test," the court concluded that he did. "Brandt performed several tortious actions outside of Texas directed towards Wien Air in Texas. These activities had foreseeable effects in the forum and were directed at the forum." *Wien Air Alaska*, 195 F.3d at 212.

---

[8] The separate concurrence overstates our reliance on these cases. We do not consider them because they are factually analogous, but because they establish principles of law applicable to this case. Relatedly, we do not rely on an effects test unmoored from a minimum contacts analysis, as the concurrence suggests. The exercise of personal jurisdiction over Grewal is proper because Grewal established sufficient minimum contacts with Texas. The legal principles articulated in *Wien Air Alaska* and *Calder* (among other cases) guide us to this conclusion.

No. 19-50723

Brandt's contacts included "letters, faxes, and phone calls to Texas . . . whose contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information." *Id.* Brandt argued that these communications, standing alone, were insufficient to support a finding of minimum contacts. *Id.* at 213. The court disagreed. "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.* "The defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* "It is of no use to say that the plaintiff 'fortuitously' resided in Texas. . . . If this argument were valid in the tort context, the defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas." *Id.*

Similarly, Grewal's communication with Defense Distributed, specifically the cease-and-desist letter delivered into Texas, itself gives rise to distinct tort causes of action. Section 1983's intentional "tort" of unconstitutional censorship and intentional interference with a contractual relationship are just two possibilities. And when "the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.*

Grewal argues that the plaintiffs cherry-picked this legal proposition and ignored glaring factual differences between *Wien Air Alaska* and this case. We disagree with Grewal's initial assertion, but it is correct that the facts in the two cases are distinguishable. Even so, the principles articulated in *Wien Air Alaska* remain relevant, as do the principles announced in *Calder*.

*Calder* was a libel suit instituted by a California actress in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. *Calder*, 465 U.S. at 784–85, 104 S. Ct. at 1484. The plaintiff's libel claims were based on an article written

12

and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000. *Id.* The California Court of Appeals held that California's assertion of jurisdiction over the defendants was consistent with due process, and the Supreme Court affirmed. Although the Court recognized that the defendants' activities "focus[ed]" on the plaintiff, the jurisdiction inquiry turned on "the relationship among the defendant, the forum, and the litigation." *Id.* at 788 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 2579 (1977)). Thus, the Court focused on the contacts the defendants had created with California (and not just with the plaintiff). It found those contacts to be ample. The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the state; and the "brunt" of that injury was suffered by the plaintiff in that state. *Id.* at 788–89. "In sum, California [wa]s the focal point both of the story and of the harm suffered." *Id.* at 789. Jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.*

Thirty years later, the Court revisited *Calder* and explained the scope of its holding:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. . . . [T]he reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, . . . the defendants' intentional tort actually occurred *in* California. . . . In this way, the "effects" caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in

the estimation of the California public—connected the defendants'
conduct to *California*, not just to a plaintiff who lived there. That
connection, combined with the various facts that gave the article a
California focus, sufficed to authorize the California court's
exercise of jurisdiction.

*Walden v. Fiore*, 571 U.S. 277, 287–88, 134 S. Ct. 1115, 1123–24 (2014)
(emphasis in original). *Walden* makes clear that *Calder* remains good law. But
*Walden* also emphasizes that it is the defendant's contacts with the forum
state, and not just the plaintiff, that must drive the personal jurisdiction
analysis. *Id.* at 285 ("[T]he plaintiff cannot be the only link between the
defendant and the forum."); *id.* at 286 ("A forum State's exercise of jurisdiction
over an out-of-state intentional tortfeasor must be based on intentional
conduct by the defendant that creates the necessary contacts with the forum.").
It is insufficient for the defendant to simply have knowledge of a plaintiffs'
"strong forum connections." *Id.* at 289. That is, "an injury is jurisdictionally
relevant only insofar as it shows that the defendant has formed a contact with
the forum State." *Id.* at 290; *see also Bristol-Myers Squibb Co. v. Super. Ct. of
Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780 (2017) ("[T]here must be an affiliation
between the forum and the underlying controversy, principally, an activity or
an occurrence that takes place in the forum State and is therefore subject to
the State's regulation.") (alteration in original omitted) (internal quotation
marks and citation omitted).

