# EXHIBIT A

No. __-____

## In the Supreme Court of the United States

GURBIR S. GREWAL, ATTORNEY GENERAL OF NEW
JERSEY, IN HIS OFFICIAL CAPACITY,

*Petitioner,*

*v.*

DEFENSE DISTRIBUTED, SECOND AMENDMENT
FOUNDATION, INC.,

*Respondents.*

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

## PETITION FOR A WRIT OF CERTIORARI

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*
JEREMY M. FEIGENBAUM*
*State Solicitor*
MAYUR P. SAXENA
*Assistant Attorney General*
MELISSA MEDOWAY
TIM SHEEHAN
*Deputy Attorneys General*
Office of Attorney General
25 Market Street
P.O. Box 112
Trenton, NJ 08625
(609) 292-4925
Jeremy.Feigenbaum@njoag.gov
*Counsel of Record*

(i)

## QUESTION PRESENTED

A court may exercise specific personal jurisdiction over a nonresident defendant only where the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). In *Walden v. Fiore*, 571 U.S. 277 (2014), this Court held that personal jurisdiction thus cannot be based solely on the fact that the plaintiff experienced injury in the forum State. Rather, defendant's own conduct must connect him to the forum State itself.

The question presented is:

Whether a nonresident state official subjects itself to personal jurisdiction in another forum State when it sends a single cease-and-desist letter to a single resident in that State.

(ii)

## STATEMENT OF RELATED PROCEEDINGS

The proceedings related to this petition are:

*Defense Distributed v. Grewal*, No. 1:18-cv-637-RP, U.S. District Court for the Western District of Texas. Judgment entered January 30, 2019.

*Defense Distributed v. Grewal*, No. 19-50723, U.S. Court of Appeals for the Fifth Circuit. Judgment entered August 19, 2020.

(iii)

## TABLE OF CONTENTS

QUESTION PRESENTED............................................i

STATEMENT OF RELATED PROCEEDINGS.........ii

OPINIONS BELOW ...................................................1

JURISDICTION ........................................................1

CONSTITUTIONAL PROVISION INVOLVED ........1

INTRODUCTION......................................................2

STATEMENT ...........................................................4

REASONS FOR GRANTING THE PETITION .......12

    I.     The Courts Of Appeals Are Split On The Question Presented...................................12

    II.    The Decision Below Squarely Conflicts With This Court's Precedent .............................17

    III.   This Case Is An Ideal Vehicle To Resolve The Circuit Split On This Important Jurisdictional Question ............................26

CONCLUSION ........................................................33

(iv)

APPENDIX

Appendix A

Opinion, United States Court of Appeals for the Fifth Circuit, *Defense Distributed, et al. v. Gurbir S. Grewal*, No. 19-50723 (Aug. 19, 2020) ............1a

Appendix B

Order, United States District Court for the Western District of Texas, *Defense Distributed, et al. v. Gurbir S. Grewal, et al.*, No. 18-637 (Jan. 30, 2019) ........................................................................29a

(v)

# TABLE OF AUTHORITIES

## Cases

*Berry College v. Rhoda,*
No. 13-115, 2013 WL 12109374 (N.D. Ga. June 12, 2013) ............................................................17

*Breckenridge Pharm., Inc. v. Metabolite Labs.,*
444 F.3d 1356 (CAFed 2006) ........................13, 30

*Bristol-Myers Squibb Co. v. Superior Ct. of California,*
137 S. Ct. 1773 (2017)..........................................25

*C5 Medical Werks, LLC v. CeramTec GMBH,*
937 F.3d 1319 (CA10 2019).....................13, 14, 16

*Calder v. Jones,*
465 U.S. 783 (1984)......................................*passim*

*Deal Point Trading v. Standard Process,*
No. 19-1926, 2020 WL 6106617 (S.D. Cal. Apr. 20, 2020) ....................................................................16

*Defense Distributed v. Att'y Gen. of N.J.,*
972 F.3d 193 (CA3 2020) ................................6, 25

*Dudnikov v. Chalk & Vermilion Fine Arts,*
514 F.3d 1063 (CA10 2008).................................14

*Genetic Implant Sys. Inc. v. Core-Vent Corp.,*
123 F.3d 1455 (CAFed 1997) ..............................31

*Halliburton Energy Servs. v. Ironshore Specialty Ins.,*
921 F.3d 522 (CA5 2019) ....................................15

(vi)

*Inamed Corp. v. Kuzmak,*
    249 F.3d 1356 (CAFed 2001) ............................... 12

*Kehm Oil Co. v. Texaco, Inc.,*
    537 F.3d 290 (CA3 2008) .................................... 14

*Kulko v. Superior Ct.,*
    436 U.S. 84 (1978).............................................. 23

*Leroy v. Great W. United Corp.,*
    443 U.S. 173 (1979)............................................ 24

*Montana-Dakota Util. Co. v. Nw. Pub. Serv. Co.,*
    341 U.S. 246 (1951)............................................ 20

*Morningside Church, Inc. v. Rutledge,*
    No. 20-5050, 2020 WL 5077255 (W.D. Mo. Sept.
    18, 2020) ............................................................ 17

*New World Int'l v. Ford Global Techs.,*
    859 F.3d 1032 (CAFed 2017) ................... 12, 13, 14

*Radio Sys. Corp. v. Accession, Inc.,*
    638 F.3d 785 (CAFed 2011) ................................ 13

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,*
    148 F.3d 1355 (CAFed 1998) ............. 13, 14, 26, 31

*Stroman Realty v. Wercinski,*
    513 F.3d 476 (CA5 2008) .................................... 15

*Walden v. Fiore,*
    571 U.S. 277 (2014)...................................... *passim*

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)............................................ 24

(vii)

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et*
*L'Antisemitisme,*
433 F.3d 1199 (CA9 2006).............................16, 26

## Constitutional Provision

U.S. Const. amend. XIV ...............................................1

## Statutes

28 U.S.C. § 1254(1) ....................................................1

28 U.S.C. § 1291 .......................................................1

28 U.S.C. § 1404.......................................................32

## Rules

N.J. Ct. R. 2:12A-1....................................................25

## Other Authorities

Cease and Desist Order, *State of North Dakota v.*
*Better Business Marketing, Inc.*
(State of North Dakota, Office of Att'y Gen., July
23, 2020) ...............................................................28

Compl., *State of Connecticut, et al. v. Teva Pharm.*
*USA, Inc.*
(D. Conn. May 10, 2019) ......................................29

Ltrs. From N.Y. Att'y Gen., dated Mar. 3 & 12, 2020
...........................................................................28

Order, *In re Ocwen Loan Servicing, LLC*
(S.D. Dep't of Labor & Regulation, Div. of
Banking, Apr. 20, 2017).......................................28

(viii)

Petition, *State of Texas v. Purdue Pharma L.P., et al.* (Travis Cnty. Dist. Ct., May 15, 2018) ...............29

Press Release, Attorney General of Louisiana, Hundreds Of Millions In Relief Announced For Subprime Auto Loan Consumers (May 22, 2020) ...........................................................................30

Press Release, Attorney General's Office, Attorney General Determines Paid Daily Fantasy Sports Contests Are Illegal Gambling (Apr. 5, 2016).....27

Press Release, Attorney General of Texas, Attorney General Paxton Announces Multistate Settlement Against Deceptive Cancer Charities (May 19, 2015) ....................................................................29

Press Release, Attorney General of Texas, Texas Attorney General Announces Settlement Requiring Two National Lenders to Comply with Antitrust Laws Before Completing Merger (Nov. 13, 2015) ................................................................29

Press Release, Department of Attorney General, AG Nessel's Office Sends Cease and Desist Letters to Online Sellers for Price-gouging (Apr. 7, 2020) ..27

Press Release, Florida's Chief Financial Officer, CFO Sink Issues Consumer Alert: Floridians Should Cease Transactions with National Foundation of America (Apr. 25, 2017) .......................................27

Press Release, Office of Attorney General Karl Racine, AG Racine Sues Predatory Online Lender For Illegal High-Interest Loans To District Consumers (June 5, 2020) ...................................27

(ix)

Press Release, Office of Attorney General Maura
    Healey, AG Healey Sends Cease and Desist
    Letter to Online E-cigarette Retailer for Violating
    State Laws, Selling to Minors (Feb. 27, 2019) .... 27

Press Release, Tennessee State Government, TABC
    Investigates And Halts Illegal Direct-To-
    Consumer Alcohol Shipments In Tennessee (Jan.
    7, 2020) ................................................................. 28

1

## OPINIONS BELOW

The opinion of the court of appeals is reported at 971 F.3d 485. Pet. App. 1a-28a. The district court's opinion is reported at 364 F. Supp. 3d 681. Pet. App. 29a-49a.

## JURISDICTION

The court of appeals had jurisdiction over Respondents' appeal of the district court's final judgment under 28 U.S.C. § 1291. The Fifth Circuit issued its opinion on August 19, 2020. This Petition is timely filed under Supreme Court Rule 13 and this Court's order dated March 19, 2020, which extended the deadline for filing any petition for writ of certiorari due after the date of the order. This Court's jurisdiction is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL PROVISION INVOLVED

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law."

2

## INTRODUCTION

The Fifth Circuit held that the New Jersey Attorney General subjected himself to the jurisdiction of the Texas courts by sending a single cease-and-desist letter to a single Texas resident that warned it not to violate New Jersey law. The court found that jurisdiction exists under the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984), which held that the publishers of a defamatory article about a California actress were subject to jurisdiction in California based on the article's California focus and circulation to 600,000 California residents. In the Fifth Circuit's view, the effects of this single cease-and-desist letter to a single company are not unlike the impacts of the widespread circulation in *Calder*. This is the first decision to hale any Attorney General into another forum State's courts to defend the validity of his State's law based solely on a single cease-and-desist letter.

This Court's review of this unprecedented expansion of effects jurisdiction is needed for three reasons. First, the decision below creates a split as to whether sending a single cease-and-desist letter is sufficient to demonstrate personal jurisdiction in the forum where a plaintiff receives it. Up until this point, the courts of appeals had uniformly found that such letters alone were not enough for jurisdiction. The courts gave good reasons for their approach. *Inter alia*, courts encourage cease-and-desist letters, which seek to resolve disputes without litigation. But if parties know sending a cease-and-desist letter may subject them to preemptive forum-shopping litigation, they will be disincentivized from doing so. Unfortunately, despite acknowledging that a cease-and-desist letter was the "totality" of the New Jersey Attorney General's ties to Texas,

3

the Fifth Circuit broke from the Third, Tenth, and Federal Circuits to allow for jurisdiction anyway.

Second, the Fifth Circuit's approach is flatly inconsistent with this Court's personal jurisdiction jurisprudence, and revives a test most recently rejected in *Walden v. Fiore*, 571 U.S. 277 (2014). The question in all personal jurisdiction cases is whether the defendant purposefully availed itself of the privilege of conducting activities within the forum State, invoking the benefits and protections of its laws. By sending a single Texas company a cease-and-desist letter warning it not to violate New Jersey law, the New Jersey Attorney General in no way availed himself of Texas as a forum. The panel majority filled that gap by emphasizing that the *recipient* of the cease-and-desist letter felt the harm in Texas, because that is where the company chooses to reside. But time and again this Court has stressed that "mere injury to a forum resident is not a sufficient connection to the forum," and that personal jurisdiction will lie only if there is a sufficient relationship between the defendant and the forum itself. *Id.*, at 290. That error was only magnified by the fact that the defendant here is a nonresident state official; the Fifth Circuit gave no consideration to the important state sovereignty interests that result from allowing Texas courts to evaluate a challenge to the constitutionality of New Jersey law.

Finally, certiorari is especially warranted because the implications of this case are tremendous—and this case is an ideal vehicle to address them. State enforcement officials, not unlike private businesses, regularly send cease-and-desist letters to out-of-state individuals and companies, seeking compliance with a range

4

of state laws from antitrust statutes to consumer protection or price gouging rules. The Fifth Circuit's approach throws that practice into doubt, because it suggests that States would regularly be required to defend their laws in faraway courts due to preemptive forum-shopping actions by the recipients of cease-and-desist letters. And it would inexorably lead to circuit splits over the meaning and validity of *state* laws in the future. Thankfully, this case squarely presents the issue of whether an individual cease-and-desist letter suffices for jurisdiction, providing the opportunity to prevent these consequences from arising.

## STATEMENT

1. In 2018, Respondent Defense Distributed, a Texas-based company that operates a website available in all 50 States, announced plans to disseminate computer files online that would allow any individual with access to a 3D printer to produce their own firearms. *Defense Distributed v. Grewal*, W.D. Tex. No. 1:18-CV-637, Dkt. 23 at 7-8. Respondent's plan would enable individuals—including felons, terrorists, and domestic abusers—to directly print their own weapons, even if they could not pass a background check. See *id.* And it would allow them to produce firearms that could not be traced by law enforcement even if later used in a crime. *Id.*; see also Pet. App. 30a.

On July 26, 2018, the New Jersey Attorney General sent Respondent a cease-and-desist letter at its Texas address, explaining that dissemination of these files for use by New Jersey residents would violate his State's law. *Defense Distributed v. Grewal*, W.D. Tex. No. 1:18-CV-637, Dkt. 23-5. The letter began by stating that "[y]ou are directed to cease and desist from publishing printable-gun computer files for use by

5

New Jersey residents." *Id.* The Attorney General explained that these printable gun codes "are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws." *Id.*; see also *id.*, Dkt. 23-5 at 1-2 (describing the relevant New Jersey public nuisance law). Writing in his official capacity, the Attorney General warned that "[a]s the chief law enforcement officer for New Jersey … my Office will initiate legal action barring you from publishing these files before August 1, 2018." *Id.*, Dkt. 23-5 at 2.

Four days later, after Respondent failed to comply, the New Jersey Attorney General followed through on his letter and sued Defense Distributed in New Jersey state court. *Id.*, Dkt. 23 at 17. The New Jersey Attorney General also joined other Attorneys General in a lawsuit in the Western District of Washington, commenced in July 2018, seeking to enjoin the U.S. State Department from issuing a license allowing Respondent to distribute these files. *Id.*, Dkt. 23 at 13.