Returning to the present case, Grewal argues that, unlike in *Calder*,
where the content of the article served as the basis for the libel claim, the
plaintiffs attribute their injury to Grewal's enforcement action and not the
cease-and-desist letter. Grewal misreads the plaintiffs' complaint: they allege
that Grewal's letter had a chilling effect on the exercise of their First
Amendment rights (among other constitutional and Texas law violations).
That chilling effect, in turn, caused them to cease publication and reduced

Texans' access to the materials the plaintiffs seek to publish. The statewide impact is not unlike that of the defamatory article at issue in *Calder*, which shaped Californians' view of the defamed actress.[9]  In this sense, Grewal created contacts with Texas and not just the plaintiffs.

Grewal's contacts with Texas, moreover, are more than a "mere fortuity," as the district court found. Grewal intentionally mailed the cease-and-desist letter into Texas, a contact *Walden* specifically mentioned as relevant to the personal jurisdiction inquiry. *See Walden*, 571 U.S. at 285 ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, *mail*, or some other means—is certainly relevant contact." (emphasis added)). Further, that contact alone gave rise to distinct tort causes of action. Grewal knew that the cease-and-desist letter would "have a potentially devastating impact" on the plaintiffs—and, by extension, those who wished to benefit from the plaintiffs' activities, including Texas residents. *Calder*, 465 U.S. at 789. And he "knew that the brunt of [the] injury would be felt by [the plaintiffs] in [Texas]." *Id.* at 789–90; *see also Wien Air Alaska*, 195 F.3d at 211 ("The foreseeable effects of a tort 'are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum.'") (emphasis in original) (quoting *Allred v. Moore & Peterson*, 117 F.3d 278, 287 (5th Cir. 1997)).

Based on the foregoing analysis, the principles discussed in *Wein Air Alaska* and *Calder* (and reaffirmed in *Walden*) control. Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas's courts.[10]  Of course, minimum contacts in-and-of themselves are

---

[9] Censorship, like libel, is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives.

[10] We do not intend to convey that sending a cease-and-desist letter into a forum always subjects the sender to jurisdiction in the forum state. *Cf. Yahoo! Inc. v. La Ligue*

insufficient to create jurisdiction.  The cause of action must arise from the forum-related contacts and the exercise of personal jurisdiction must be fair and reasonable.  *Seiferth*, 472 F.3d at 271.  Grewal takes issue with the second of these two requirements and contends that a judgment in the plaintiffs' favor would offend traditional notions of fair play and substantial justice.  We are skeptical of this argument.  *See DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 388 (5th Cir. 2015) ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice.") (internal quotation marks omitted) (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154–55 (Tex. 2013)).  But in any event, Grewal did not raise this argument below, either in his initial motion to dismiss or in his reply.  "The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal."  *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010); *see also Broad. Music, Inc. v. M.T.S. Enters., Inc.*, 811 F.2d 278, 281 (5th Cir. 1987) ("[O]bjections to personal jurisdiction or to service of process must be raised in a timely fashion, i.e., as a

---

*Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) ("There are strong policy reasons to encourage cease and desist letters.  They are normally used to warn an alleged rights infringer that its conduct, if continued, will be challenged in a legal proceeding, and to facilitate resolution of a dispute without resort to litigation.  If the price of sending a cease and desist letter is that the sender thereby subjects itself to jurisdiction in the forum of the alleged rights infringer, the rights holder will be strongly encouraged to file suit in its home forum without attempting first to resolve the dispute informally by means of a letter.").  Indeed, as our review of *Stroman* makes clear, sending a cease-and-desist letter may, under different circumstances, be insufficient to establish personal jurisdiction.  *See also Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins.*, 921 F.3d 522, 542 (5th Cir. 2019) (reaching the same conclusion as *Stroman*, albeit under facts that are markedly different from the facts here).  Today's holding is derivative of the specific language used in Grewal's cease-and-desist letter coupled with other actions he took that, together, demonstrate his intent to gut Defense Distributed's operations and restrict Texans' access to Defense Distributed's materials.  That the plaintiffs' injuries are directly attributable to the cease-and-desist letter itself also weighs heavily in our analysis.

party's first pleading in the case, or they are waived."). We follow that rule here. The same goes for Grewal's argument that "[u]nder the plain text of the Texas long-arm statute, and the analysis by *Stroman* and other courts, it is not proper for Texas courts to exercise jurisdiction over a state official sued in his official capacity regarding his decision to enforce his state's law." Grewal should have raised these arguments timely if he intended to rely on them in this court.