But before the New Jersey Attorney General could file the state court suit he had warned of, Respondents rushed to court on July 29, 2018, suing the Attorney General in the Western District of Texas instead. *Id.*, Dkt. 1 & 23.[1] Respondents sought a declaration that the New Jersey law the Attorney General threatened to enforce was unconstitutional, and an injunction

---

[1] Respondents also sued the New York Governor, Delaware Attorney General, Pennsylvania Attorney General and Governor, and Los Angeles City Attorney, each in their official capacities. *Defense Distributed v. Grewal*, W.D. Tex. No. 1:18-CV-637, Dkt. 23 at 5. These defendants are no longer parties to this action because the claims against them were dismissed, and Respondents chose not to appeal that dismissal. Pet. App. 48a-49a.

6

barring him from enforcing his State's law against Respondents' conduct. *Id.*, Dkt. 23 at 23-32. In particular, Respondents alleged that New Jersey law violates the First and Second Amendments, Dormant Commerce Clause, and Supremacy Clause, and that it constitutes tortious interference with Respondents' contracts. *Id.* Respondents sought a preliminary injunction and temporary restraining order against the Attorney General. *Id.*, Dkt. 52.

Separately, Respondents also filed suit against the New Jersey Attorney General in the District of New Jersey, raising the same claims as in the Western District of Texas. Pet. App. 4a; see *Defense Distributed v. Grewal*, D.N.J. No. 3:19-cv-4753. Over Respondents' objection, that suit was stayed pending the resolution of the first-filed litigation in Texas. Pet. App. 4a. Although Respondents had the option to drop the lawsuit in Texas and proceed in New Jersey federal court, they declined to do so. See *Defense Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193, 197 (CA3 2020).

2. On January 30, 2019, the district court for the Western District of Texas (Pitman, J.) dismissed for lack of personal jurisdiction. The court, relying on Respondents' own filings, began by explaining that the primary jurisdictional question was whether a nonresident state official subjects itself to the jurisdiction of Texas courts when it sends a cease-and-desist letter to a Texas resident warning that resident not to violate the official's own state law. Pet. App. 40a. The court held such a letter insufficient to establish personal jurisdiction in Texas on its own. Pet. App. 41a-43a.

The court first acknowledged that the New Jersey Attorney General had sent its cease-and-desist letter only "in an effort to uphold the laws" of his State. Pet.

7

App. 40a. The court explained such a letter "do[es] not constitute 'doing business' in Texas, and [the New Jersey Attorney General has] not accrued any benefit relating to Texas through use of the letter[]." *Id.* (citation omitted). To the contrary, the Attorney General "did not 'purposefully avail' [himself] of the benefits of Texas law like someone actually 'doing business' in Texas." *Id.* (citations omitted). It follows that the Attorney General "could not have reasonably anticipated being haled into federal court in Texas to defend" the enforcement of New Jersey law. *Id.*

The court specifically rejected the idea that the "effects test" first announced in *Calder v. Jones*, 465 U.S. 783 (1984), could support personal jurisdiction in this case. Pet. App. 41a-43a. As the court noted, "[e]ffects jurisdiction … is rare," and "it is premised on the idea that an act done outside a state that has consequences or effects within the forum state can suffice as a basis for personal jurisdiction if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." Pet. App. 41a (citations omitted). The court emphasized that effects jurisdiction could not lie in Texas based solely on the fact that a resident felt injury there: "the proper question is not *where* the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Pet. App. 42a (quoting *Walden*, 571 U.S., at 285). Simply, "a defendant's conduct is insufficient to establish minimum contacts when it has no relation to the forum state 'other than the fortuity that plaintiffs reside there.'" *Id.* (cleaned up) (citation omitted).

8

The court held that these principles foreclosed the
exercise of jurisdiction in this case. While Respond-
ents said that jurisdiction is proper in Texas because
that "is where Defense Distributed is headquartered
and where it publishes its website," as well as where
the company "publishes information about firearms at
a brick-and-mortar public library," Pet. App. 42a-43a
(quoting Respondents' filings), the district court re-
plied that this amounted to an impermissible request
for the "*plaintiff's* contacts with the defendant and fo-
rum to drive the jurisdictional analysis." Pet. App. 43a
(quoting *Walden*, 571 U.S., at 289). Said another way,
while it was true a cease-and-desist letter was mailed
to Texas (because that is where Respondent resides)
and that the company experienced the legal threat in
Texas (for the same reason), the New Jersey Attorney
General's own conduct "has no relation to Texas, was
not expressly aimed at Texas, and does not avail itself
of any Texas laws or benefits. The only relationship
[the Attorney General's] actions have with the State
of Texas is the 'mere fortuity' that Defense Distributed
resides there." *Id.* (citation omitted).

The court also rejected as irrelevant the other ju-
risdictional ties Respondents highlighted—including
a letter that the Attorney General sent to Defense Dis-
tributed's internet security company in California, a
statement by the Attorney General about Respondent
at a press conference in Trenton, New Jersey, and the
Attorney General's participation in a suit in the West-
ern District of Washington, because none of these ac-
tions "have any jurisdictionally meaningful relation to
Texas." Pet. App. 43a n.5.

3. The Fifth Circuit reversed. Writing for the ma-
jority, Judge Edith H. Jones began by acknowledging

9

that the "totality of [the New Jersey Attorney General's] contacts with Texas involves a cease and desist order sent to Defense Distributed." Pet. App. 9a. Like the district court, the panel concluded that none of the remaining asserted jurisdictional ties related to Texas in any way. See Pet. App. 10a-11a (noting that, aside from the single cease-and-desist letter, the remaining jurisdictional hooks on which Respondents relied related to a company "based in California, not Texas," or otherwise "took place in New Jersey"). Whether this nonresident state official could be haled into Texas court thus turned on the import of this one letter.

Unlike the district court, however, the panel determined that the Attorney General's single cease-and-desist letter to a Texas company qualified as "purposeful availment" such that he could be haled into court in Texas to defend New Jersey's law. The panel wrote that it was reaching its conclusion because the Attorney General, in sending a letter to Respondent, allegedly sought to "'halt publication of the printable-gun computer files'" anywhere in the United States "without specifying that Defense Distributed cease marketing its materials to New Jersey residents" alone. Pet. App. 12a; see Pet. App. 14a (basing jurisdiction on the fact that the letter "asserted a pseudo-national executive authority" that was not limited to New Jersey's borders).[2] The majority also found that "many of [Respondents'] claims are based on [the] cease-and-desist," which supported jurisdiction. Pet. App. 11a.

---

[2] To be clear, New Jersey disagreed with the panel's reading of this letter—which specifically warned Respondent not to publish its printable gun codes "for use by New Jersey residents." Pet. App. 12a n.6. But New Jersey acknowledges that at the motion-to-dismiss stage courts "resolve all factual disputes in favor

10

After describing New Jersey's cease-and-desist let-
ter, the panel held that the letter sufficed for the ex-
ercise of jurisdiction under *Calder*'s "effects test." Pet.
App. 18a-19a. In *Calder*, the Court allowed for the ex-
ercise of jurisdiction in California where the National
Enquirer's defamatory article about a California ac-
tress was based upon information obtained from Cali-
fornia sources about California activities, was circu-
lated to 600,000 California residents, and caused rep-
utational harm in California. 465 U.S. at 788-89. The
Fifth Circuit concluded that "*Walden* [*v. Fiore*] makes
clear that *Calder* remains good law." Pet. App. 17a.

The Fifth Circuit held that this case fit in the mold
of *Calder* because the cease-and-desist letter allegedly
"had a chilling effect on the exercise of [Respondents']
First Amendment rights," which in turn "caused them
to cease publication and reduced Texans' access to the
materials the plaintiffs seek to publish." Pet. App.
18a. As a result, because this letter had "'a potentially
devastating impact' on the plaintiffs—and, by exten-
sion, those who wished to benefit from the plaintiffs'
activities, including Texas residents," Pet. App. 19a
(quoting *Calder*, 465 U.S. at 789), the majority found
that its impact "is not unlike that of the defamatory
article at issue in *Calder*." Pet. App. 18a.

Judge Higginson concurred, agreeing that specific
personal jurisdiction exists based on the allegation
that the Attorney General sought "to prevent Texas
residents from publishing files online to individuals

---

of the plaintiff." *Id.* Even assuming the panel correctly inter-
preted New Jersey's letter, however, its legal conclusions gener-
ated a split among circuits, directly conflict with this Court's
precedents, and will have significant consequences for state en-
forcement actions and cease-and-desist letters going forward.

11

outside of New Jersey," Pet. App. 23a, but disagreeing that *Calder*'s "effects test" would apply. Judge Higginson started by emphasizing that "[t]his form of jurisdiction is 'rare,' and the Supreme Court has moved away from an effects-based analysis, instead requiring active minimum contacts with the forum state." Pet. App. 25a. Although *Walden* acknowledged that *Calder* could remain good law (as the majority emphasized), *Walden* also "explained that *Calder* should not be interpreted to confer jurisdiction whenever an individual is accused of committing a tort against a resident of the forum state." *Id.*

The concurrence concluded that the instant litigation fell far short of the special circumstances of *Calder*. While "*Calder* was unique in that there was evidence in the record that the defendant's conduct affected not only the plaintiff but also at least 600,000 others in the forum state," this single "cease-and-desist letter injured only the plaintiffs because it threatened enforcement against only them." Pet. App. 26a. And though it was true Respondents happened to be based in Texas, Respondents "cannot rely on their connections to Texas alone to show an effect within the state based on Grewal's actions toward them as individuals he knew to be Texans." *Id.* Simply put, while the Attorney General "communicated with Texas residents"—to warn them they would be violating New Jersey's law—"none of [his] challenged conduct had anything to do with [Texas] itself." Pet. App. 27a (quoting *Walden*, 571 U.S., at 289).

Judge Higginson also explained that the majority's expansive reading of *Calder* had significant implications for "state sovereignty principles." Pet. App. 25a. His opinion noted that "[w]hen a state defends its laws

12

in a faraway forum, it loses the benefit of having the
laws examined by local state or federal courts—courts
that have special expertise interpreting its laws." Pet.
App. 27a n.3 (citation omitted). That is why, Judge
Higginson continued, he was unable to find *any* other
case exercising personal jurisdiction over a nonresi-
dent government official on such facts. *Id.* To the con-
trary, "[f]rom [his] review of cases against government
officials who attempt to enforce a state law, so for no
personal or commercial profit, the litigation has taken
place in the governmental official's state." *Id.*

## REASONS FOR GRANTING THE PETITION

The Fifth Circuit determined that Texas courts en-
joy personal jurisdiction over the New Jersey Attorney
General on the basis of a single cease-and-desist letter
he sent to a single Texas resident. That decision gen-
erates a circuit split; is directly inconsistent with this
Court's precedents; and will have sweeping conse-
quences for state officials seeking to enforce their
laws. This Court should grant certiorari.

## I.  The Courts Of Appeals Are Split On The Question Presented.

The Fifth Circuit's conclusion that a cease-and-de-
sist letter alone can suffice to support personal juris-
diction in the recipient's forum State conflicts with de-
cisions from the Federal, Tenth, and Third Circuits.

The Federal Circuit has repeatedly "held that it is
improper to predicate personal jurisdiction on the act
of sending ordinary cease and desist letters into a fo-
rum, without more." *New World Int'l v. Ford Global
Techs.*, 859 F.3d 1032, 1038 (CAFed 2017); see, *e.g.,
Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1361 (CAFed

13

2001) (confirming "the sending of an infringement let-
ter, without more, is insufficient to satisfy the require-
ments of due process when exercising jurisdiction over
an out-of-state patentee"); *Red Wing Shoe Co. v. Hock-
erson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (CAFed
1998) (concluding that "cease-and-desist letters alone
do not suffice to create personal jurisdiction"); *Radio
Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 789 (CAFed
2011); *Breckenridge Pharm., Inc. v. Metabolite Labs.*,
444 F.3d 1356, 1363 (CAFed 2006). After all, as that
court has repeatedly explained, "principles of fair play
and substantial justice afford a patentee sufficient lat-
itude to inform others of its patent rights without sub-
jecting itself to jurisdiction in a foreign forum." *New
World Int'l*, 859 F.3d, at 1038 (quoting *Red Wing Shoe*,
148 F.3d, at 1360-61). A contrary rule would prevent
a patentee from doing so pre-litigation.

   The Tenth Circuit's precedent is in accord. See *C5
Medical Werks, LLC v. CeramTec GMBH*, 937 F.3d
1319, 1234 (CA10 2019) ("[W]e agree with the Federal
Circuit that a single cease-and-desist letter is insuffi-
cient to confer jurisdiction in a declaratory judgment
action like this one."). In that case, a German ceramics
producer sent a Colorado competitor a letter warning
of trademark violations and threatening suit. *Id.* at
1322. When the Colorado company sued in the District
of Colorado in response, the Tenth Circuit concluded
that this single letter was "not a proper basis for juris-
diction" in the State. *Id.* at 1324; see also *id.* (adding
that, for effects-based jurisdiction, "merely interacting
with a plaintiff known to bear a strong connection to
the forum state is not enough to establish jurisdic-
tion") (citing *Walden*, 571 U.S. at 284). Instead, be-
cause the plaintiff "failed to allege sufficient activities

14

in addition to the cease-and-desist letter, [the] exercise of personal jurisdiction … was improper." *Id.*

Finally, the Third Circuit has likewise rejected the idea that a cease-and-desist letter alone justifies exercising jurisdiction in the recipient's forum state. See *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 301 (CA3 2008) (holding, in a franchisor dispute, that "a cease and desist letter does not rise to the level of purposeful availment for purposes of jurisdiction in Pennsylvania"). After all, the minimum contacts analysis looks at whether a defendant has purposefully availed itself of the forum, but a cease-and-desist letter "expresses the goal *not* to do business in" the forum State. *Id.* (citing *Red Wing Shoe,* 148 F.3d at 1361). The split could not be clearer: if the Texas Attorney General had sent a cease-and-desist letter to a New Jersey company, jurisdiction in New Jersey would not be proper on that basis. But the converse is now permitted.