## III

Questions of personal jurisdiction typically do not lend themselves to broad generalizations. *See Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982) ("[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state."). They require an understanding of particular facts and an application of general principles. Having carefully considered the facts of this case, we conclude that *Stroman* is distinguishable and thus not dispositive. Applying the principles discussed in *Wien Air Alaska* and *Calder*, we hold that jurisdiction over Grewal is proper. The judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings.

No. 19-50723

STEPHEN A. HIGGINSON, Circuit Judge, concurring:

I agree that the allegations of Attorney General Grewal attempting to prevent Texas residents from publishing files online to individuals outside of New Jersey constitute purposeful direction of his activities toward the State of Texas such that he should have "reasonably anticipate[ed] being haled into court" there. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Unlike the Commissioner of the Department of Real Estate in *Stroman Realty, Incorporated v. Wercinski*, who was "simply attempting to uniformly apply its [state] laws" against those who "chose to market Arizona properties and transact business with Arizona residents," Grewal is alleged to have attempted to reach conduct that did not involve New Jersey residents or assets at all.[1] 513 F.3d 476, 486 (5th Cir. 2008). Thus, I agree that jurisdiction exists in this case where it did not in *Stroman*. But I find the limiting principles given in *Stroman* protecting state government officials, as should be assured reciprocally for Attorneys General from our three states, vitally important and binding in this circuit even after our holding today.

I disfavor parallels between this case and *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) or *Calder v. Jones*, 465 U.S. 783 (1984). *Wien Air Alaska* involved a commercial dispute that is largely incomparable to the state law enforcement in this case. As we pointed out in *Stroman*, "the

---

[1] Importantly, at the motion to dismiss phase, a plaintiff's allegations must be taken as true. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) ("Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor."). Therefore, as the majority points out, we do not resolve the factual dispute of whether Grewal did indeed threaten to enforce New Jersey nuisance laws against residents of Texas distributing the online files to residents of states other than New Jersey. If, in fact, Grewal attempted to prevent the distribution of the files only within the state of New Jersey as counsel forcefully contended in oral argument, the case would be analogous to *Stroman*, in which Arizona's Commissioner limited her enforcement to those engaging in real estate transactions in the State of Arizona.

18

absence of 'commercial transactions in interstate commerce' in which a
defendant 'sought a commercial benefit' preclude[s] an analogy to commercial
activity cases as a basis for assertion of personal jurisdiction." 513 F.3d at 485
(quoting *Kulko v. Superior Court*, 436 U.S. 84, 97 (1978)). *Wien Air Alaska* is
also distinguishable because that commercial defendant engaged in multiple
types of interactions beyond a cease-and-desist letter. 195 F.3d at 212–14. He
contacted the plaintiff "numerous" times via "letters, faxes, and phone calls to
Texas." *Id*. at 212. He also visited Texas and held other meetings in person
with the plaintiff as part of an ongoing attorney-client relationship with the
plaintiff. *Id*. at 214. This ongoing business relationship is a more natural fit for
the "doing business" requirement in the Texas long-arm statute. TEX. CIV.
PRAC. & REM. CODE § 17.042. Any stray language in *Wien Air Alaska* implying
that a single cease-and-desist letter, even one that directly relates to the
plaintiff's cause of action, creates personal jurisdiction is not tied to the facts
of that case.