To be sure, these courts have acknowledged that a cease-and-desist letter can be relevant to the jurisdictional analysis if it is one of *multiple* contacts with the forum. See *New World*, 859 F.3d, at 1038 (concluding that "[w]hile the act of sending cease and desist letters is in-sufficient by itself to trigger a finding of personal jurisdiction, other activities by the defendant, in conjunction with cease and desist letters, may be sufficient," and collecting cases); *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1082 (CA10 2008) (allowing jurisdiction when defendant "communicated … to a third party with the intent that the third party take action directly against plaintiffs' business interests," but holding that such letter was "readily distinguishable" from "sending a mere cease-and-desist let-

15

ter directly to plaintiffs," and "[a]ssuming without deciding that it would be unreasonable to found jurisdiction solely on a cease-and-desist letter"). In this case, however, the court below admitted the "totality of [the New Jersey Attorney General's] contacts with Texas involves a cease and desist order sent to Defense Distributed." Pet. App. 9a. And as to the jurisdictional import of such a cease-and-desist letter standing alone, the Federal, Tenth, and Third Circuits are clear.

The Fifth Circuit's approach stands in contrast to these decisions. Of course, the Fifth Circuit recognizes that many cease-and-desist letters are insufficient to support jurisdiction in the recipient's state. See, *e.g., Halliburton Energy Servs. v. Ironshore Specialty Ins.*, 921 F.3d 522, 542 (CA5 2019) (finding letters at issue, "even if they threatened litigation, are not enough to show minimum contacts with Texas");[3] *Stroman Realty v. Wercinski*, 513 F.3d 476 (CA5 2008) (rejecting claim that nonresident state official was subject to jurisdiction based upon cease-and-desist letter). But unlike the other circuits, the Fifth Circuit believes such letters *are* enough to create effects-based jurisdiction in the recipient's State if the sender asserts "pseudo-national" authority that would "crush" the recipient's operations, and thus would have downstream effects on the company's consumers—including consumers in the forum state. See Pet. App. 12a-14a.

That legal line is flatly inconsistent with the cases discussed above. The Federal Circuit's rulings provide

_____

[3] Notably, the Fifth Circuit in *Halliburton* acknowledged that "[m]any other circuits have addressed similar scenarios in which a potential plaintiff sends a cease-and-desist letter threatening litigation to a potential defendant. None of these courts held that sending a letter amounts to purposeful availment." *Id.*

16

a perfect example. There is no dispute, of course, that a patent provides the holder with national rights; as a result, a cease-and-desist letter threatening infringement action asserts pseudo-national authority against the conduct. In the same vein, successful infringement lawsuits also "crush" the operations of any infringer, with downstream consequences to that company's consumers. So too for the Tenth Circuit ruling in *C5 Medical Werks*, which involved a "pseudo-national" assertion of trademark rights and an attempt to "crush" the unlawful business practices of a Colorado-based company. But in those cases, the courts relied on the fact that the letters reflected no purposeful availment of the forum State, but simply the fortuity of where the violator resided. The distinct considerations advanced by the Fifth Circuit played no role whatsoever.[4]

Finally, while the cases cited above involved cease-and-desist letters issued by nonresident corporations rather than nonresident state officials, that is no basis for distinguishing the circuit split. As laid out in detail

---

[4] While the Fifth Circuit appears to be the only court to adopt its expansive approach after *Walden*, the Ninth Circuit has previously adopted a distinct rule that allows jurisdiction to turn on the nature of the cease-and-desist letter. See, *e.g., Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1209 (CA9 2006). In *Yahoo!*, the Ninth Circuit held that courts should examine the intent behind a cease-and-desist letter to determine whether it is "more like a normal cease and desist letter" (and does not support jurisdiction in the recipient's forum state) or is "abusive, tortious or otherwise wrongful" (and could support jurisdiction). *Id.* at 1209. Notably, while *Yahoo!* was decided before *Walden*, district courts in the Ninth Circuit continue to apply its test to cease-and-desist letters. See, *e.g., Deal Point Trading v. Standard Process*, No. 19-1926, 2020 WL 6106617, *4-5 (S.D. Cal. Apr. 20, 2020) (inquiring into whether letters were "abusive, tortious or otherwise wrongful").

17

below, the arguments against jurisdiction are *stronger* when nonresident state officials are involved. See *infra* at 23-24. In such a case, it is especially likely that the nonresident state official is simply seeking to enforce his State's law rather than to enjoy the benefits of Texas, and particularly likely it is a "mere fortuity" the recipient resides in Texas. It cannot be that a national company avoids personal jurisdiction based on a cease-and-desist letter, but a State official—sued in his official capacity—can be haled into another State's courts to defend the validity of his own law based on the same facts.[5] A clear split thus exists as to whether and when a single cease-and-desist letter alone supports the exercise of personal jurisdiction.

## II.   The Decision Below Squarely Conflicts With This Court's Precedent.

The Fifth Circuit's decision is an outlier for a good reason: its approach resurrects an expansive understanding of jurisdiction that this Court has repeatedly

---

[5] In any event, although the few cases New Jersey has identified involving cease-and-desist letters from nonresident state officials were resolved by district courts, these courts also refused to exercise jurisdiction. See *Berry College v. Rhoda*, No. 13-115, 2013 WL 12109374, *11 (N.D. Ga. June 12, 2013) (refusing jurisdiction over Executive Director of the Tennessee Higher Education Commission where his total "contacts with Georgia involved communications with Plaintiff in which Defendants attempted to perform their regulatory duties" because he did not "purposefully avail[]" himself "of Georgia's benefits and laws like individuals or entities that actually conduct business in Georgia"); *Morningside Church, Inc. v. Rutledge*, No. 20-5050, 2020 WL 5077255, *3-5 (W.D. Mo. Sept. 18, 2020) (dismissing suit against nonresident officials and finding that their decisions to send letters and subpoenas to Missouri company did not subject them to jurisdiction in Missouri), *appeal docketed*, CA8 No. 20-2954.

18

rejected. In the process, the Fifth Circuit reached the unprecedented conclusion that mailing a *single* letter to a *single* company suffices to establish "effects jurisdiction" in the recipient forum State. And it failed to give any weight to New Jersey's sovereignty interests, notwithstanding the important role for federalism in the due process analysis. Certiorari is needed to return the federal courts to the jurisdictional principles this Court has consistently articulated.

1. Begin with hornbook jurisdictional rules. As this Court has explained, the inquiry into whether a defendant can be haled into court (let alone whether a nonresident state official can be) turns on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 517 U.S., at 285. In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* At bottom, the question is whether a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Burger King*, 471 U.S. at 475, or whether the relationship to the forum is being driven by the plaintiff instead.

The Fifth Circuit erred in concluding that this single cease-and-desist letter is sufficient to meet that test. As laid out above, the Fifth Circuit admitted the "totality of [the New Jersey Attorney General's] contacts with Texas involves a cease and desist order" sent to Defense Distributed alone. Pet. App. 9a. And that letter had nothing to do with Texas. To the con-

19

trary, the cease-and-desist letter informed Respondents that their conduct would violate New Jersey law and it described the action New Jersey's chief law enforcement officer intended to pursue in New Jersey court. See Dist. Ct. Dkt. 23-5 at 1-2 (warning that the conduct "violates New Jersey's public nuisance and negligence laws" and "[a]s the chief law enforcement officer for New Jersey … my Office will initiate legal action"). The only time Texas appears in the letter is in *Respondent's* own address block. But see *Walden*, 517 U.S., at 289 (holding it is "impermissibl[e]" to "allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis").

There is no way in which the New Jersey Attorney General purposefully availed himself of the privilege of conducting activities within Texas, invoking its legal benefits and protections. To the contrary, it is undisputed that the Attorney General sent a letter only "in an effort to uphold the laws" of *his* State, and did not warn Respondent against violating Texas law or the law of any other state. Pet. App. 40a; Dist. Ct. Dkt. 23-5 at 1-2. Had the Attorney General simply filed his proposed enforcement action without a pre-suit letter, it would be obvious that he had no contact with Texas. The analysis does not change just because he chose to send Respondent a warning letter urging compliance, and Respondent happened to reside in Texas.

The Fifth Circuit's own legal analysis confirms the shortcomings in its approach. According to the panel, while many cease-and-desist letters would be insufficient for jurisdiction, the rule is different when a nonresident state official asserts any "pseudo-national authority." Pet. App. 14a. But that turns the purposeful availment analysis on its head: while such assertions

20

of extra-territorial enforcement authority might go to the *merits* of Respondents' substantive Dormant Commerce Clause claim,[6] they operate in just the opposite way for jurisdiction. See *Montana-Dakota Util. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951) (noting "the question whether jurisdiction exists" is distinct from "the question whether the complaint states a cause of action"). After all, any allegations that the Attorney General reads New Jersey law to demand compliance across the Nation makes clear that the Attorney General was not targeting Texas; that he would have pursued the same letter and challenge had Respondent resided in any other State; and that the relationship to Texas is driven by the plaintiff and not the defendant. See Pet. App. 43a (finding the Attorney General's conduct "has no relation to Texas, was not expressly aimed at Texas, and does not avail itself of any Texas laws or benefits. The only relationship [the Attorney General's] actions have with the State of Texas is the 'mere fortuity' that Defense Distributed resides there."). Put simply, any efforts to enforce New Jersey law uniformly across the country fail to indicate any purposeful availment of *Texas*.

2. The Fifth Circuit got around these problems only by adopting an unprecedented approach to effects jurisdiction. In short, the majority held that mailing a *single* letter to a *single* company is sufficient to satisfy the test first laid out in *Calder*. But that flatly ignores this Court's most recent case on the subject.

---

[6] Of course, the State contests that it sought to enforce its law in any way that violates the Dormant Commerce Clause, and is simply referring to Respondents' allegations, on which the Fifth Circuit relied at this stage of the case. See Pet. App. 6a-7a.

21

In *Walden v. Fiore*, this Court addressed the effects
test for personal jurisdiction and made clear that its
reach was narrow. In *Walden*, Nevada plaintiffs sued
a nonresident law enforcement official for conducting
an allegedly unlawful seizure of the plaintiffs' funds
in Georgia. This Court reversed the finding that juris-
diction existed in Nevada, reasoning that the defend-
ant's "relevant conduct occurred entirely in Georgia"
and his actions did not connect him to Nevada "in a
meaningful way." 571 U.S., at 290-91. The Court thus
held that "mere injury to a forum resident is not a suf-
ficient connection to the forum," rejecting a jurisdic-
tional test that equates a defendant's connection to a
forum resident with connections to the forum itself.
See *id.* at 289-90; see also *id.* at 291 (noting "it is the
defendant, not the plaintiff or third parties, who must
create contacts with the forum").

In the process, *Walden* discussed *Calder v. Jones*—
in which the Court first announced the effects test for
personal jurisdiction—and made clear that it was lim-
ited in scope. Although *Calder* held that the nonresi-
dent reporter and editor of a National Enquirer article
could be haled into California court in a defamation
suit, the unique facts in that case showed those de-
fendants really had taken "intentional conduct … that
creates the necessary contacts with the forum" itself,
not just the particular plaintiff. *Walden*, 571 U.S., at
286. To reach that conclusion, *Calder* had found "de-
fendants relied on phone calls to 'California sources'
for the information in their article; they wrote the
story about the plaintiff's activities in California; they
caused reputational injury in California by writing an
allegedly libelous article that was widely circulated in
the State; *and* the 'brunt' of that injury was suffered
by the plaintiff in that State." *Walden*, 571 U.S., at

22

287 (emphasis added). Notably, the challenged article was published in "a national weekly newspaper with a California circulation of roughly 600,000." *Id.*; see Pet. App. 25a-26a (Higginson, J., concurring) (concluding that "*Calder* was unique," and that such jurisdiction "is rare, and the Supreme Court has moved away from an effects-based analysis").

This case could not be further afield. As laid out in detail above, the only contact on which the Fifth Circuit relied for jurisdiction was the sending of a single letter to a single forum resident—in sharp contrast to the facts of *Calder*. The Fifth Circuit found this letter was nevertheless enough to establish "effects jurisdiction" because the "cease-and-desist letter would have a potentially devastating impact on the plaintiffs— and, by extension, those who wished to benefit from the plaintiffs' activities, including Texas residents." Pet. App. 19a. In other words, although the New Jersey Attorney General's *only* "contact" with Texas was his relationship with the Texas resident, the majority explicitly focused on the fact of Respondents experiencing injury in Texas to fill that gap.

But that is precisely the error that *Walden* warns against. See *Walden*, 571 U.S., at 289 (reversing decision that allowed "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis"). As Judge Higginson put it, this "cease-and-desist letter injured only the plaintiffs because it threatened enforcement against only them. Plaintiffs cannot rely on their connections to Texas alone to show an effect within the state based on [the Attorney General's] actions toward them as individuals he knew to be Texans." Pet. App. 26a. Again, the only reason the New

23

Jersey Attorney General had contact with Texas is because that is where Defense Distributed is located; if the company resided in another state, the same events would have occurred. At the end of the day, "[t]hough he affirmatively communicated with Texas residents, 'none of [the Attorney General's] challenged conduct had anything to do with [Texas] itself.'" Pet. App. 27a (quoting *Walden*, 571 U.S. at 289).[7]

3. The panel decision is especially untenable given the important sovereignty interests it disregarded.

To begin, the panel overlooked the fact that non-resident state officials do not purposefully avail themselves of the benefits of a foreign State's law like commercial actors do. Unlike the latter, nonresident state officials derive no economic, commercial, or personal benefit from efforts to enforce their State's law against out-of-state actors who seek to violate it. See *Kulko v. Superior Ct.*, 436 U.S. 84, 97 (1978) (explaining that lack of "commercial benefit" to a defendant precludes analogy to commercial activity as basis for jurisdiction); Pet. App. 27a n.3 (Higginson, J., concurring) (noting "officials who attempt to enforce a state law" do so "for no personal or commercial profit"). Instead, their actions redound to the benefit of their *States*. That distinction matters especially because this is an *Ex Parte Young* suit, which relies on the fact that a state officer—not the State itself—is the defendant. In other words, Respondents seek to have it both ways under the *Ex Parte Young* doctrine by suing an *official* to avoid the sovereign immunity bar, while relying on

---

[7] Indeed, the conflict between the decision below and the decisions of this Court limiting effects jurisdiction is so clear that this Court could consider reversing summarily on that basis.