The comparison to *Calder* is similarly inapt, above all if it is offered by
litigants to diminish the state sovereignty principles underlying *Stroman*.
That case involved personal jurisdiction based on the "effects" of the
commercial defendant's conduct in the forum, rather than the typical
minimum contact test. 465 U.S. at 789. This form of jurisdiction is "rare," and
the Supreme Court has moved away from an effects-based analysis, instead
requiring "active minimum contacts with the forum state." *Stroman*, 513 F.3d
at 486, 489. In *Walden v. Fiore*, the Court explained that *Calder* should not be
interpreted to confer jurisdiction whenever an individual is accused of
committing a tort against a resident of the forum state:

> *Calder* made clear that mere injury to a forum resident is not a
> sufficient connection to the forum. Regardless of where a plaintiff

lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

571 U.S. 277, 290 (2014). We have repeatedly refused to find jurisdiction based on conduct toward an individual who happens to be located in a state—even conduct that causes injury—where the conduct is not expressly aimed at the state. *See Stroman*, 513 F.3d at 486 ("We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident."); *Wien Air Alaska*, 195 F.3d at 212 ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."); *see also Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). Therefore, I do not agree that Grewal's cease-and-desist letter had a strong enough "effect" in Texas to create jurisdiction.

*Calder* was unique in that there was evidence in the record that the defendant's conduct affected not only the plaintiff but also at least 600,000 others in the forum state. *Calder*, 465 U.S. at 785 (stating that the circulation of the National Enquirer in California was 600,000 at the time of the alleged tort); *see also Walden*, 571 U.S. at 287 ("The strength of th[e] connection [in *Calder*] was largely a function of the nature of the libel tort."). Conversely, Grewal's cease-and-desist letter injured only the plaintiffs because it threatened enforcement against only them.[2] Plaintiffs cannot rely on their

---

[2] If we were to analyze the effects of Grewal's conduct by looking at the number of people affected by plaintiffs' compliance with his demands, the effects within the larger Texas

connections to Texas alone to show an effect within the state based on Grewal's actions toward them as individuals he knew to be Texans. *See Walden*, 571 U.S. at 289 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections."). Though he affirmatively communicated with Texas residents, "none of [Grewal's] challenged conduct had anything to do with [Texas] itself." *Id.*

The majority contends that this is the unique case in which the effect in the forum is significant enough to create jurisdiction because the plaintiffs' injuries are more directly attributable to the letter itself than in *Stroman*. This characterization is in tension with *Stroman*'s holding that "[t]here is no question that the underlying cause of action 'arises' out of the Commissioner's cease and desist order to Stroman in Texas." *Stroman*, 513 F.3d at 487. The majority does not explain how this letter more directly causes the plaintiffs' alleged injuries than the letter in *Stroman*, above all when Grewal's letter begins: "You are directed to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*." (emphasis added). I am therefore unconvinced that "effects" jurisdiction based on Grewal's alleged tort is appropriate; I would instead employ the traditional minimum contacts analysis to find that the aggregate of Grewal's alleged conduct affirmatively reached out into Texas by attempting to enforce state law even when New Jersey citizens or property were not involved.

---

population would be minimal because Defense Distributed admits that the files remain available online.

No. 19-50723

For these reasons, I agree that Grewal's conduct created minimum contacts with the State of Texas, but I do not agree that *Wien Air Alaska* and *Calder* control the outcome of this case.[3]

---

[3] Even if personal jurisdiction exists, there is now parallel litigation in Texas and New Jersey, and the parties, and either district court, may seek transfer under 28 U.S.C. § 1404(a). Our observation in *Stroman* was that "[w]hen a state defends its laws in a faraway forum, it loses the benefit of having the laws examined by local state or federal courts—courts that have special expertise interpreting its laws." 513 F.3d at 487. From my review of cases against *government officials* who attempt to enforce a state law, so for no personal or commercial profit, the litigation has taken place in the governmental official's state. *See generally Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (operator of classified advertising website brought action alleging that the Cook County Sheriff violated his First Amendment rights in the Northern District of Illinois); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (religious organization and pastor sued Staten Island borough president alleging violations of their First Amendment rights in the Eastern District of New York).

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

September 11, 2020

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 19-50723   Defense Distributed, et al v. Gurbir Grewal
                    USDC No. 1:18-CV-637

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                     Sincerely,

                     LYLE W. CAYCE, Clerk

                     *Melissa Mattingly*

                     By: _____
                     Melissa V. Mattingly, Deputy Clerk
                     504-310-7719

cc w/encl:
    Mr. Jeremy M. Feigenbaum
    Mr. Chad Flores
    Mr. Alexander Hardiman
    Mr. Ronald Casey Low
    Mr. Glenn Moramarco