24

the benefits accruing to the *State* to establish personal jurisdiction. That approach lacks any basis in law.

Moreover, a rule allowing state officials to be haled into the courts of another State to defend the validity of their laws raises serious federalism concerns. For one, States have an interest in not having the validity of their laws decided by faraway courts, which lack the expertise interpreting their laws that the local courts enjoy. See *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979) ("[F]ederal judges sitting in Idaho are better qualified to construe Idaho law, and to assess the character of Idaho's probable enforcement of that law, than are judges sitting elsewhere."); Pet. App. 27a n.3 (Higginson, J., concurring) (same). This is not just a practical issue, but one that sounds in due process. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (due process "ensures that the States through their courts, do not reach out beyond the limits imposed on them by their status as co-equal sovereigns").

For another, the Fifth Circuit's decision will lead inexorably to an increase in circuit splits on the meaning and validity of *state* law. Because of the frequency of state cease-and-desist letters, see *infra* at 27-28, the Fifth Circuit's ruling will generate additional forum-shopping preemptive suits like this one, and federal courts may be required to interpret state laws and assess their constitutionality well beyond their circuits. It follows that federal courts may adopt and apply interpretations that conflict with related rulings of the

home state circuit—leading to greater confusion and implementation challenges for the States.[8]

Nor is this concern academic. Just days after the district court dismissed the instant action, Respondents (along with a group of other plaintiffs) filed another action in the District of New Jersey challenging the same New Jersey law. See *Defense Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193, 196-97 (3d Cir. 2020). Because of the involvement of additional plaintiffs, Respondents claim the case will have to be resolved no matter how the Texas action comes out. If the Texas courts and the New Jersey courts both exercise jurisdiction to assess the meaning and validity of New Jersey law, a merits conflict remains possible.

This Court has instructed courts time and again to take sovereignty interests into account in conducting personal jurisdiction analyses. See, *e.g., Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1780 (2017) (noting that courts "must" consider "many essential attributes of [state] sovereignty" in this inquiry). At a minimum, due process requires a court to weigh these important sovereignty interests when the defendant is a nonresident state official. The panel's failure to do so is one more way in which its decision directly contrasts with this Court's personal jurisdiction precedents.

---

[8] The Fifth Circuit would not have the ability to avoid such conflicts in this case by certifying questions to the New Jersey Supreme Court, because the Supreme Court's rules unsurprisingly permit certification requests only from the Third Circuit. See N.J. Ct. R. 2:12A-1.

26

### III.   This Case Is An Ideal Vehicle To Resolve The Circuit Split On This Important Jurisdictional Question.

Not only did the Fifth Circuit misapply effects jurisdiction and create a circuit split in the process, but its decision has enormous consequences for States and businesses nationwide. This case is an ideal vehicle to address the question presented and to prevent those consequences from materializing.

1. Unfortunately, the decision below risks having a significant impact on the use of cease-and-desist letters. As one court explained, "[t]here are strong policy reasons to encourage cease and desist letters. They are normally used to warn an alleged rights infringer that its conduct, if continued, will be challenged in a legal proceeding, and to facilitate resolution of a dispute without resort to litigation." *Yahoo!*, 433 F.3d, at 1208. But "[i]f the price of sending a cease and desist letter is that the sender thereby subjects itself to jurisdiction in the forum of the alleged rights infringer, the rights holder will be strongly encouraged to file suit in its home forum without attempting first to resolve the dispute informally by means of a letter." *Id.*; see also *Red Wing Shoe*, 148 F.3d, at 1361 (noting "[a] patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement," and that the contrary rule "provid[es] disincentives for the initiation of settlement negotiations").

Indeed, cease-and-desist letters are a common tool for state enforcement officials for these very reasons— meaning the Fifth Circuit's ruling has consequences far beyond this case. In recent years, across a range of contexts, Attorneys General and other state officials

27

have sent such letters to out-of-state companies warning them not to violate state law. Examples of cease-and-desist letters to out-of-state companies include a letter from the Alabama Attorney General to sports betting companies to prevent violations of state gambling statutes;[9] from the D.C. Attorney General to a Delaware-barred online lender for deceptive business practices;[10] from the Florida Insurance Commissioner to a Tennessee business ordering it to cease soliciting Florida consumers;[11] from the Massachusetts Attorney General to an online seller of electronic cigarette devices to block sales that violate state law;[12] from the Michigan Attorney General to businesses engaging in price gouging during the COVID-19 pandemic;[13] from the New York Attorney General to those selling false

---

[9] See Press Release, Attorney General's Office, Attorney General Determines Paid Daily Fantasy Sports Contests Are Illegal Gambling (Apr. 5, 2016), https://tinyurl.com/y6l3gvoj.

[10] See Press Release, Office of Attorney General Karl Racine, AG Racine Sues Predatory Online Lender For Illegal High-Interest Loans To District Consumers (June 5, 2020), https://tinyurl.com/y3rrlaft.

[11] See Press Release, Florida's Chief Financial Officer, CFO Sink Issues Consumer Alert: Floridians Should Cease Transactions with National Foundation of America (Apr. 25, 2017), https://tinyurl.com/y5ma6p8c.

[12] See Press Release, Office of Attorney General Maura Healey, AG Healey Sends Cease and Desist Letter to Online E-cigarette Retailer for Violating State Laws, Selling to Minors (Feb. 27, 2019), https://tinyurl.com/y3xslqaw.

[13] See Press Release, Department of Attorney General, AG Nessel's Office Sends Cease and Desist Letters to Online Sellers for Price-gouging (Apr. 7, 2020), https://tinyurl.com/yxwqhre4.

28

treatments for COVID-19;[14] from the North Dakota Attorney General to a business regarding registering as a debt settlement provider under state law;[15] from the South Dakota Division of Banking to a company to prevent it from acquiring new residential mortgages until it proved its operations comply with state law;[16] and from Tennessee regulators to alcohol shippers regarding violations of state liquor laws.[17]

The fact that the Fifth Circuit drew a line between cease-and-desist letters asserting a "pseudo-national" authority and letters that assert more limited authority in no way diminishes the impact of its decision. For one, the intended scope of an enforcement action will often be a contested factual issue—as it is here—subjecting nonresident officials to jurisdictional discovery in a foreign forum. Pet. App. 19a n.10 (panel decision below), Pet. App. 23a n.1 (Higginson, J., concurring). But more importantly, state enforcement actions regularly seek remedies that are not limited to their borders—especially in areas like antitrust enforcement or charities regulation. There are many such actions,

---

[14] See Mar. 3, 2020 Ltr. from N.Y. Att'y Gen., https://tinyurl.com/yxswwhgr; Mar. 12, 2020 Ltr. From N.Y. Att'y Gen., https://tinyurl.com/yaxeqwnn.

[15] See Cease and Desist Order, *State of North Dakota v. Better Business Marketing, Inc.* (State of North Dakota, Office of Att'y Gen., July 23, 2020), https://tinyurl.com/y2knvtrk.

[16] See Order, *In re Ocwen Loan Servicing, LLC* (S.D. Dep't of Labor & Regulation, Div. of Banking, Apr. 20, 2017), https://tinyurl.com/y3mwzchg.

[17] See Press Release, Tennessee State Government, TABC Investigates And Halts Illegal Direct-To-Consumer Alcohol Shipments In Tennessee (Jan. 7, 2020), https://tinyurl.com/y5oj4ka6.

29

and the following examples from within the Fifth Circuit alone helpfully illustrate the point:

- The Texas Attorney General settled a multistate action against out-of-state cancer charities, requiring dissolution of two of them;[18]

- The Texas Attorney General settled a multistate action requiring changes to the merger of national lenders, requiring amendment to non-compete clauses not limited to Texas;[19]

- The Texas Attorney General filed a consumer protection suit against national opioid manufacturers seeking marketing practice changes not limited to Texas;[20]

- The Louisiana Attorney General took part in a multistate antitrust action against generic drug manufacturers, seeking to enjoin them from engaging in anticompetitive conduct not limited to Louisiana;[21] and

---

[18] See Press Release, Attorney General of Texas, Attorney General Paxton Announces Multistate Settlement Against Deceptive Cancer Charities (May 19, 2015), https://tinyurl.com/yxczpxj6;

[19] See Press Release, Attorney General of Texas, Texas Attorney General Announces Settlement Requiring Two National Lenders to Comply with Antitrust Laws Before Completing Merger (Nov. 13, 2015), https://tinyurl.com/y6qezdbo.

[20] Petition, *State of Texas v. Purdue Pharma L.P., et al.* (Travis Cnty. Dist. Ct., May 15, 2018), https://tinyurl.com/y4rd4zmo.

[21] *See* Compl., *State of Connecticut, et al. v. Teva Pharm. USA, Inc.* (D. Conn. May 10, 2019), https://tinyurl.com/y3ru2nyj.

30

- The Louisiana Attorney General settled a multistate suit against a bank based on deceptive practices, requiring changes to its lending practices beyond Louisiana.[22]

As these examples show, state enforcement activity against out-of-state actors is commonplace—even where the relief has broad implications for the corporate actor. Under the Fifth Circuit's rule, were these actions preceded by cease-and-desist letters, the validity of the claims may have been litigated in the forum State of the recipient instead. See Pet. App. 27a n.3 (Higginson, J., concurring) (highlighting that "[w]hen a state defends its laws in a faraway forum, it loses the benefit of having the laws examined by local state or federal courts—courts that have special expertise interpreting its laws") (citation omitted). Those jurisdictional consequences undermine the States' ability to benefit from cease-and-desist letters.

2. The Fifth Circuit's decision is no less disruptive for commercial actors, who up until now could safely assume that merely sending a cease-and-desist letter would not subject them to jurisdiction in the recipient's State. See, *e.g., Breckenridge Pharm.*, 444 F.3d, at 1366 n.8 (noting cease-and-desist letters are commonplace in patent infringement disputes). Indeed, an approach that allows jurisdiction in the recipient's forum State where the cease-and-desist letter asserts any "pseudo-national" authority to limit their conduct would wreak havoc in the context of private litigation,

_____

[22] See Press Release, Attorney General of Louisiana, Hundreds Of Millions In Relief Announced For Subprime Auto Loan Consumers (May 22, 2020), http://ag.state.la.us/Article/10758.

31

where senders often assert contractual or legal rights
nationwide. After all, a patentee's purpose in sending
a cease-and-desist letter to a suspected infringer is to
prevent infringement not only in one state, but to pre-
vent it *everywhere*—given a patent's national scope.
See *Red Wing*, 148 F.3d, at 1361; *Genetic Implant Sys.
Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (CAFed
1997). So too for disputes over trademarks, non-com-
pete agreements, and more. If sending a cease-and-de-
sist letter to a Texas company that asserts nationwide
limits on its conduct suffices for jurisdiction in Texas,
especially where the letter would significantly affect
the violator's operations, businesses may also have to
rethink their reliance on cease-and-desist letters to re-
solve disputes without suit.

3. Finally, the instant case presents an ideal vehi-
cle to clarify whether a nonresident state official sub-
jects itself to jurisdiction in another forum State when
it sends a single cease-and-desist letter to a single res-
ident in the State. Most importantly, the Fifth Circuit
explicitly acknowledged the "totality of [the New Jer-
sey Attorney General's] contacts with Texas involves
a cease and desist order sent to Defense Distributed."
Pet. App. 9a. The jurisdictional question regarding the
role of such a letter is thus cleanly presented.

Although the concurrence recognized that the New
Jersey Attorney General may, on remand, still seek to
avoid litigation of this case in Texas courts, those av-
enues do not undermine the need for certiorari. First,
the concurrence explained that the New Jersey Attor-
ney General could introduce evidence on remand that
he was not asserting "pseudo-national" authority and
that the requested relief was limited to Respondent's
actions relative to New Jersey. Pet. App. 23a n.1. The

32

point of a clear jurisdictional rule, however, is to avoid subjecting nonresident officials and other defendants to burdensome discovery in another forum. And as explained above, even if the New Jersey Attorney General had asserted such pseudo-national authority, personal jurisdiction would still be improper. Second, the concurring opinion suggested that the Attorney General could pursue a transfer to the District of New Jersey on remand. But the success of such a transfer motion is hypothetical and uncertain. Moreover, it is always the case that a party validly subject to jurisdiction in one forum could still seek transfer to another, see 28 U.S.C. § 1404, meaning this possibility arises in every personal jurisdiction case.

The question whether a single cease-and-desist letter from a nonresident official suffices for jurisdiction is directly presented and outcome-determinative. This Court should act to confirm that state officials using this common enforcement tool do not run the risk of preemptive litigation in faraway courts.

33

## CONCLUSION

This Court should grant the petition.

Respectfully submitted,

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*
JEREMY M. FEIGENBAUM*
*State Solicitor*
MAYUR P. SAXENA
*Assistant Attorney General*
MELISSA MEDOWAY
TIM SHEEHAN
*Deputy Attorneys General*
Office of Attorney General
25 Market Street
P.O. Box 112
Trenton, NJ 08625
(609) 292-4925
Jeremy.Feigenbaum@
njoag.gov
*\*Counsel of Record*

January 2020          *Counsel for Petitioners*

**APPENDIX**

1a

**APPENDIX A — OPINION OF THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, FILED AUGUST 19, 2020**

IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 19-50723

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

*Plaintiffs-Appellants,*

v.

GURBIR S. GREWAL, ATTORNEY GENERAL OF NEW JERSEY, IN HIS OFFICIAL CAPACITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the Western District of Texas.

August 19, 2020, Filed

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from the ongoing efforts of New Jersey's Attorney General Gurbir Grewal and several of his peers to hamstring the plaintiffs' distribution of materials related to the 3D printing of firearms. To

2a

*Appendix A*

defend against their efforts, the plaintiffs filed this lawsuit, alleging, *inter alia*, infringement of their First Amendment rights and state law claims. Grewal countered with a motion to dismiss for lack of personal jurisdiction. The district court, relying principally on this court's decision in *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), granted Grewal's motion. *Stroman*, however, is distinguishable from this case and does not compel dismissal. Based on well-established principles of personal jurisdiction, we conclude that Grewal is subject to the jurisdiction of Texas courts. We REVERSE and REMAND for further proceedings.

**I**

Plaintiff Defense Distributed is a Texas company operated for the purpose of promoting popular access to firearms. To carry out this purpose, it produces and makes accessible information related to the 3D printing of firearms and publishes and distributes such information to the public. Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide, non-profit membership organization that "promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." Across the nation, SAF members seek the digital firearms information created by Defense Distributed, circulate their own digital firearms information by utilizing Defense Distributed's facilities, and republish digital firearms information independently.

3a

*Appendix A*

Defense Distributed began distributing files related to the 3D printing of firearms in December 2012. It did so by publishing files to its defcad.org and defcad.com websites and letting visitors freely download them. It also distributed digital firearms information via mail and at a brick-and-mortar public library in Austin, Texas. Defense Distributed's efforts were initially met with opposition from the United States Department of State.[1] But, after a period of litigation, the parties reached a settlement agreement that granted Defense Distributed a license to publish its files.

Shortly thereafter, nine Attorneys General, including New Jersey Attorney General Grewal, filed suit on behalf of their respective states in the Western District of Washington to enjoin the State Department from authorizing the release of Defense Distributed's files. They argued that the State Department's license to Defense Distributed constituted an *ultra vires* about-face that violated the Administrative Procedure Act and jeopardized the states' statutory and regulatory schemes for firearms. The Western District of Washington quickly issued a temporary restraining order, followed closely by a nationwide preliminary injunction.[2]

---

1. *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016); *id.* at 462-76 (Jones, J., dissenting).

2. The Attorneys General later filed a motion for summary judgment, which the district court granted in part. *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019). On appeal, the Ninth Circuit found that the case was moot and thus dismissed for lack of jurisdiction. *Washington v. Defense Distributed*, Nos. 20-35030 & 20-35064, 2020 U.S. App. LEXIS 22900, 2020 WL 4332902 (9th Cir. July 21, 2020).

4a

*Appendix A*

Just before the Attorneys General sued in Washington, Defense Distributed and SAF brought the instant action in the Western District of Texas challenging select enforcement actions taken by the state Attorneys General. Of relevance to this appeal, plaintiffs alleged these actions by Grewal: (1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey;[3] and (4) threatening Defense Distributed with criminal sanctions at a live press conference. Further, these actions, coupled with the injunctive orders issued in the Washington litigation, have caused Defense Distributed to cease publication of its materials. The plaintiffs asserted, *inter alia*, that these actions infringed the exercise of their First Amendment freedoms and constituted tortious interference with the State Department's settlement agreement.

Grewal moved to dismiss for lack of personal jurisdiction.[4] The plaintiffs, meanwhile, sought a

---

3. That lawsuit was removed to federal court before being administratively terminated in light of the nationwide injunction issued in Washington. The plaintiffs have likewise sued in New Jersey, raising the same claims asserted in the case at bar. *See Defense Distributed v. Grewal*, D.N.J. No. 3:19-CV-4753. That case is currently stayed pending resolution of this one.

4. The other state Attorneys General also moved to dismiss, and the district court granted their motions. On appeal, the plaintiffs challenge only the judgment related to Grewal.

5a

*Appendix A*

preliminary injunction. After holding a hearing and considering the parties' arguments, the court granted Grewal's motion and dismissed the action without prejudice.

The district court's order addressed two primary issues: judicial estoppel and minimum contacts. The plaintiffs had argued that Grewal should be judicially estopped from challenging the court's jurisdiction because, in the Washington litigation, Grewal asserted that Defense Distributed had minimum contacts with Washington, and that argument was inconsistent with the position taken in Grewal's motion to dismiss. The court disagreed, concluding that Grewal's position in the Washington case "is in no way inconsistent with [his] argument here that [he] ha[s] no minimum contacts with Texas."

Next, the court determined that the plaintiffs failed to establish that Grewal had "minimum contacts with the State of Texas." The court found most instructive this court's decision in *Stroman*, in which it was held that sending a cease-and-desist letter into Texas was, by itself, insufficient to exercise personal jurisdiction over an out-of-state defendant. Just as in *Stroman*, the court explained, Grewal did not "purposefully avail [himself] of the benefits of Texas law like someone actually 'doing business' in Texas" when he demanded that Defense Distributed cease publication of its materials. *See Stroman*, 513 F.3d at 484. "It follows that [Grewal] could not have reasonably anticipated being haled into federal court in Texas to defend [the enforcement of his state's

6a

*Appendix A*

laws].” The court rejected the plaintiffs’ attempt to distinguish *Stroman* based on Grewal’s additional alleged contacts, finding that they were either the plaintiffs’ own contacts with Texas or were contacts not “expressly aimed at Texas.” The district court also rejected the plaintiffs’ invocation of the “effects test” pronounced in *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), because it believed only the plaintiffs—and not Texas more generally—were affected by Grewal’s enforcement activities. Grewal’s relationship to Texas, in other words, was a “mere fortuity.”

The plaintiffs’ motion to alter or amend the judgment was denied, and they timely appealed.

**II**

In this court, the plaintiffs continue to press the arguments that the doctrine of judicial estoppel bars Grewal from arguing against personal jurisdiction, and Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas’s courts. We agree with the second argument and thus need not address the judicial estoppel claim.

“We review the district court’s dismissal for lack of personal jurisdiction *de novo*.” *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). At the motion to dismiss stage, the plaintiffs bear the burden of presenting sufficient evidence to support a prima facie case of jurisdiction. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000). We “accept

7a

*Appendix A*

the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

Personal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process. *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Id.* Though personal jurisdiction can be general or specific, this case implicates only the latter. Texas's long-arm statute permits the exercise of specific jurisdiction over any defendant "doing business" in the state, including defendants who "commit[] a tort in whole or in part in th[e] state." Tex. Civ. Prac. & Rem. Code § 17.042.

"The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Stroman*, 513 F.3d at 484 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)). This court has framed the inquiry as a three-step analysis: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's

8a

*Appendix A*

cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

The issue on appeal is whether Grewal has established sufficient minimum contacts with Texas. The parties' arguments rely on the interpretation and application of three cases—*Stroman; Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999); and *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984). Grewal argues that *Stroman* controls here and compels the conclusion that he lacks the minimum contacts necessary to justify the exercise of jurisdiction. The plaintiffs aver that *Stroman* is distinguishable and posit that the district court's judgment runs counter to principles announced in *Wien Air Alaska* and *Calder*. We consider each of these cases in turn.

Stroman Realty, Inc. was a Texas-based real estate firm that sought relief in Texas federal court from attempts by the Commissioner of the Arizona Department of Real Estate to exercise regulatory authority over the company's timeshare sales business. *Stroman*, 513 F.3d at 479. "[T]he totality of the Commissioner's contacts with Texas involve[d] a cease and desist order and correspondence with Stroman's attorneys." *Id.* at 485. This court concluded that "[b]ased on such minimal known contacts, . . . [the] nonresident state official . . . could not have reasonably anticipated being haled into federal court

9a

*Appendix A*

in Texas to defend her enforcement of an Arizona statute." *Id.* at 484.

This court disagreed with Stroman's invocation of the *Calder* "effects test," as we observed that this circuit has "declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident." *Id.* at 486. "By seeking to regulate Stroman's activities involving Arizona residents or property," the court explained, "the Commissioner is not 'expressly aim[ing]' her actions at Texas." *Id.* (alteration in original) (quoting *Calder*, 465 U.S. at 789, 104 S. Ct. at 1487). Rather, "it was Stroman who chose to market Arizona properties and transact business with Arizona residents. Arizona is simply attempting to uniformly apply its laws." *Id.* Put another way, the nexus to Texas was "based entirely on the unilateral actions and decisions of Stroman, not the Commissioner." *Id.* And "[i]n general, '[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* (second alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239-40, 2 L. Ed. 2d 1283 (1958)). To embrace Stroman's approach, the court warned, would subject state officials seeking to enforce their state's laws "to suit in any state where the validity of her state's laws were in question." *Id.*

The facts of this case bear a resemblance to those in *Stroman*. "[T]he totality of [Grewal's] contacts with Texas involves a cease and desist order" sent to Defense Distributed. *Id.* at 484. And Grewal's purpose in issuing

10a

*Appendix A*

the cease-and-desist letter ostensibly was to enforce New Jersey public nuisance and negligence laws (more on this below). Further, Grewal, like the Commissioner in *Stroman*, was sued in his official capacity and did not derive commercial benefits from performing his governmental function.

While acknowledging some of these factual similarities, the plaintiffs contend that *Stroman* is distinguishable principally because the cease-and-desist letter at issue in *Stroman* focused on activities occurring *outside* Texas whereas Grewal's cease-and-desist letter focused on activities occurring *inside* Texas. But *Stroman* expressly forecloses this distinction. "Although it may be true that the Commissioner's action against Stroman is based upon *conduct which occurred entirely in Texas*, we cannot find, as Stroman urges, that the Commissioner has purposefully directed her conduct at Texas. . . . [T]he Commissioner, by proceeding with the cease and desist order, is essentially asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 485-86 (emphasis added).

The plaintiffs also maintain that *Stroman* is distinguishable because Grewal did more than just send a cease-and-desist letter. He "(1) obtained a nationwide injunction that governs the State of Texas itself and everyone in it, (2) threatened companies that contracted to provide internet security services for Defense Distributed, and last but not least, (3) stood at a live broadcast's podium to call out Defense Distributed's founder by name and promise that he would 'come after' 'anyone who is

11a

*Appendix A*

contemplating making a printable gun' and 'the next ghost gun company.'" None of these actions, however, represent direct contacts with Texas.[5] The nationwide injunction is just that—a nationwide order not targeting Texas but rather the plaintiffs' nationwide operations. *Cf. J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880-87, 131 S. Ct. 2780, 2787-91, 180 L. Ed. 2d 765 (2011) (rejecting jurisdiction based on the defendant's nationwide product distribution system where the defendant did not otherwise manifest an intent to benefit from or submit to the laws of the forum state). The companies Grewal threatened are based in California, not Texas, and the broadcast event the plaintiffs reference took place in New Jersey.

*Stroman*, however, is distinguishable in at least two key respects. First, many of the plaintiffs' claims are based on Grewal's cease-and-desist letter. In contrast, Stroman's claim was that "Arizona's attempted exercise of regulatory jurisdiction to license timeshare resales violated the Commerce Clause by discriminatorily and unduly burdening nonresident participation in the interstate secondary timeshare market." *Stroman*, 513 F.3d at 481. Stroman's claim, in other words, was more a product of Arizona's regulatory scheme than it was the cease-and-desist letter itself. Not so for the plaintiffs' claims here, many of which are based on injuries stemming solely and directly from Grewal's cease-and-desist letter. Grewal's contact with Texas is more relevant to the personal jurisdiction inquiry than was the cease-and-desist letter analyzed in *Stroman*.

---

5. But, as explained below, these actions affirm Grewal's intention to undermine Defense Distributed's operations and have significant effects on Texas.

12a

*Appendix A*

Second, and more important, *Stroman* found that the Arizona public official did not purposefully direct her conduct at Texas because she was simply "asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 486. The contrary is alleged here. Grewal's assertion of legal authority is much broader. He does not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demands that the plaintiffs cease publication of their materials generally. For example, in his cease-and-desist letter, Grewal states that the plaintiffs' "widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey." He accordingly requests that Defense Distributed "halt publication of the printable-gun computer files" without specifying that Defense Distributed cease marketing its materials to New Jersey residents.[6]

Grewal's conduct beyond sending the cease-and-desist letter confirms his intent to crush Defense Distributed's

---

6. Grewal's letter opens with the command "to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*." Perhaps this could be interpreted as a limited instruction. But, as just noted, elsewhere, Grewal orders Defense Distributed to "halt publication of the printable-gun computer files" lock, stock, and barrel. This latter command better captures the general tone of the cease-and-desist letter. And regardless, at this stage of the litigation, we are required to resolve all factual disputes in favor of the plaintiff. *Panda Brandywine Corp.*, 253 F.3d at 868.

13a

*Appendix A*

operations and not simply limit the dissemination of digital files in New Jersey. Grewal's enforcement actions are selective. He has not targeted the many similarly-situated persons who publish Defense Distributed's files on the internet.[7] *Cf. id.* (stressing that Arizona was "simply attempting to *uniformly* apply its laws") (emphasis added). Instead, he has focused solely on Defense Distributed. Perhaps nowhere is this better illustrated than in Grewal's efforts to enjoin the national distribution of Defense Distributed's files by suing in Washington, far from his or the plaintiffs' home state. Grewal has also threatened Defense Distributed's founder, Cody Wilson, by name, promising to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company." Together, these actions confirm Grewal's intent to force Defense Distributed to close shop.

Relatedly, the intended effects on the plaintiffs and, by extension, the intended effects on Texas residents who would benefit from the plaintiffs' activities, are much greater than the effects at issue in *Stroman*. Whereas the Arizona Commissioner only requested that Stroman acquire a license before doing business in the state, Grewal seeks to bar Defense Distributed from publishing its materials anywhere, not just in New Jersey. Grewal's

---

7. As Defense Distributed notes in its complaint, other publishers continue to publish Defense Distributed's files to generally-accessible internet websites. "Such files can be located with a simple Google search." *See also Defense Distributed*, 838 F.3d at 462 (Jones, J., dissenting) (observing that Defense Distributed's files were downloaded "hundreds of thousands of times").

14a

*Appendix A*

actions, moreover, have all been taken in the name of law and order. He has projected himself across state lines and asserted a pseudo-national executive authority that the public official in *Stroman* never asserted. Because *Stroman* is distinguishable, and thus not dispositive, we consider the applicability of *Wien Air Alaska* and *Calder*.[8]

In *Wien Air Alaska*, this court considered whether the defendant, Brandt, had sufficient contacts with Texas to subject him to the jurisdiction of Texas's courts. Relying largely on *Calder*'s "effects test," the court concluded that he did. "Brandt performed several tortious actions outside of Texas directed towards Wien Air in Texas. These activities had foreseeable effects in the forum and were directed at the forum." *Wien Air Alaska*, 195 F.3d at 212. Brandt's contacts included "letters, faxes, and phone calls to Texas . . . whose contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information." *Id.* Brandt argued that these communications, standing alone, were insufficient to support a finding of minimum contacts. *Id.* at 213. The court disagreed. "When the actual content of communications with a forum gives rise

---

8. The separate concurrence overstates our reliance on these cases. We do not consider them because they are factually analogous, but because they establish principles of law applicable to this case. Relatedly, we do not rely on an effects test unmoored from a minimum contacts analysis, as the concurrence suggests. The exercise of personal jurisdiction over Grewal is proper because Grewal established sufficient minimum contacts with Texas. The legal principles articulated in *Wien Air Alaska* and *Calder* (among other cases) guide us to this conclusion.

15a

*Appendix A*

to intentional tort causes of action, this alone constitutes purposeful availment." *Id.* "The defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* "It is of no use to say that the plaintiff 'fortuitously' resided in Texas. . . . If this argument were valid in the tort context, the defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas." *Id.*

Similarly, Grewal's communication with Defense Distributed, specifically the cease-and-desist letter delivered into Texas, itself gives rise to distinct tort causes of action. Section 1983's intentional "tort" of unconstitutional censorship and intentional interference with a contractual relationship are just two possibilities. And when "the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.*

Grewal argues that the plaintiffs cherry-picked this legal proposition and ignored glaring factual differences between *Wien Air Alaska* and this case. We disagree with Grewal's initial assertion, but it is correct that the facts in the two cases are distinguishable. Even so, the principles articulated in *Wien Air Alaska* remain relevant, as do the principles announced in *Calder*.

*Calder* was a libel suit instituted by a California actress in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. *Calder*, 465 U.S. at 784-

16a

*Appendix A*

85, 104 S. Ct. at 1484. The plaintiff's libel claims were based on an article written and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000. *Id.* The California Court of Appeals held that California's assertion of jurisdiction over the defendants was consistent with due process, and the Supreme Court affirmed. Although the Court recognized that the defendants' activities "focus[ed]" on the plaintiff, the jurisdiction inquiry turned on "the relationship among the defendant, the forum, and the litigation." *Id.* at 788 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 2579, 53 L. Ed. 2d 683 (1977)). Thus, the Court focused on the contacts the defendants had created with California (and not just with the plaintiff). It found those contacts to be ample. The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the state; and the "brunt" of that injury was suffered by the plaintiff in that state. *Id.* at 788-89. "In sum, California [wa]s the focal point both of the story and of the harm suffered." *Id.* at 789. Jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.*

Thirty years later, the Court revisited *Calder* and explained the scope of its holding:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected

17a

*Appendix A*

the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. . . . [T]he reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, . . . the defendants' intentional tort actually occurred *in* California. . . . In this way, the "effects" caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Walden v. Fiore*, 571 U.S. 277, 287-88, 134 S. Ct. 1115, 1123-24, 188 L. Ed. 2d 12 (2014) (emphasis in original). *Walden* makes clear that *Calder* remains good law. But *Walden* also emphasizes that it is the defendant's contacts with the forum state, and not just the plaintiff, that must drive the personal jurisdiction analysis. *Id.* at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *id.* at 286 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the

18a

*Appendix A*

forum."). It is insufficient for the defendant to simply have knowledge of a plaintiffs' "strong forum connections." *Id.* at 289. That is, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* at 290; *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017) ("[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.") (alteration in original omitted) (internal quotation marks and citation omitted).

Returning to the present case, Grewal argues that, unlike in *Calder*, where the content of the article served as the basis for the libel claim, the plaintiffs attribute their injury to Grewal's enforcement action and not the cease-and-desist letter. Grewal misreads the plaintiffs' complaint: they allege that Grewal's letter had a chilling effect on the exercise of their First Amendment rights (among other constitutional and Texas law violations). That chilling effect, in turn, caused them to cease publication and reduced Texans' access to the materials the plaintiffs seek to publish. The statewide impact is not unlike that of the defamatory article at issue in *Calder*, which shaped Californians' view of the defamed actress.[9] In this sense, Grewal created contacts with Texas and not just the plaintiffs.

---

9. Censorship, like libel, is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives.

19a

*Appendix A*

Grewal's contacts with Texas, moreover, are more than a "mere fortuity," as the district court found. Grewal intentionally mailed the cease-and-desist letter into Texas, a contact *Walden* specifically mentioned as relevant to the personal jurisdiction inquiry. *See Walden*, 571 U.S. at 285 ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, *mail*, or some other means—is certainly relevant contact." (emphasis added)). Further, that contact alone gave rise to distinct tort causes of action. Grewal knew that the cease-and-desist letter would "have a potentially devastating impact" on the plaintiffs—and, by extension, those who wished to benefit from the plaintiffs' activities, including Texas residents. *Calder*, 465 U.S. at 789. And he "knew that the brunt of [the] injury would be felt by [the plaintiffs] in [Texas]." *Id.* at 789-90; *see also Wien Air Alaska*, 195 F.3d at 211 ("The foreseeable effects of a tort 'are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum.'") (emphasis in original) (quoting *Allred v. Moore & Peterson*, 117 F.3d 278, 287 (5th Cir. 1997)).

Based on the foregoing analysis, the principles discussed in *Wein Air Alaska* and *Calder* (and reaffirmed in *Walden*) control. Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas's courts.[10] Of course, minimum

---

10. We do not intend to convey that sending a cease-and-desist letter into a forum always subjects the sender to jurisdiction in the forum state. *Cf. Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) ("There are strong policy reasons to encourage cease and desist letters. They are normally used to warn an alleged rights infringer that

20a

*Appendix A*

contacts in-and-of themselves are insufficient to create jurisdiction. The cause of action must arise from the forum-related contacts and the exercise of personal jurisdiction must be fair and reasonable. *Seiferth*, 472 F.3d at 271. Grewal takes issue with the second of these two requirements and contends that a judgment in the plaintiffs' favor would offend traditional notions of fair play and substantial justice. We are skeptical of this argument. *See DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 388 (5th Cir. 2015) ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice.") (internal quotation marks omitted) (quoting *Moncrief*

---

its conduct, if continued, will be challenged in a legal proceeding, and to facilitate resolution of a dispute without resort to litigation. If the price of sending a cease and desist letter is that the sender thereby subjects itself to jurisdiction in the forum of the alleged rights infringer, the rights holder will be strongly encouraged to file suit in its home forum without attempting first to resolve the dispute informally by means of a letter."). Indeed, as our review of *Stroman* makes clear, sending a cease-and-desist letter may, under different circumstances, be insufficient to establish personal jurisdiction. *See also Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins.*, 921 F.3d 522, 542 (5th Cir. 2019) (reaching the same conclusion as *Stroman*, albeit under facts that are markedly different from the facts here). Today's holding is derivative of the specific language used in Grewal's cease-and-desist letter coupled with other actions he took that, together, demonstrate his intent to gut Defense Distributed's operations and restrict Texans' access to Defense Distributed's materials. That the plaintiffs' injuries are directly attributable to the cease-and-desist letter itself also weighs heavily in our analysis.

21a

*Appendix A*

*Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154-55 (Tex. 2013)). But in any event, Grewal did not raise this argument below, either in his initial motion to dismiss or in his reply. "The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal." *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010); *see also Broad. Music, Inc. v. M.T.S. Enters., Inc.*, 811 F.2d 278, 281 (5th Cir. 1987) ("[O]bjections to personal jurisdiction or to service of process must be raised in a timely fashion, i.e., as a party's first pleading in the case, or they are waived."). We follow that rule here. The same goes for Grewal's argument that "[u]nder the plain text of the Texas long-arm statute, and the analysis by *Stroman* and other courts, it is not proper for Texas courts to exercise jurisdiction over a state official sued in his official capacity regarding his decision to enforce his state's law." Grewal should have raised these arguments timely if he intended to rely on them in this court.

## III

Questions of personal jurisdiction typically do not lend themselves to broad generalizations. *See Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982) ("[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state."). They require an understanding of particular facts and an application of general principles.

22a

*Appendix A*

Having carefully considered the facts of this case, we conclude that *Stroman* is distinguishable and thus not dispositive. Applying the principles discussed in *Wien Air Alaska* and *Calder*, we hold that jurisdiction over Grewal is proper. The judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings.

23a

*Appendix A*

STEPHEN A. HIGGINSON, Circuit Judge, concurring:

I agree that the allegations of Attorney General Grewal attempting to prevent Texas residents from publishing files online to individuals outside of New Jersey constitute purposeful direction of his activities toward the State of Texas such that he should have "reasonably anticipate[ed] being haled into court" there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). Unlike the Commissioner of the Department of Real Estate in *Stroman Realty, Incorporated v. Wercinski*, who was "simply attempting to uniformly apply its [state] laws" against those who "chose to market Arizona properties and transact business with Arizona residents," Grewal is alleged to have attempted to reach conduct that did not involve New Jersey residents or assets at all.[1] 513 F.3d 476, 486 (5th Cir. 2008). Thus, I agree that jurisdiction exists in this case where it did not in *Stroman*. But I find the limiting principles given in

---

1. Importantly, at the motion to dismiss phase, a plaintiff's allegations must be taken as true. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) ("Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor."). Therefore, as the majority points out, we do not resolve the factual dispute of whether Grewal did indeed threaten to enforce New Jersey nuisance laws against residents of Texas distributing the online files to residents of states other than New Jersey. If, in fact, Grewal attempted to prevent the distribution of the files only within the state of New Jersey as counsel forcefully contended in oral argument, the case would be analogous to *Stroman*, in which Arizona's Commissioner limited her enforcement to those engaging in real estate transactions in the State of Arizona.

24a

*Appendix A*

*Stroman* protecting state government officials, as should be assured reciprocally for Attorneys General from our three states, vitally important and binding in this circuit even after our holding today.

I disfavor parallels between this case and *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) or *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984). *Wien Air Alaska* involved a commercial dispute that is largely incomparable to the state law enforcement in this case. As we pointed out in *Stroman*, "the absence of 'commercial transactions in interstate commerce' in which a defendant 'sought a commercial benefit' preclude[s] an analogy to commercial activity cases as a basis for assertion of personal jurisdiction." 513 F.3d at 485 (quoting *Kulko v. Superior Court*, 436 U.S. 84, 97, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978)). *Wien Air Alaska* is also distinguishable because that commercial defendant engaged in multiple types of interactions beyond a cease-and-desist letter. 195 F.3d at 212-14. He contacted the plaintiff "numerous" times via "letters, faxes, and phone calls to Texas." *Id.* at 212. He also visited Texas and held other meetings in person with the plaintiff as part of an ongoing attorney-client relationship with the plaintiff. *Id.* at 214. This ongoing business relationship is a more natural fit for the "doing business" requirement in the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE § 17.042. Any stray language in *Wien Air Alaska* implying that a single cease-and-desist letter, even one that directly relates to the plaintiff's cause of action, creates personal jurisdiction is not tied to the facts of that case.

25a

*Appendix A*

The comparison to *Calder* is similarly inapt, above all if it is offered by litigants to diminish the state sovereignty principles underlying *Stroman*. That case involved personal jurisdiction based on the "effects" of the commercial defendant's conduct in the forum, rather than the typical minimum contact test. 465 U.S. at 789. This form of jurisdiction is "rare," and the Supreme Court has moved away from an effects-based analysis, instead requiring "active minimum contacts with the forum state." *Stroman*, 513 F.3d at 486, 489. In *Walden v. Fiore*, the Court explained that *Calder* should not be interpreted to confer jurisdiction whenever an individual is accused of committing a tort against a resident of the forum state:

> *Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

571 U.S. 277, 290, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). We have repeatedly refused to find jurisdiction based on conduct toward an individual who happens to be located in a state—even conduct that causes injury—where the conduct is not expressly aimed at the state. *See Stroman*, 513 F.3d at 486 ("We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional

26a

*Appendix A*

basis is the alleged harm to a Texas resident."); *Wien Air Alaska*, 195 F.3d at 212 ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."); *see also Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). Therefore, I do not agree that Grewal's cease-and-desist letter had a strong enough "effect" in Texas to create jurisdiction.

*Calder* was unique in that there was evidence in the record that the defendant's conduct affected not only the plaintiff but also at least 600,000 others in the forum state. *Calder*, 465 U.S. at 785 (stating that the circulation of the National Enquirer in California was 600,000 at the time of the alleged tort); *see also Walden*, 571 U.S. at 287 ("The strength of th[e] connection [in *Calder*] was largely a function of the nature of the libel tort."). Conversely, Grewal's cease-and-desist letter injured only the plaintiffs because it threatened enforcement against only them.[2] Plaintiffs cannot rely on their connections to Texas alone to show an effect within the state based on Grewal's actions toward them as individuals he knew to be Texans. *See Walden*, 571 U.S. at 289 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct

---

2. If we were to analyze the effects of Grewal's conduct by looking at the number of people affected by plaintiffs' compliance with his demands, the effects within the larger Texas population would be minimal because Defense Distributed admits that the files remain available online.

27a

*Appendix A*

at plaintiffs whom he knew had Nevada connections."). Though he affirmatively communicated with Texas residents, "none of [Grewal's] challenged conduct had anything to do with [Texas] itself." *Id.*

The majority contends that this is the unique case in which the effect in the forum is significant enough to create jurisdiction because the plaintiffs' injuries are more directly attributable to the letter itself than in *Stroman*. This characterization is in tension with *Stroman*'s holding that "[t]here is no question that the underlying cause of action 'arises' out of the Commissioner's cease and desist order to Stroman in Texas." *Stroman*, 513 F.3d at 487. The majority does not explain how this letter more directly causes the plaintiffs' alleged injuries than the letter in *Stroman*, above all when Grewal's letter begins: "You are directed to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*." (emphasis added). I am therefore unconvinced that "effects" jurisdiction based on Grewal's alleged tort is appropriate; I would instead employ the traditional minimum contacts analysis to find that the aggregate of Grewal's alleged conduct affirmatively reached out into Texas by attempting to enforce state law even when New Jersey citizens or property were not involved.

For these reasons, I agree that Grewal's conduct created minimum contacts with the State of Texas, but I do not agree that *Wien Air Alaska* and *Calder* control the outcome of this case.[3]

_____

3. Even if personal jurisdiction exists, there is now parallel litigation in Texas and New Jersey, and the parties, and either district court, may seek transfer under 28 U.S.C. § 1404(a). Our

28a

*Appendix A*

---

observation in *Stroman* was that "[w]hen a state defends its laws in a faraway forum, it loses the benefit of having the laws examined by local state or federal courts—courts that have special expertise interpreting its laws." 513 F.3d at 487. From my review of cases against *government officials* who attempt to enforce a state law, so for no personal or commercial profit, the litigation has taken place in the governmental official's state. *See generally Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (operator of classified advertising website brought action alleging that the Cook County Sheriff violated his First Amendment rights in the Northern District of Illinois); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (religious organization and pastor sued Staten Island borough president alleging violations of their First Amendment rights in the Eastern District of New York).

29a

**APPENDIX B — ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS, AUSTIN DIVISION,
DATED JANUARY 30, 2019**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
AUSTIN DIVISION

1:18-CV-637-RP

DEFENSE DISTRIBUTED AND SECOND
AMENDMENT FOUNDATION, INC.,

*Plaintiffs,*

v.

GURBIR S. GREWAL, IN HIS OFFICIAL
CAPACITY AS NEW JERSEY ATTORNEY
GENERAL, MICHAEL FEUER, IN HIS OFFICIAL
CAPACITY AS LOS ANGELES CITY ATTORNEY,
ANDREW CUOMO, IN HIS OFFICIAL CAPACITY
AS NEW YORK GOVERNOR, MATTHEW DENN,
IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE STATE OF DELAWARE,
JOSH SHAPIRO, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF PENNSYLVANIA, AND
THOMAS WOLF, IN HIS OFFICIAL CAPACITY AS
PENNSYLVANIA GOVERNOR,

*Defendants.*

**ORDER**

Before the Court are Defendant Feuer's Motion to
Dismiss, (Feuer Mot., Dkt. 50), Defendant Cuomo's Motion

30a

*Appendix B*

to Dismiss, (Cuomo Mot., Dkt. 55), Defendants Grewal and Denn's Motion to Dismiss, (Grewal & Denn Mot., Dkt. 57), Defendants Wolf and Shapiro's Motion to Dismiss, (Wolf & Shapiro Mot., Dkt. 75), Plaintiffs' responses to each motion, (Dkts. 59, 73, 86),[1] and Defendants' respective replies, (Dkts. 76, 79, 82, 90). Having considered the parties' briefs, the record, and relevant law, the Court finds that it lacks personal jurisdiction over each Defendant. Accordingly, the Court will grant the Defendants' motions to dismiss.

## I. BACKGROUND

Plaintiff Defense Distributed is a Texas corporation whose mission is to "defend[ ] the American civil liberty of popular access to arms," a mission it furthers by "publishing information regarding the production of arms to the general public." (Am. Compl., Dkt. 23 ¶ 10). Part of what Defense Distributed has published includes "computer-aided design (CAD) data files that can be used to manufacture a virtually undetectable, untraceable gun with a 3D printer." (Feuer Mot., Dkt. 50, at 3). Defense Distributed's primary method of distributing these files is by hosting them on its website, DEFCAD, for visitors to download. (Am. Compl., Dkt. 23 ¶ 11; Heindorff Decl., Dkt. 65-26 ¶ 8). Plaintiff Second Amendment Foundation, Inc. ("Second Amendment Foundation") is a non-profit organization whose members seek to obtain the information published by Defense Distributed. (Am. Compl., Dkt. 23 ¶¶ 12-13).

---

1. Plaintiffs filed a combined response to the motions to dismiss filed by Defendant Cuomo and Defendants Grewal and Denn. (*See* Dkt. 73).

31a

*Appendix B*

Defense Distributed began publishing CAD files related to the 3D printing of firearms in December 2012. (Wilson Decl., Dkt. 65-23 ¶ 3; Heindorff Decl., Dkt. 65-26 ¶ 8). In May 2013, the Directorate of Defense Trade Controls ("DDTC"), part of the U.S. State Department, sent a letter to Defense Distributed instructing them to remove certain CAD files from the DEFCAD website. (*See* State Dept. Letter, Heindorff Decl., Dkt. 65-26, at 19-21). The letter stated that Defense Distributed was required to seek prior authorization before publishing these files because they may have contained information subject to the Arms Export Control Act ("AECA") and the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"). (*See id.* at 19). Defense Distributed complied with the DDTC's instructions and sought authorization to publish the specified CAD files. (Req. Jud. Not., Dkt. 77, at 7). The DDTC failed to timely rule on Defense Distributed's request, and the matter of *Defense Distributed, et al., v. U.S. Dept. of State, et al.*, 1:15-CV-372-RP (W.D. Tex) (*Defense Distributed I*) followed. In that case, Plaintiffs challenged the ITAR provisions regulating the publication of the CAD files (hereafter, the "*Defense Distributed I* files") on the Internet. (*Id.*).

Ultimately, the parties settled. The parties' Settlement Agreement provided that the State Department would issue a license permitting the plaintiffs to publish the *Defense Distributed I* files on the Internet. (*See* Settlement Agreement, Heindorff Decl., Dkt. 65-26, at 23-25). This license issued on July 27, 2018. (*Id.* ¶ 18). Three days later, this Court dismissed the *Defense Distributed I* action pursuant to the parties' stipulated dismissal with

32a

*Appendix B*

prejudice. (*See* Req. Jud. Not., Dkt. 77, at 40). That same day, however, nine Attorneys General from eight States and the District of Columbia filed suit in the United States District Court for the Western District of Washington to enjoin the State Department from performing the terms of the Settlement Agreement (the "Washington Action").[2] (Am. Compl., Dkt. 23 ¶¶ 59-60). The Washington Court issued a temporary restraining order on July 31, and a nationwide preliminary injunction on August 27, enjoining the State Department from modifying the ITAR regulations to allow Defense Distributed to publish the *Defense Distributed I* files. (*Id.* ¶¶ 62-63). The preliminary injunction remains in effect, the Washington Action is currently pending, and Defense Distributed has ceased publishing CAD files on the Internet.

The instant action concerns several civil and criminal enforcement actions taken by the Defendant state officials in the wake of the *Defense Distributed I* Settlement Agreement. These actions include:

> (1) sending cease-and-desist letters threatening legal action if Defense Distributed does not cease publishing the *Defense Distributed I* files;
>
> (2) sending letters to third-party companies that provide internet security services to Defense Distributed;

---

2. The Washington Action is currently docketed as *State of Washington, et al., v. United States Dept. of State, et al.*, No. 2:18-CV-1115-RSL (W.D. Wash.).

33a

*Appendix B*

(3) initiating civil lawsuits against Defense
    Distributed;

(4) threatening to enforce a criminal law
    against Defense Distributed;

(5) issuing press releases regarding
    commitments and efforts to prevent Defense
    Distributed from publishing the *Defense
    Distributed I* files;

(6) placing a telephone call with Defense
    Distributed to demand that Defense
    Distributed stop publishing the *Defense
    Distributed I* files; and

(7) filing a letter with this Court in support of a
    motion to intervene in *Defense Distributed I.*

(*See id.* ¶¶ 75-115; Mot. Prelim. Inj., Dkt. 67, at 30).

Plaintiffs allege that these actions are part of a
"coordinated and politically-fueled campaign to censor
Defense Distributed." (Am. Compl., Dkt. 23 ¶ 5). As
explained below, the Court finds that none of the above
actions establish minimum contacts between any of the
Defendants and Texas.

## II. LEGAL STANDARD AND DISCUSSION

Each Defendant to this action challenges this Court's
exercise of personal jurisdiction over him. "Requiring

34a

*Appendix B*

a court to have personal jurisdiction over a party [is] a matter of constitutional due process" designed to "protect[ ] an individual's liberty interest in not being subject to the binding judgment of a forum with which he has established no meaningful contacts, ties, or relations." *First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 749 (5th Cir. 2012) (citation and quotation marks omitted). Under Federal Rule of Civil Procedure 12(b)(2), the party invoking the power of the court (here, Plaintiffs) bears the burden of making a *prima facie* showing that personal jurisdiction is proper. *Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). To make this showing, "the plaintiff must show that the nonresident defendant purposefully availed itself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state." *Id.* (citation omitted) (cleaned up). "Sufficient minimum contacts will give rise to either specific or general jurisdiction." *Id.* (citation omitted). All Defendants argue, and Plaintiffs do not dispute, that this Court does not have general jurisdiction over them.[3] Accordingly, Plaintiffs must show that the exercise of specific jurisdiction over each Defendant is proper.

With respect to specific jurisdiction, the Fifth Circuit applies a three-step analysis: "(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum

---

3. (*See* Feuer Mot., Dkt. 50, at 11; Pls. Resp. Feuer Mot., Dkt. 59, at 10; Cuomo Mot., Dkt. 55, at 15; Grewal & Denn Mot., Dkt. 57; at 11; Pls. Resp. Cuomo, Grewal & Denn Mots., Dkt. 73, at 10; Wolf & Shapiro Mot., Dkt. 75, at 18; Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 5).

35a

*Appendix B*

state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Monkton*, 768 F.3d at 433 (citation omitted). Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Monkton*, 768 F.3d at 432-33 (5th Cir. 2014) (quoting *Walden v. Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014)). Plaintiffs bear the burden of establishing the first two prongs; only if they are successful in doing so does the burden shift to the Defendants to establish the third prong. *Id.*

## A. Threshold Issues

Plaintiffs raise two threshold issues pertinent to the Court's minimum contacts analysis. The Court addresses each in turn before turning to the merits of the parties' personal jurisdiction dispute.

### 1. Judicial Estoppel

Plaintiffs argue that Defendants Cuomo, Grewal, Denn, Wolf, and Shapiro are judicially estopped from challenging personal jurisdiction in Texas because of the position they took in the Washington Action. The judicial estoppel doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 742-43, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001). Plaintiffs assert that these Defendants

36a

*Appendix B*

argued in the Washington Action that (1) "there is nothing wrong with litigating this kind of controversy away from" the Defendants' respective states of citizenship, and (2) that "'minimum contacts' exist as to Defense Distributed in Washington." (Pls. Resp. Cuomo, Grewal & Denn Mot., Dkt. 73, at 9; Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 3). But here, Defendants Cuomo, Grewal, and Denn argue that minimum contacts "for this controversy" exist only in New York, New Jersey, and Delaware; and Defendants Wolf and Shapiro argue that minimum contacts exist only in Pennsylvania. (*Id.*). Plaintiffs claim that these positions are contradictory to the Defendants' positions in the Washington Action.

Plaintiffs, however, incorrectly focus on "this controversy" rather than on the *defendants* to the controversy. It is foundational that the minimum contacts inquiry focuses not on "the kind of controversy" before the court, but on the defendant's contacts with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Walden v. Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). The Defendants' argument, in a different case, that Defense Distributed had minimum contacts with Washington, is in no way inconsistent with their argument here that they themselves have no minimum contacts with Texas. Because these positions are not contradictory, Plaintiffs have failed to make a colorable claim for judicial estoppel.

*2. Nationwide Contacts*

Plaintiffs raise a second threshold matter—that the Court's minimum contacts analysis must look to

37a

*Appendix B*

Defendants' contacts with the nation as a whole, not just Texas. (Pls. Resp. Cuomo, Grewal & Denn Mot., Dkt, 73, at 11 n.6; Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 9-11). Plaintiffs point to the Supreme Court's observation in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County* that "constitutional 'restrictions on the exercise of personal jurisdiction by a federal court' are not the same as 'the due process limits on the exercise of personal jurisdiction by a State.'" (Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 10) (emphasis removed) (quoting *Bristol-Myers Squibb*, 137 S. Ct. 1773, 1783-84, 198 L. Ed. 2d 395 (2017)). As applied to this case, Plaintiffs argue that "[m]ost or all of the defendants' motions implicate this issue by directly invoking federal due process guarantees," and, "[t]o the extent that this is the case, they should fail because 'minimum contacts' with the Nation as a whole suffice to meet the Fifth Amendment's Due Process Clause concerns." (Pls. Resp. Cuomo, Grewal & Denn Mot., Dkt, 73, at 11 n.6; *see also* Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 10-11).

Plaintiffs have not shown that the national minimum contacts rule applies in this case. That rule applies only when a federal statute or rule supplies the basis for personal jurisdiction, which Plaintiffs do not allege here. *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 825 (5th Cir. 1996). Even Plaintiffs' cited cases acknowledge this limitation. *See Bristol-Myers Squibb*, 137 S. Ct. at 1784 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102, n.5, 108 S. Ct. 404, 98 L. Ed. 2d 415 (1987)); *Lone Star Package Car Co. v. Baltimore & O. R. Co.*, 212 F.2d 147, 153-54 (5th Cir. 1954)

38a

*Appendix B*

(in a case where a federal court's jurisdiction is based on the assertion of a federal right, "Congress can provide for service of process anywhere in the United States")[4]; *United Rope Distribs., Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 535 (7th Cir. 1991) ("[P]ersonal jurisdiction may be created only by statute or federal rule with the force of statute.") (citing *Omni*, 484 U.S. at 108).

Moreover, even if Plaintiffs' nationwide jurisdiction rule were applicable here, Plaintiffs have failed to establish that Defendants have minimum contacts with the nation as a whole. Indeed, Plaintiffs make no attempt to show that Defendants have national minimum contacts; rather, Plaintiffs merely assert that by virtue of the open question identified in *Bristol-Myers Squibb*, and the fact that "[m]ost or all of the defendants' motions seem to implicate this issue by directly invoking federal due process guarantees," national contacts suffice to establish personal jurisdiction. (Pls. Resp. Cuomo, Grewal & Denn

---

4.  Moreover, the Fifth Circuit has stated that because "service of process and personal jurisdiction are conceptually related concepts," "when a federal court attempts to exercise jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Bellaire*, 97 F.3d at 825 (internal quotation marks and citation omitted); *accord Walden*, 571 F.3d at 283 ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons . . . because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.") (citations and quotation marks omitted).

39a

*Appendix B*

Mot., Dkt. 73, at 11 n.6; *see also* Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 10-11). This result does not follow.

## B. Minimum Contacts

Turning to the merits of the personal jurisdiction dispute, it is Plaintiffs' burden to establish that Defendants have minimum contacts with Texas. *Monkton*, 768 F.3d at 431. Plaintiffs must do so for each Defendant. *See Logan Int'l v. 1556311 Alta. Ltd.*, 929 F. Supp. 2d 625, 631 (S.D. Tex. 2012) ("Each defendant's contacts with the forum must be analyzed individually.").

### 1. *"Effects-based" Jurisdiction*

Plaintiffs challenge several actions taken by the Defendants, including sending cease-and-desist letters to Defense Distributed, issuing press releases about Defense Distributed, and bringing civil lawsuits against Defense Distributed. (*See* Am. Compl., Dkt. 23 ¶¶ 67-71). Of these, Plaintiffs assert that "[c]ease-and-desist letters deployed to Defense Distributed in Texas are the keystone conduct that subjects each defendant to specific jurisdiction in Texas." (Pls. Resp. Cuomo, Grewal & Denn Mot., Dkt. 73, at 11). Specifically, Plaintiffs assert that the Defendants who sent these letters "purport[ed] to change Texas law," thus "literally becoming governing officials of Texas." (*Id.* at 11-12).

All Defendants rely on *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008) to argue that the Court cannot exercise specific jurisdiction over them in this

40a

*Appendix B*

case. In *Stroman*, the Fifth Circuit held that an Arizona Department of Real Estate Commissioner who sent cease-and-desist letters to a Texas-based real estate company did not have minimum contacts with Texas. 513 F.3d at 484. There, the Fifth Circuit recognized that "[c]ourts generally exercise specific jurisdiction over nonresident defendants that are engaged in commercial, profit-oriented enterprise," but found that "the Commissioner was not engaged in commercial transactions to obtain a commercial benefit by acting in a governmental capacity to enforce Arizona law." *Id.* at 485 (citing *Kulko v. Superior Court*, 436 U.S. 84, 96-97, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978)). Rather than "purport[ing] to change Texas law," the Commissioner was simply trying "to uphold and enforce the laws of Arizona." *Id.* at 486.

*Stroman* is instructive in this case. Like the Arizona Commissioner, Defendants sent cease-and-desist letters to a Texas entity in an effort to uphold the laws of their respective states. Like the Commissioner's letters, the Defendants' letters do not constitute "doing business" in Texas, and Defendants have not accrued any benefit relating to Texas through use of the letters. *See id.* at 484-85. So, like the Arizona Commissioner, Defendants did not "purposefully avail [themselves] of the benefits of Texas law like someone actually 'doing business' in Texas." *Id.* at 484 (cleaned up) (quoting *Hanson*, 357 U.S. at 253). It follows that the Defendants "could not have reasonably anticipated being haled into federal court in Texas to defend [the enforcement of their respective state statutes]." *Id.* (quoting *World Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

41a

*Appendix B*

Plaintiffs attempt to diminish *Stroman* by suggesting that it is inconsistent with two Supreme Court decisions: *Calder v. Jones*, 465 U.S 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), and *Walden v. Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). (Pls. Resp. Grewal & Denn Mot. Dismiss, Dkt. 73, at 12). In *Calder*, the Court held that the exercise of jurisdiction over the petitioners in that case was "proper in California based on the 'effects' of their Florida conduct in California." 465 U.S. at 789 (citation omitted). In *Walden*, the Court held that the exercise of jurisdiction over the petitioner was *not* proper because the "petitioner formed no jurisdictionally relevant contacts with Nevada" even though "he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." 517 U.S. at 289. Plaintiffs claim that *Stroman* "disregards *Calder*" but that *Walden* "reaffirm[s]" it, (Pls. Resp. Grewal & Denn Mot. Dismiss, Dkt. 73, at 12), and that under the *Calder* "effects test," Defendants have sufficient minimum contacts with Texas, (Hearing, Mot. Prelim. Inj., Dkt. 97). The Court disagrees.

"Effects jurisdiction . . . is rare." *Stroman*, 513 F.3d at 486 (cleaned up). It is "premised on the idea that an act done outside a state that has consequences or effects within the forum state can suffice as a basis for personal jurisdiction if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.* (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007)). "[T]he key to *Calder*," however, "is that the effects" of a nonresident defendant's conduct must be assessed "as part of the analysis of the defendant's relevant contacts

42a

*Appendix B*

with the forum." *Id.* Thus, the Fifth Circuit has regularly "declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas *resident*." *Id.* (emphasis added) (citing *Moncrief*, 481 F.3d at 314); *see also Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 870 (5th Cir. 2001). A defendant's conduct is insufficient to establish minimum contacts when it has no relation to the forum state "other than the fortuity that [plaintiffs] reside there." *Panda Brandywine*, 253 F.3d at 869.

Similarly, the Supreme Court in *Walden* emphasized: "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." 571 U.S. at 290. What matters is "the defendant's contacts with the forum State *itself*, not the defendant's contacts with persons who reside there." *Id.* at 285 (emphasis added). Accordingly, "[t]he proper question is not *where* the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* (emphasis added).

Plaintiffs have shown no meaningful connection between the Defendants and Texas. Illustratively, Plaintiffs argue that Defendants Wolf and Shapiro's lawsuit against Defense Distributed in Pennsylvania, seeking to enjoin the distribution of the *Defense Distributed I* files, "by definition entails Texas contacts because Texas is where Defense Distributed is headquartered and where it publishes its website." (Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 7-8). Similarly, Plaintiffs argue that minimum contacts are established with Texas because "Texas is

43a

*Appendix B*

also where Defense Distributed publishes information about firearms at a brick-and-mortar public library in digital formats." (*Id.* at 8). In essence, Plaintiffs ask the Court to "allow[ ] a *plaintiff's* contacts with the defendant and forum to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289 (emphasis added). This approach to the minimum contacts analysis is "impermissible." *Id.*; *see also Monkton*, 768 F.3d at 433. It would "completely vitiate the constitutional requirement of minimum contacts and purposeful availment" because a nonresident defendant would be subject to suit in Texas "simply because the plaintiff's complaint alleged injury in Texas to Texas residents." *Panda Brandywine*, 253 F.3d at 870. Defendants' allegedly harmful conduct, however, has no relation to Texas, was not expressly aimed at Texas, and does not avail itself of any Texas laws or benefits. The only relationship any of the Defendants' actions have with the State of Texas is the "mere fortuity" that Defense Distributed resides there. *Panda Brandywine*, 253 F.3d at 870.[5]

---

5. Plaintiffs' several attempts to distinguish *Stroman* do not circumvent this fundamental rule. Plaintiffs have variously asserted that *Stroman* is distinguishable because it did not involve: (1) a nationwide injunction; (2) concurrent state court lawsuits; (3) a brick-and-mortar library; (4) take-down letters sent to Internet security companies; (5) public statements and press releases; or (6) a letter communicating an intent to intervene in a related but distinct lawsuit in Texas. (*See* Pls. Resp. Feuer Mot., Dkt. 59, at 12; Pls. Resp. Cuomo, Grewal & Denn Mot., Dkt. 73, at 12-13; Pls. Resp. Wolf & Shapiro Mot., Dkt. 86, at 7-8). None of these distinctions entail actions, taken by Defendants, that have any jurisdictionally meaningful relation to Texas, that were expressly aimed at Texas, or that avail themselves of any Texas laws or benefits. The Supreme Court is clear: "The

44a

*Appendix B*

In sum, the Court finds that under *Stroman, Calder,* and *Walden,* Plaintiffs have failed to establish that any Defendant to this action has minimum contacts with the State of Texas.

*2. Defendant Feuer's Letter to the Court
in Defense Distributed I*

Plaintiffs also argue that Defendant Feuer consented to the Court's personal jurisdiction over him through his letter that urged the Court to grant a motion to intervene by three gun control advocacy groups in *Defense Distributed I.* (Pls. Resp. Feuer Mot., Dkt. 59, at 10-11; Am. Compl., Dkt. 23 ¶¶ 110-11). In the letter, Feuer expressed an intent to intervene, though he did not request such relief from the Court. (Am. Compl., Dkt. 23 ¶ 113). Plaintiffs argue that through this letter, Defendant Feuer voluntarily appeared before and sought affirmative relief from this Court, and so the Court has personal jurisdiction over him in the instant case. (Pls. Resp. Feuer Mot., Dkt. 59, at 11). That Feuer submitted this letter in a different action does not matter, Plaintiffs argue, because *Defense Distributed I* and this case "arise from the same general set of facts." (*Id.* at 12 n.3).

The Court finds the letter insufficient to establish personal jurisdiction over Feuer. First, Feuer neither "voluntary appeared" before nor sought "affirmative relief" from the Court, for purposes of jurisdiction,

_____

proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden,* 571 U.S. at 290.

45a

*Appendix B*

in *Defense Distributed I. See Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d 1147, 1149 (5th Cir. 1987) ("[T]he filing of a counter-claim, cross-claim, *or third-party demand* does not operate as a waiver of an objection to jurisdiction.") (emphasis added); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 86, 92 (D. Del. 2002) (letter in support of consolidation motion by other parties not sufficient "to constitute a waiver of a timely filed and actively pursued defense of lack of personal jurisdiction").

Second, Feuer neither chose to commence *Defense Distributed I* nor the instant action, and he has not "purposefully availed" himself of Texas's benefits and protections by participating in either case. *See Painewebber Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 460 (5th Cir. 2001) ("This is not a case in which the party seeking to avoid the court's jurisdiction has chosen to commence the action or a related action in the very forum in which it is contesting personal jurisdiction."); *Kennedy Ship & Repair, L.P. v. Loc Tran*, 256 F. Supp. 2d 678, 684 (S.D. Tex. 2003) ("unlike a case where a party merely files a cross-motion, a party purposefully avails itself of a state's benefits and protections when it is has previously 'chosen to commence the action or a related action in the very forum in which it is contesting personal jurisdiction'") (quoting *Painewebber*, 260 F.3d at 460); *Toshiba* 993 F. Supp. at 573 (no personal jurisdiction when a party did not bring a separate, original action, but rather a third-party action for indemnity).

Third, even if Defendant Feuer's letter constituted a voluntary appearance and affirmative request for relief in

46a

*Appendix B*

*Defense Distributed I*, that case is not sufficiently related to this one such that the letter provides the Court with a basis for exercising personal jurisdiction over Feuer here. *Defense Distributed I* involved the State Department's enforcement of ITAR and the national security and foreign policy interests furthered by those regulations, whereas here, Plaintiffs are attempting to stop the Defendant state officials from enforcing their respective states' laws in order to protect their states' interests.

Accordingly, the Court finds that Defendant Feuer's letter in *Defense Distributed I* is insufficient to support the Court's exercise of personal jurisdiction over him in this case.

\* \* \*

In sum, Plaintiffs have failed to establish that any Defendant to this action has minimum contacts with the State of Texas. Because minimum contacts are a prerequisite to the exercise of jurisdiction, *Walden*, 571 U.S. at 288, the Court concludes that it does not have personal jurisdiction over any Defendant.

## C. Jurisdictional Discovery

Finally, Plaintiffs argue that if the Court finds it lacks personal jurisdiction over the Defendants, then jurisdictional discovery is warranted to assess the relationship between the Defendants and the three gun control advocacy groups discussed above. (Pls. Resp. Grewal & Denn Mot. Dismiss, Dkt. 73, at 14). Plaintiffs'

47a

*Appendix B*

theory is that "one or more of the defendants" directed these groups to intervene in *Defense Distributed I*, and that the groups' contacts with Texas established in that case can be attributed to the defendants "for jurisdictional purposes" in this one. (*Id.*). Plaintiffs' theory is based on Defendant Grewal acknowledging "some kind of cooperation" with these groups in a public speech, and the fact that "representatives from each gun control group have . . . tout[ed] their relationship[s] with lawmakers." (*Id.* at 14 n.8).

"The district court . . . has broad discretion in all discovery matters." *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982). In particular, the district court's discretion to permit jurisdictional discovery on a motion to dismiss for lack of personal jurisdiction "will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Id.* Further, "[w]hen the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Id.*

Here, Plaintiffs have failed to plead sufficient facts to base personal jurisdiction on any relationship between Defendants and the three gun control advocacy groups. Plaintiffs wish to base the Defendants' minimum contacts on actions taken by these third parties, who are not parties to this action, who may or may not have any relationship with an unspecified number of the Defendants, whose supposed relationship with the Defendants is not alleged anywhere in Plaintiffs' amended complaint, and which relationship would have arisen, if at all, out of events relating to a separate legal dispute—*Defense Distributed*

48a

*Appendix B*

*I*—to which Defendants were not parties. The Court finds that the lack of personal jurisdiction over Defendants is clear, and that any discovery on the matter would be futile in light of the Court's finding that this case and *Defense Distributed I* are not sufficiently related for purposes of exercising personal jurisdiction. Accordingly, the Court will not grant Plaintiffs' request for jurisdictional discovery.

### III. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendant Michael Feuer's Motion to Dismiss, (Dkt. 50), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Andrew M. Cuomo's Motion to Dismiss, (Dkt. 55), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Gurbir S. Grewal and Matthew Denn's Motion to Dismiss, (Dkt. 57), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Thomas Wolf and Josh Shapiro's Motion to Dismiss, (Dkt. 75), is **GRANTED**.

**IT IS FURTHER ORDERED** that because the Court finds it does not have personal jurisdiction over Defendant Grewal, Plaintiffs' Motion for Preliminary Injunction, (Dkt. 67), is **DENIED**.

49a

*Appendix B*

**IT IS FINALLY ORDERED** that Plaintiffs' claims against all Defendants are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may pursue their claims in a court of proper jurisdiction.

**SIGNED** on January 30, 2019.

/s/ Robert Pitman_____
ROBERT PITMAN
UNITED STATES DISTRICT
JUDGE